Nancy Shinabargar
4604 Neil Road #119
Reno, NV 89502
(775) 827-1645
dclawpup@gmail.com
*Pro Se*



UNTIED STATES DISTRICT COURT
DISTRICT OF NEVADA

FIRST AMENDED COMPLAINT

Nancy Shinabargar,
Plaintiff *Pro Se*

CASE NO. *3:14-cv-00072*
FIRST AMENDED COMPLAINT

vs.

Board of Trustees of the University
    of the District of Columbia
Katherine S. Broderick, an Individual
Annamaria Steward, an Individual
Marc Strothers, an Individual
Larry Volz, an Individual
Thomas Mack, an Individual
Kemit Mawakana, aka
    Samuel Jefferson, an Individual
Karen Evans, an Individual
Angelyn Flowers, an Individual
Mohamed Taqi Tirmazi, an Individual
John/Jane Does I-X

Americans with Disabilities Act;
Rehabilitation Act of 1973;
Discriminatory Intent pursuant to
42 U.S.C. 12182;
Civil Rights pursuant to
42 U.S.C. 1983;
Breach of Written Contract;
Intentional Misrepresentation;
Fraudulent Inducement;
Defamation;
Declaratory Relief;
Injunctive Relief;
Demand for Trial by Jury

Plaintiff Nancy Shinabargar *pro se* complains of Defendants and alleges as

follows:

## I. Jurisdiction and Venue

1.  The Court has subject matter jurisdiction pursuant to 28

U.S.C. 1331 (federal question), 28 U.S.C. 1343 (a)(3) (deprivation of rights), 28 U.S.C.

1367 (supplemental jurisdiction), 42 U.S.C. 1983 (constitutional rights), 42 U.S.C.

12101 *et seq.*, and 29 U.S.C. 701 *et seq.*

2.      Venue is proper in this Court for the District of Nevada pursuant to 28

U.S.C. 1391(b) because a substantial portion of the events giving rise to Plaintiff's

claims, namely, all of Defendant University's contractual representations that

induced Plaintiff to move her domicile from Nevada to Washington, D.C., to enroll

for the 2011-2012 Academic Year at her ABA Law School while her husband

remained in Nevada working, were made to the Plaintiff in this Judicial District of

Nevada.

3.      Plaintiff is a resident of Reno, Nevada. On information and belief, it is

alleged that each of the named Defendants resides in the judicial districts of the

District of Columbia, Maryland, California or Virginia.

## II. Nature of the Case

4.      Plaintiff, a Nevada resident, was accepted to 12 ABA Law Schools in

2011.  Plaintiff chose the David A. Clarke School of Law at the University of the

District of Columbia (hereafter referred to as the "Law School") in Washington, D.C.

because the Law Faculty offered Plaintiff the Rosa Parks Scholarship for overcoming

adversity in her life and the D.C. Metro System offered help for Plaintiff's mobility

problems as a disabled person in managing her heavy, 80-85 pound daily Law

School book load.

5.      Plaintiff has a genetic spinal disorder called "OPLL," meaning

"Ossification of the Posterior Longitudinal Ligament," that was surgically treated by

a Nevada M.D. and Ph.D. in Neurosurgery in 2005 who replaced Plaintiff's ligaments

in her cervical spine with titanium rods, screws, a titanium plate and a bone graft.

Plaintiff disclosed her physical spinal disability on her Law School Applications

2

because it was material to Plaintiff's need for ADA "reasonable accommodation" from the Law School.  As a result of this physical disability, Plaintiff can only lift up to 12 pounds.  Plaintiff also suffers from lymphangioma in her left foot, parts of which were surgically amputated and reconstructed through plastic surgery twice as a child, which also affects Plaintiff's ability to lift heavy weight.

6.      Plaintiff was engaged in lawfully performing her Contracts, engaged in exercising her protected civil rights as a physically disabled person to seek ADA status and ADA "reasonable accommodation" codified under 42 U.S.C. 12101 *et seq.*, the Americans with Disabilities Act, under the Rehabilitation Act of 1973, codified under 29 U.S.C. 701 *et seq.*, and Plaintiff was engaged in activity protected under the United States Constitution and Defendants, at all times acting under color of State law, retaliated against her by imposing adverse action and retaliation upon Plaintiff that she herein complains.

7.      The University of the District of Columbia (hereafter referred to as Defendant University) is sued under the Board of Trustees of the University of the District of Columbia for retaliating against Plaintiff solely for Plaintiff exercising her civil right as a physically disabled person to seek ADA "status" and "reasonable accommodation" under 42 U.S.C. 12101 *et seq.* of the ADA, and under 29 U.S.C. 701 *et seq.*, the Rehabilitation Act of 1973, and under Title VII of the Civil Rights Act. Defendant University is also sued for Discriminatory Intent against Plaintiff under 42 U.S.C. 12182 (a) (1) (C) and (D) (ii), which bar Discriminatory Intent in placing unreasonable restrictions on participation in school activities and programs and in

the use of administrative methods.   Action is also brought against Defendant
University for Breach of Contract.

8.      Individual named Defendants are sued in their Individual capacity.  At
all times Individual named Defendants were acting under color of State law in
violating Plaintiff's protected constitutional right under the First Amendment to
Free Speech.  At all times Individual named Defendants were acting under color of
State law in violating Plaintiff's protected constitutional right under the Fifth
Amendment to Due Process of Law by wrongfully depriving Plaintiff of more than
$76,000 in her property and liberty interest in her ABA Education.  Action is also
brought against Individual named Defendants for tortious interference with
Plaintiff's Contracts and for Defamation.

### III. Parties

9.      The Board of Trustees of the University of the District of Columbia
operates a public university in Washington, D.C. that includes the David A. Clarke
School of Law (hereafter referred to as the "Law School").

10.      Katherine S. Broderick, Dean of the Law School, is sued as an
Individual.

11.      Karen Evans, Adjunct Professor of Law, is sued in the scope of her
employment with Jack H. Olender and Associates, P.C. of Washington, D.C.

12.      Annamaria Steward, Associate Dean of Students at the Law School, is
sued as an Individual.

13.      Kemit Mawakana, aka Samuel Jefferson, Professor of Contracts at the
Law School, is sued as an Individual.

4

14.     Thomas Mack, Professor of Torts at the Law School, is sued as an Individual.

15.     Angelyn Flowers, Professor of Criminal Law at the Law School and Director of Defendant University's M.S. in Homeland Security Studies, is sued as an Individual.

16.     Larry Volz, Director of Public Safety and Campus Police Chief at Defendant University, is sued as an Individual.

17.     Marc Strothers, Special Assistant to University President Sessions at Defendant University, is sued as an Individual.

18.     Mohamed Taqi Tirmazi, Visiting Assistant Professor of Social Work at Defendant University, is sued as an Individual.

19.     John/Jane Does I-X are included because Plaintiff will be filing in the next two weeks under seal a separate False Claims Act action under 31 U.S.C. 3729 against an entity transacting business in Nevada, serving the U.S. Attorney in this Judicial District and the U.S. Attorney in Washington, D.C., and these John/Jane Does I-X may relate back as Defendants to certain of Plaintiff's claims in this civil action. Plaintiff includes these John/Jane Does as Defendants in her Defamation Claim, Count 11.

## IV.  Statement of Facts

20.     By written contract, Plaintiff was required to report plagiarism to her Law School.  Plaintiff's actions of reporting plagiarism at all times from August 15, 2011 to March 2, 2012 lawfully comported with the Plaintiff's Honor Code Contract, upheld in Federal Court in 2008.   The DCSL-UDC Honor Code Contract states:

"I hereby pledge that I will abide by the DCSL-UDC
Honor system and the academic norms and standards
described therein and I will neither violate said norms,
nor be silent with regard to the violation of those norms
and standards if such violations come to my attention."

21.     Plagiarism is broadly defined in the DCSL-UDC Honor Code Contract,
and every student and faculty member in the Law School is required to perform due
diligence to exercise:  (1) honesty in crediting sources of ideas, information and
written work; (2) honesty in taking exams; (3) honesty in claiming credit for work
in a course; (4) honesty in documents; and (5) non-interference with the
educational process.

22.     Plaintiff made many credible reports about the plagiarism of Law
Faculty and Law Students on August 18, 2011, August 22, 2011, August 23, 2011,
October 10, 2011, October 13, 2011, October 17-21, 2011, January 16, 2012,
February 6, 2012, February 7, 2012 and February 8, 2012.  All of Plaintiff's reports
were polite and lawfully conducted and done to fulfill her contracts, and met the
criteria (1) through (5) stated above because they targeted significant acts of
plagiarism that materially and detrimentally affected the academic environment of
the Law School.

23.     Plaintiff's reports of plagiarism that were true and lawfully comported
with Plaintiff's DCSL-UDC Honor Code Contract were rejected without explanation
by Individual named Defendants who were also ABA Law School Deans or ABA Law
Faculty at Defendant University at all times.

24.     On February 8, 2012, Defendant Broderick, Defendant Steward and
deceased Academic Dean Richardson refused to accept anymore of Plaintiff's true

and valid reports of plagiarism.  The actions of Defendant Broderick and Defendant Steward were: (1) inconsistent with the DCSL-Honor Code Contract and any reasonable person's interpretation of its obligations on both parties, one who reports plagiarism and the other who receives the report; (2) inconsistent with ABA Standard 512, a new Complaint Process that the ABA's Council of the Section of Legal Education and Admissions to the Bar sent to the House of Delegates on June 11, 2011, and which was approved by the ABA for "immediate" implementation on August 8, 2011 for the 2011-2012 Academic Year, but that Defendant University and individual Defendants refused to implement for the 2011-2012 Academic Year.

25.     At approximately 8:45 a.m. on February 8, 2012, Defendant Broderick, Defendant Steward, and deceased Academic Dean Richardson in an arbitrary, capricious and irrational manner began suspension and deprivation proceedings against Plaintiff. On February 8, 2012 at 3 p.m., February 9, 2012 at 3:30 p.m., February 14, 2012 at 2:30 p.m., February 27, 2012 at 1:30 p.m. and March 2, 2012 at 2 p.m. Defendant University and all Individual named Defendants applied a standard of Due Process of Law to Plaintiff that all Defendants factually knew violated the University's own Due Process of Law Stipulation for Law Students because the University itself had made this stipulation to Federal Court in 2008.  Nevertheless, Defendant University and all Individual named Defendants deliberately applied this wrong standard of deprivation to Plaintiff, an ABA Law Student, thereby wrongfully deprived Plaintiff of over $76,000 in her property and liberty interest in her ABA Education without Due Process of Law under the Fifth Amendment.

26.     Here is how this wrongful deprivation occurred in less than a week.

27.    At 8:15 a.m. on February 8, 2012, Plaintiff was confronted by Defendant Steward who came with a University Campus Police Officer with a gun at her side in the basement hallway of the Law School.   Defendant Steward wanted to discuss plagiarism.   The confrontation was totally unprovoked by the Plaintiff, although Plaintiff had been warned by Defendant Evans, the Plaintiff's Lawyering Process Instructor, only thirty-six hours earlier, at 6 p.m. on February 6, 2012, of some impending catastrophic action by the Law School if the Plaintiff did not stop making plagiarism reports, even though true and valid.   Defendant Evans at the close of class at 6 p.m. on February 6, 2012 had told Plaintiff that if Plaintiff did not stop reporting plagiarism, and in particular, Defendant Mack's 27-page plagiarism of his official Torts I Outline, which he had placed on the Law School's official website, then Plaintiff was going to get the "surprise of her life," or words to that effect.

28.    Defendant Evans, an Associate with Jack H. Olender, P.C., worked in the area of medical malpractice involving spinal cord issues.  Plaintiff had talked with Defendant Evans about helping Plaintiff obtain ADA status and ADA "reasonable accommodation" because deceased Academic Dean Richardson had told Plaintiff that she would no longer help Plaintiff obtain ADA "reasonable accommodation" after Plaintiff made her first plagiarism report about Defendant Mack to her on October 10, 2011.

29.    Defendant Evans was also an R.N. who knew as a licensed medical professional the medical issues that were involved in Plaintiff's spinal disability. Defendant Evans knew that Plaintiff's condition needed immediate ADA "reasonable

accommodation" by the Law School or that Plaintiff could injure herself lifting her huge 80-85 pound Law Book load every day.

30.     Plaintiff did not know at that time that Defendant Mack was a personal friend of Mr. Olender, nor did Plaintiff know then that Mr. Olender was a major financial contributor to the Law School, as well as Defendant Evans' employer. Mr. Olender's office was a block from the White House on 17th Street, N.W. Defendant Evans had taken Plaintiff and others there to see her office.  Mr. Olender had won over $150 million in damages as a Medical Malpractice Attorney specializing in spinal cord issues.

31.     At 8:15 a.m. on February 8, 2012, when Defendant Steward came accompanied by a University Campus Policeman with a gun, the situation looked unusual to Plaintiff.  Plaintiff was a long-time academic and former New Testament scholar who knew six languages from U.C. Berkeley, the Jesuit School of Theology at Berkeley, and Harvard University Divinity School.  Defendant Steward had come with armed support by the University Campus Police to respond to Plaintiff's email of January 16, 2012.  Plaintiff had also mentioned the possible plagiarism by a Law Student whose family knew Defendant Broderick personally to Defendant Steward the day before, on February 7, 2012.  The Law Student appeared to be reading someone else's briefs verbatim in a law class to the professor and claiming the work as his/her own.

32.     Defendant Steward took Plaintiff out of her Civil Procedure Classroom involuntarily.  Defendant Steward stood less than a foot away, addressed the latter matter first, and said to the Plaintiff in the Hallway: "I studied like that too."

Plaintiff, who had been a College Instructor for over ten years, replied from memory to Defendant Steward, "If you used the words, thoughts and ideas of others without attribution on you exams or in-class answers to the professor that you claim as your own, then yes, you committed plagiarism."

33.     Defendant Steward gasped, turned around and left with the University Police Officer and his gun.  Defendant Steward: (1) never denied to Plaintiff that the Law Student had plagiarized (2) never denied to Plaintiff that Defendant Mack had plagiarized his entire 27-page Torts I Outline from a Law Student; (3) never denied to Plaintiff that 1L Law Students including Plaintiff were forced to memorize its plagiarized definitions; (4) never denied to Plaintiff that according to 3L Law Students, the problem had begun in 2009, when they had been forced to do the same thing, and the Law School had not yet addressed the issue; (5) refused to report or investigate the matter further, in direct violation of the DCSL-Honor Code and ABA Standard 512.

34.     Plaintiff thought that Defendant Steward would eventually realize that Defendant Mack had plagiarized.  Plaintiff thought that under the Plaintiff's DCSL-UDC Honor Code Contract, which by reference to the Academic Code required Law Students to report the plagiarism of Law Faculty, Defendant Steward, Defendant Broderick and deceased Academic Dean Richardson would take the appropriate action against Defendant Mack in a rational and legal manner to correct the problem.

35.     Plaintiff was wrong.

36.     At 3 p.m. on February 8, 2012, a little over six hour later, Plaintiff was served with suspension papers that Defendant Steward had Defendant University send to the Plaintiff by email.   No significant events had intervened between 8:15 a.m. and 3 p.m. on February 8, 2012 that could possibly have caused Plaintiff to be sent suspension papers.  Plaintiff had simply gone to class, had lunch, and then had looked into working as a legal intern for the U.S. Bureau of Prisons or for the U.S. Attorney in Washington, D.C., Northern Virginia or Nevada.

37.     Plaintiff's suspension letter was from the University, and not the Law School.  Plaintiff, an excellent law student, knew right away that this might involve two different rules of procedure being applied to her, and two different standards of due process.   Defendant University's official Deprivation Letter was attached by PDF to the email.   It contained no evidence on which Plaintiff's deprivation hearing at 12 p.m. on February 14, 2012 was to be based:  no statement, no text message, no video, nothing.   Nor did Defendant University's official letter of deprivation contain any factually based charges or factual allegations against Plaintiff that specified any time, place, manner date or person who saw or alleged that Plaintiff had violated any rule of the University or the Law School.  Nor did Defendant University's official letter of deprivation describe the procedure to be used on Plaintiff.

38.     Nor did the words in Defendant University's official Deprivation Letter even rise to the level of "bald-faced assertions" or "baseless allegations" against Plaintiff, let alone, official "charges."  The letter simply associated vague terms with Plaintiff's name that sounded to Plaintiff more like some of the derogatory taunts and slurs against Plaintiff as a disabled person that had been

hurled at Plaintiff at the Law School for the past two months rather than anything that could remotely be called a fact-based allegation or a charge.

39.     Defendant University and its Law School had two sets of rules for conduct matters.  One set contained the Law School's rules that were stipulated to the Court in 2008 under the direction of Defendant University's Attorneys that outlined a standard for a deprivation involving a Law Student (called hereafter the 2008 Federal Court Due Process Stipulation) that was consistent with Due Process of Law under the Fifth Amendment and of which the Court approved.  The other set were more akin to cafeteria "food-fight" rules that had been personally authored by President Alan Sessions in 2009.

40.     The Court found the Law School's 2008 Federal Court Due Process Stipulation that Defendant University's Attorneys had directed the Law School to make to the Court provided enough Due Process under the Fifth Amendment by means of its four-part procedure for Defendant University to permit its use at the Law School to conduct a suspension hearing that was also a *de facto* deprivation and a financial taking of a Law Student's property and liberty interest in his or her ABA legal education.

41.     The four-part process includes a hearing attended by Law Faculty and mandated that a Law Student be given:  (1) charges with written evidence before the hearing; (2) a fact-finding process addressing factually-based evidence including a time, place, manner and date; (3) time to respond and offer facts and witnesses to the contrary; (4) a substantial three-page decision giving the conclusions reached and the reasons for those conclusions based on the fact-finding process.

42.    Defendant University's cafeteria "food-fight" rules had been personally written by President Alan Sessions in 2009 and offered no "due process" in a legal sense at all.   They were arbitrary, capricious and irrational by definition. No terms in any of the rules were keyed to any recognized legal code, such as even a K-12 Board of Education Code, let alone a State or Federal Code.   President Sessions reserved the right to define all terms and definitions himself, or to appoint one of his subordinates to it, such as Defendant Strothers, who could then apply his own definitions if he preferred to do so.  Defendant Sessions or his assistants could even define words independently of the dictionary meaning of any word, and Defendant Sessions could change his definitions over time, at will, with no record kept.

43.    As a Law Student in good standing on February 8, 2012, Plaintiff clearly fell under the former process with its expanded grasp of procedural Due Process Rights as stipulated to Federal Court in 2008.   Defendant University and Defendants Steward and Broderick, and deceased Academic Dean Richardson factually knew this as ABA Law School Deans because deceased Academic Dean Richardson was the Academic Dean of the Law School and Defendant Broderick was Dean of the Law School when this stipulation to Federal Court was made by a member of Defendant Broderick's Law Faculty with the approval of deceased Academic Dean Richardson and under the supervision of Defendant University's Attorneys in 2008.

44.    Nor did Defendant University's Attorneys who directed the 2008 Federal Court Due Process Stipulation ever mention to the Court any circumstances under which a Law Student might be suspended and deprived of his or her property

13

and liberty interest in an ABA Education at the Law School by an application of

Defendant University's "food-fight" rules.   These "food-fight" rules were designed to

stop cafeteria food fights, and they were so arbitrarily, capriciously and irrationally

articulated and enforced that Defendant University's Attorneys had not even dared

to mention them to a Federal Judge as affording even a scintilla of Due Process of

Law.  Nor did Defendant Broderick and Defendant Steward, nor deceased Academic

Dean Richardson, ever mention Defendant University's "food-fight" rules as playing

any role in Law School disciplinary procedures, either in academic or in conduct

matters at the Law School, to the Court in 2008.

45.     Therefore, when Defendant Broderick and Defendant Steward, and

deceased Academic Dean Richardson at 3 p.m. on February 8, 2012, at 8:30 a.m. on

February 9, 2012, at 10:30 a.m. February 9, 2012 p.m., at 3:30 pm. on February 9,

2012, at 2:30 p.m. on February 14, 2012, at 2 p.m. on February 27, 2012 and at 1:30

p.m. on March 2, 2012 deliberately switched the rules of procedure on the Plaintiff

as the procedural basis for her more than $76,000 deprivation, and subjected

Plaintiff to "food fight" rules rather than to the 2008 Federal Court Due Process

Stipulation, Defendant University and Individual named Defendants wrongfully

deprived Plaintiff of over $76,000 in her legal education.

46.     Defendant University, which ran the February 14, 2012 deprivation

hearing, factually knew that Plaintiff was being wrongfully deprived of over $76,000

in her property and liberty interest in her legal education property rights without

Due Process of Law under the Fifth Amendment by the use of the wrong rules.

Defendant University knew that in subjecting Plaintiff to cafeteria "food fight" rules

that Plaintiff was being denied the same protections for Due Process of Law that the
Court had required Defendant University to give to all Law Students at the Law
School in any suspension hearing that was also a *de facto* deprivation under the
2008 Federal Court Due Process Stipulation.

47.    Plaintiff contested the rules at the time.  Plaintiff also denied all of the
terms and all of the contents of the University's official letter of deprivation of
February 8, 2012 that ascribed any wrongdoing by Plaintiff at all times from
February 8, 2012 at 3 p.m. to March 2, 2012 and thereafter as categorically false,
baseless and without merit.

48.    Plaintiff thought on February 8, 2012 that the rules Defendant
Steward gave to Plaintiff must be the wrong rules to apply to Plaintiff, but when
Plaintiff, an excellent law student, earning A- and B- grades, raised that issue and the
issue of why she was even being suspended in the first place with Defendant
Steward at 8:30 a.m. and 10:30 a.m. on February 9, 2012, and denied that there was
any truth to what was being ascribed to Plaintiff, Defendant Steward replied to
Plaintiff, in contradiction to Defendant Steward's actual factual knowledge, that
these were the "only" rules used for Law School suspensions such as Plaintiff's.

49.    Nor did Defendant Steward comply with even the minimal demands of
the 2008 Federal Court Due Process Stipulation and allow the Plaintiff even one
Law Faculty Witness to observe the deprivation.   Defendant Steward was obligated
to keep a list of Law Faculty Witnesses for Plaintiff at the upcoming deprivation of
her $76,000 in property.  Instead, at 8:30 a.m. on February 9, 2012, Defendant
Steward told Plaintiff that Plaintiff must find a Law Faculty Witness herself.

50.     Plaintiff repeatedly sought but was denied any Law Faculty Witness for the next two hours.  After Plaintiff personally had contacted Law Faculty to serve as a Law Faculty Witness but they refused, Plaintiff went back to Defendant Steward at 10:30 a.m. on February 9, 2012 and told Defendant Steward that.  Defendant Steward told Plaintiff to "keep trying," but took no action herself as Dean of Students, although Defendant Steward knew a Law Faculty Witness was a required part of the process and having one on the list was part of her job description as the ABA Dean of Students, and Defendant Steward factually knew that Plaintiff had only been given two working days to prepare her Defense to the University.

51.     Here is a typical Law Faculty response to Plaintiff at this time as Plaintiff sought a Law Faculty Witness.  Plaintiff emailed her Contracts I Professor, Defendant Mawakana, asking him to serve as a Law Faculty Witness.  Defendant Mawakana, active in Law School governance, factually knew that Plaintiff was being subjected to the wrong disciplinary process.   Nevertheless, Defendant Mawakana sent this email in reply to Plaintiff's request, knowing that Plaintiff was physically disabled and had to make her Defense in less than two working days:

52.     "Have a nice life, Nancy."

53.     Of course, Defendant Mawakana never disclosed to Defendant Steward that Plaintiff had caught Defendant Mawakana plagiarizing an assignment that he gave to his 1L Contracts I Class on the very first day of her Contracts I Course on August 22, 2011.  Plaintiff mentioned this in confidence to deceased Academic Dean Richardson on or about the first week of classes, on or about August 23 or August 24, 2011.  Deceased Academic Dean Richardson refused to investigate it.

16

Plaintiff told deceased Academic Dean Richardson that she recognized the source behind Defendant Mawakana's act of plagiarism and described it for her.

54.     It appeared to Plaintiff that Defendant Mawakana was retaliating against the Plaintiff by refusing to be a Law Faculty witness for her and impeding her Defense solely because Plaintiff had exercised her right to Free Speech under the First Amendment to report Defendant Mawakana's act of Law Faculty plagiarism on August 22, 2011 to deceased Academic Dean Richardson.

55.     As Plaintiff again returned to Defendant Steward at 10:30 a.m. on February 9, 2012 to report no Law Faculty was available on such short notice, Plaintiff again asked Defendant Steward if this process was the correct one.  Plaintiff was concerned about her Due Process rights as a Law Student.  Defendant Steward said it was.  Defendant Steward also refused to extend the time deadline when asked.

56.     As a result, under such short notice, no Law Faculty came to Plaintiff's February 14, 2012 Deprivation Hearing, or any later Deprivation Hearings, to observe the wrong set of rules being applied to Plaintiff.

57.     The following is a summary of Defendant University's disciplinary process to which Plaintiff was wrongly and deliberately subject by all Individual named Defendants on February 14, 2012, February 27, 2012 and March 2, 2012 showing that nothing even remotely resembling the 2008 Federal Court Due Process Stipulation standard of Due Process of Law under the Fifth Amendment was applied to Plaintiff: (1) Plaintiff was never given any evidence or any factually-based allegation to dispute, not even one sentence as simple as "Professor X says Plaintiff

performed Act Y at 4 p.m. on January 31, 2012 in the Second Floor Hallway by the Restroom;" (2) there was no fact-finding process of any kind because there were no factually-based allegations; (3) Plaintiff was denied the right to call any witness or introduce any evidence to the contrary; (4) the letter sent to Plaintiff by Defendant Strothers summarized no wrongdoing by Plaintiff such as, "The University says that on February 1, 2012, You did X to Faculty Member W.  And X is a violation of Rule Y. So you will be deprived of $76,000."

58.     About two hours later at 12:30 p.m. on February 9, 2012, Plaintiff had lunch with some Law Students at the Law School.  Plaintiff expressed the thought to classmates that she might even try to get an Injunction from Federal Court, because she had earned an A- in Civil Procedure, to stop the suspension.   Plaintiff was an A- and B- student in Law School and confident of her legal abilities.  Both procedurally and substantively, the suspension was ludicrous and retaliated against the Plaintiff as a disabled person, Plaintiff said publically.

59.     After lunch, about 12:50 p.m. Plaintiff walked less than 30 feet to the office of her Criminal Law and Criminal Procedure Professor, Senior Chief Justice William "Bill" Pryor of the District of Columbia Court of Appeals.  Judge Pryor, as Law Students referred to him, was the top judicial officer in the District.  Judge Pryor had graciously given Plaintiff earlier in the week his personal, brand new, "examination only" copy of a new supplement book from the *Sum and Substance Series* by Westlaw, called "*Quick Review: Criminal Procedure,*" by Leslie W. Abramson of Loyola Marymount University Law School in Los Angeles, California.  Plaintiff wanted to thank Judge Pryor and give the book back to him in a timely manner so

that she and other 1L students could purchase it as an approved supplement for their Criminal Procedure class with Judge Pryor.

60.     Plaintiff had gone to the Oscar Ortega-Hernandez preliminary hearing for Judge Pryor after Mr. Ortega-Hernandez's attempted assassination using a Cugir 7 mm rifle at the White House on November 11, 2011.  Judge Pryor was writing the D.C. Court of Appeals Opinion on the Gordy case, another attempted assassination on 2nd Street N.E. at the U.S. Supreme Court of Chief Justice John Roberts with a sawed-off shotgun.   Both cases involved competency issues.  Judge Pryor had taken all interested students—about 30 of 90—from his 1L Criminal Law Class, including Plaintiff, to see himself as the Presiding Judge of the three-member Appellate Court at a Gordy hearing in October 2011.

61.     Gregg Maisel and David Bos, both of whom Plaintiff met at Mr. Ortega-Hernandez's preliminary hearings in Federal Court in December 2011, were working to insure that Mr. Ortega-Hernandez did not become another *pro se* Defendant who mentally deteriorated in custody, as Gordy had in 2006.  Gordy appealed his conviction because the Assistant U.S. Attorney had forgotten to give Gordy a competency exam before his Preliminary Hearing.  Judge Pryor was interested in this.   Mr. Maisel even hand-corrected his phone number on his business card for Plaintiff at Court.  The cards of Mr. Maisel and Mr. Bos are attached as Exhibit A, to show Plaintiff came to Mr. Ortega-Hernandez's preliminary hearing and met the Federal Public Defender of Mr. Ortega-Hernandez and the Chief of the National Security Section of the U.S. Department of Justice as a law student for Judge Pryor as he worked on writing the Gordy Opinion.

62.     As Plaintiff sat outside Judge Pryor's office about 12:56 p.m. on

February 9, 2012, waiting to thank him, Dean Steward suddenly appeared in the

hallway of the Third Floor with five UDC PD in tow, with guns and handcuffs.

Plaintiff was not sure what Defendant Steward had planned.

63.     Suddenly, under Defendant Steward's direction, Plaintiff was placed in

a Third Floor Conference Room of the Law School at gunpoint.   Two alleged "U.S.

Secret Service Uniformed Division Officers" came and told Plaintiff that two alleged

"U.S. Secret Service Agents" would arrive shortly.   At 1:10 p.m., a middle-aged man

and woman dressed in business attire arrived.   Both showed Plaintiff false Federal

Law Enforcement identification with no DHS-approved Photo ID.   Plaintiff thought

this was some kind of disability slur stunt by Defendant Steward, similar to the one

that several Law Students had performed on the Third Floor of the Law School, a

few feet away, in December 2011.   But due to the University Campus Police Officer

with a gun at the door, Plaintiff was not free to leave the Conference Room and just

walk away, as she had done in December 2011 from that violent disability slur stunt.

64.     At gunpoint, Plaintiff was physically searched without any warrant or

probable cause by the alleged female "U.S. Secret Service Agent."   Plaintiff was then

interrogated about her life for over two hours, beginning with her adoption, going

on to her Mother's near fatal car accident where Plaintiff's Mother had been hit by a

drunk driver in a crosswalk in Glendale, CA, when Plaintiff was a child, going on to

her Jesuit Seminary years, reciting the many Jesuit and Dominican seminarians

whom Plaintiff knew as friends who had died of AIDS.   Then the alleged "Agents"

started asking questions about Plaintiff's politics and about "assassinations."

65. At this point, Plaintiff knew this "interrogation" had to be some kind of disability slur stunt, like the earlier disability slur stunt against her in December 2011 on the Third Floor of the Law School, because Plaintiff knew that the real U.S. Secret Service knew Judge Pryor intimately—and had for the previous 25 years. Judge Pryor had been John Hinckley's Judge, who was the near-assassin of President Reagan in 1981.   The Hinckley case was where Judge Pryor had derived his legal expertise in competency cases that he was now applying to his Gordy Opinion.

66.      Plaintiff, with the gun at the door, politely explained to the so-called "Agents" why she had gone to Mr. Ortega-Hernandez's preliminary hearings for Judge Pryor, how the three cases legally interrelated, and how Judge Pryor had even put these cases on the list of possible final exam topics because he had taken his Criminal Law Class to a D.C. Court of Appeals hearing on Gordy.

67.      Defendant Mawakana actually saw this interrogation of Plaintiff in progress, because Defendant Mawakana's office was only 10 to 12 feet away from the Conference Room and he walked by at least twice.  However, Defendant Mawakana refused to come in and help Plaintiff stop the fake interrogation, or call any other Law Faculty to come to Plaintiff's defense.   At 3:20 p.m., Plaintiff involuntarily, at gunpoint, had to sign over all of her medical, legal, financial and education records to these two alleged "U.S. Secret Service Agents" for Defendant Steward as a condition of leaving.   Plaintiff protested it, but had no option in the face of UDC PD's gun.

68.      At 3:30 p.m. on February 9, 2012, Plaintiff walked with her Handicapped Cart to the Law Library wondering what Defendant Steward thought

to gain by this disability slur stunt.   Defendant Volz suddenly and unexpectedly sent five University Campus Police with guns to the Plaintiff on second floor of the Law School while Plaintiff walked with her Handicapped Cart to the Law Library.    The UDC PD pushed Plaintiff against the wall until Plaintiff fell to the ground.

69.    While Plaintiff was on the ground, Defendant Strothers thrust a new, February 9, 2012 Deprivation Letter from Defendant University at Plaintiff in which Defendant Strothers reiterated the contents of the February 8, 2012 Deprivation Letter.  Plaintiff had never met Defendant Strothers before.  Defendant Strothers called Plaintiff a "terrorist," and demanded that Plaintiff read the new letter. Plaintiff, lying on the ground, read Defendant University's official, new "immediate" Deprivation Letter.

70.    Defendant Strothers' new letter of February 9, 2012 at 3:30 p.m. contained the same name-calling, derogatory terms and slurs on Plaintiff's disability as the February 8, 2012 PDF Deprivation Letter: (1) Defendant Strothers stated his personal belief that Plaintiff was "disorderly" and a "terrorist "and that she was "immediately" suspended; (2) the letter omitted all evidence and there was not a single factually-based allegation, just like the PDF letter of February 8, 2012; (3) the letter was not signed by any licensed medical, legal or law enforcement professional stating that there was any necessity for this action of immediate suspension. Plaintiff observed that Law School and the University were functioning normally at 3:30 p.m. on February 9, 2012, and students and professors were going in and out of classes.  Therefore, there was no exigency that prevented a pre-deprivation hearing

from having been held before this "immediate" suspension of the Plaintiff by the Law School.

71.     Plaintiff told Defendant Strothers at the time that his and the University's new letter of February 9, 2012, like the old letter of February 8, 2012, and its contents were false and defamatory, and she denied she had done anything wrong

72.     At 12 p.m. on February 14, 2012, at Plaintiff's Deprivation Hearing for more than $76,000, Plaintiff was provided not one of the four protections outlined in the Federal Court 2008 Due Process Stipulation by the University itself.  There was:  (1) no evidence or a list of witnesses were provided at the deprivation hearing, before it or during it; (2) no fact-finding process based on any factually-based allegation or witness statement occurred to determine what was true as opposed to what was false; (3) Plaintiff was not allowed to respond with her own facts and witnesses; (4) there was no summary of any violation Plaintiff had committed as the basis for a deprivation of over $76,000 after the hearing.

73.     Plaintiff had been the object of slurs and derogatory acts and comments by Law Students before at the Law School based on her disabilities.  Even when ABA Law Deans or Professors had been eyewitnesses to some of the slurs aimed at Plaintiff as a disabled person, the Law Faculty had done nothing and refused to report these discriminatory acts to the Law School or to the University during the Fall 2011 Semester and into the first week of the Spring 2012 Semester.

74.     The University's two official Deprivation Notices of February 8, 2012 and February 9, 2012 to Plaintiff contained the same type of derogatory disability

slurs on Plaintiff's spinal disability that a handful of Law Students had hurled at

Plaintiff the prior two months.   However, in Defendant University's two official

deprivation letters, the prior disability taunts and slurs against Plaintiff's disability

were now turned around 180 degrees and falsely stated to be Plaintiff's acts, when,

in fact, they described disability slurs, derogatory disability stunts and derogatory

disability gestures that a handful of Law Students had aimed at Plaintiff as a

disabled person because they did not like Plaintiff's spinal disability.

75.    For example, one basis for Plaintiff's deprivation in the University's

letter was that Plaintiff was "disorderly."  This was nothing more than a slur on

Plaintiff's disability because Plaintiff, due to assigned seating, could not sit on the

edge of the classroom and was forced to walk into the middle of many classes with

her Handicapped Book Cart by the Law School.  This bothered some Law Students if

the Cart even gently and accidently brushed against their own belongings.  Plaintiff

did not want to sit in the middle of the class and had asked for ADA "reasonable

accommodation," but Plaintiff was forced to sit in the middle of the classroom by

Defendant Broderick and deceased Academic Dean Richardson despite Plaintiff's

80-85 pound Law Book load and despite her requests for ADA "reasonable

accommodation" to sit on the edge of the class.  Plaintiff never once came late to

class, but always at least 15 to 30 minutes early, but nevertheless, there were

always some students in the rows whom Plaintiff had to pass to reach her own seat.

76.    A second basis for Plaintiff being suspended was "disturbing the

peace."  This was merely a slur for Plaintiff's disability because Plaintiff had

accidently once at the start of the Spring 2012 Semester dropped her coffee cup on

the floor of a classroom.  A 1L classmate screamed at Plaintiff over and over calling her stupid, and asking how long the class had to put up with this.  Plaintiff was amazed but profusely apologized to the Law Student.

77.    Plaintiff politely explained to the Law Student that Plaintiff had altered sensation of grasp in her left hand as a result of her Anterior Cervical Discectomy with Fusion (ACDF) operation in 2005 and did not have sensation in parts of her left hand, so when Plaintiff reached for her coffee cup, she did not feel the cup.  Plaintiff as a result of this was forced to change her seat to a back row seat because the Law Student would no longer tolerate Plaintiff sitting next to her.  So the whole event turned into a slur too.

78.    A third basis for Plaintiff's deprivation was a vague term of "menacing."  Plaintiff believed this referred to an event in December 2011.  About two months before Plaintiff's Deprivation Hearing, Dean Vivian Canty and Dean Duane Thomas of the Law School had actually been eyewitnesses to a violent stunt of disability slurring against Plaintiff in December 2011 on the Third Floor of the Law School during a faculty meeting.   These two Deans heard and saw a group of female Law Students shouting at the Plaintiff, while Plaintiff was just walking through the hallway with her Handicapped Book Cart.  The female Law Students exploded out of the elevator, saw Plaintiff, and started throwing books at Plaintiff while shouting over and over, "Old White Thing Why are you here?"   Neither Dean Canty nor Dean Thomas, 20 feet away, ever took any action.  Plaintiff never knew why this happened—either the disability slurs or the lack of a report about it by Deans Canty and Dean Thomas to Defendant Broderick.

79.     A fourth basis for Plaintiff's deprivation was that Plaintiff was a "terrorist."  Plaintiff thought the "terrorist" charge was based on the actions of another Law Student and not the Plaintiff, who allegedly thought Plaintiff's spinal disease was contagious, and used to make the Sign of the Cross whenever Plaintiff came into the classroom.   There was no religious reason for such a gesture in a secular, public university so therefore this gesture was just a disability slur to Plaintiff under another name.   This Law Student used to do this nearly every class meeting, and do it only when Plaintiff would walk in the door.  Defendant Mawakana saw the gesture and, being from a Jesuit University, knew what it meant and knew it was inappropriate and a disability slur at Plaintiff, but Defendant Mawakana did nothing.

80.     At 12 p.m. on February 14, 2012 at Plaintiff's deprivation hearing, Plaintiff denied all of the terms and contents ascribing wrongdoing to her in the University's official notices of deprivation on February 8, 2012 and February 9, 2012, and Plaintiff has continued at all times from February 8, 2012 at 3 p.m. to March 2, 2012 to the present to deny these ascriptions of wrongdoing by her as categorically false, baseless, defamatory and without merit.   However, Defendants Strothers and Tirmazi refused to allow Plaintiff to discuss the four incidents just narrated at Plaintiff's February 14, 2012 deprivation hearing in her Defense. Plaintiff was not allowed even to state that she had been the victim of disability slurs or disability stunts for the past two months. Under the University's cafeteria "food fight" rules, witnesses would only come voluntarily and Plaintiff had no power to compel them to come.  Nor was Plaintiff allowed to state or show that two ABA Law

Deans, Dean Canty and Dean Thomas, had witnessed the most violent anti-disability stunt against Plaintiff in December 2011, but had refused to report it and had refused to come to Plaintiff's February 14, 2012 deprivation hearing.

81.     Additionally, Plaintiff was even prevented from bringing her Handicapped Book Cart into the hearing at all, to demonstrate how it might have irrationally bothered some Law Students.   Plaintiff wanted to bring her Handicapped Book Cart because of the prior irrational reaction to it by some Law Students.  However, when Plaintiff asked Defendant Volz for permission to do that, Plaintiff got the same irrational reaction from Defendant Volz to it.

82.     Plaintiff had told Defendant Volz that Plaintiff believed that many of the terms in the University's official notices of deprivation slurred Plaintiff for her physical disability and did not even rise to the level of bald-faced assertions, let alone actual fact-based allegations and Plaintiff wanted to bring the Handicapped Book Cart to show it was normal accommodation for disability.  Defendant Volz refused and called Plaintiff's Handicapped Book Cart a "threat" to the University. Plaintiff was dumfounded.  It was just like the reaction of some Law Students.  Nor would Defendant Volz allow the Plaintiff to produce a fax from Plaintiff's Neurosurgeon in Reno, Nevada for the February 14, 2012 deprivation stating that it was not a "threat." Defendant Volz, with 30 years of Law Enforcement experience, clearly knew that the Plaintiff's Handicapped Book Cart was very similar to ones commonly used by law office legal assistants to move heavy boxes of Court cases from their car to Court and it was not a threat.  It was a book cart.

83.     At 12 p.m. on February 14, 2012, Defendant Strothers conducted the hearing using a man named Mohamed Taqi Tirmazi in the triple roles of prosecutor, witness and judge.  Plaintiff had never met Defendant Tirmazi before. Defendant Tirmazi spent two-and-one-half hours repeating the derogatory disability terms and disability slurs from Defendant University's official letters of February 8, 2012 and February 9, 2012 that had targeted Plaintiff's physical disability.  Defendant Tirmazi again called Plaintiff "disorderly" at the Law School and asked her to explain it, and again called Plaintiff a "terrorist," and asked about her "terroristic" acts.  Plaintiff again took these words as a slur on her physical disability because it was her Handicapped Book Cart with her 80-85 pounds of books each day that had caused irrational reactions when the Law School would not reasonably accommodate Plaintiff's physical disability to stop them.  However, Plaintiff was not allowed to know what any of the evidence against her was, was not allowed to introduce any evidence of her own, was not allowed to call any witness, nor did Plaintiff ever learn at the deprivation hearing on February 14, 2012 what Defendant University's official charges of what rules Plaintiff had violated actually were.

84.     Defendant Tirmazi:  (1) never identified his role at the deprivation hearing nor did he ever identify himself by first and/or last name to Plaintiff; (2) never identified his Academic position or Department at the University to Plaintiff; (3) never identified his academic degree to Plaintiff or if he had any professional license that gave him any expertise in any field to be judge, witness and prosecutor at the same time; (4) misrepresented to Plaintiff that he was from the University of Montana, a law school to which Plaintiff was interested in transferring for the 2012-

2013 Academic Year and with whom the Plaintiff had corresponded by email before her Deprivation Notices on February 8 and 9, 2012.

85.      Defendant Tirmazi failed to recuse himself from Plaintiff's deprivation due to conflict of interest despite the fact, Plaintiff learned later, that Defendant Tirmazi's own job as a Visiting Assistant Professor at Defendant University was contingent on the approval of three colleagues in the same Academic Department who held "doctorates" from institutions that under U.S. Department of Education guidelines are considered to be "diploma mills" and hence under these U.S. Department of Education guidelines they were academic cheats similar to Defendant Mack.

86.      Nor did Defendant Tirmazi reveal that one of his colleagues with a "diploma mill" doctorate was Defendant Flowers who herself taught Criminal Law at the Law School.  Nor did Defendant Tirmazi reveal whether or not Defendant Flowers used the "diploma mill" doctorate to obtain a $2.9 million FEMA Federal Grant in 2007, or perhaps, as Washington, D.C. area media speculated later in 2012, an increase in salary at Defendant University in her role as Chair of Defendant University's M.S. Program in Homeland Security Studies.  Any use of a "diploma mill" doctorate to obtain a financial benefit from the Federal Government to which one is otherwise not legally entitled is a violation of 18 U.S.C. 666, the Honest Fraud Services Statute, but to Plaintiff's knowledge, Defendant Volz never addressed this issue with anyone from Federal Law Enforcement.

87.      Nor would Defendant Strothers or Defendant Tirmazi allow Plaintiff to call the U.S. Secret Service Office on "L" Street by cell phone to explain that the so-

called U.S. Secret Service "interrogation" of Plaintiff from 12:56 to 3:20 p.m. on February 9, 2012 was actually a disability slur stunt, done under the direction of Defendant Steward and done, in Plaintiff's opinion, to try and scare Plaintiff out of the Law School before she could exhaust her administrative appeals of her suspension for any future lawsuit.

88.     Plaintiff had gone to the U.S. Secret Service "L" Street Office on February 13, 2012, the day before her suspension, where the Duty Agent had graciously searched all of the U. S. Secret Service's official computerized logs for February 9, 2012 for Washington, D.C. and told Plaintiff that no Officers or Agents had come to the Law School on that date from any Washington, D.C. office, and that the event was a "sick joke" by Plaintiff's Law School.

89.  Plaintiff discovered after filing her lawsuit on February 4, 2014 that Defendant Steward is a Governor of the District of Columbia Bar Board of Governors, and that Defendant Steward was in the position of public trust as a Governor of the D.C. Bar at the time of her outrageous behavior to Plaintiff on February 9, 2012. As a result, Plaintiff made a Bar Counsel Complaint against Defendant Steward to the D.C. Bar Office of Professional Responsibility on February 26, 2014. The Bar Complaint is attached as Exhibit B.

90.     Plaintiff also attaches the 27-page report she made about the February 9, 2012 disability slur stunt to the U.S. Department of Education asking for an investigation of the incident by the U.S. D.O.E. on September 4, 2013 as a Hate Crime under 18 U.S.C. 249.   The report is attached as Exhibit C.

91.     Plaintiff also attaches four letters from the U.S. Secret Service in response to FOIA requests by Plaintiff and Plaintiff's husband starting in January 2013 seeking a clarification of the February 9, 2012 "Nancy Shinabargar interrogation."  Plaintiff will be able to subpoena this exculpatory material by the U.S. Secret Service in Discovery.   The letters are attached as exhibit D.

92.     These were the circumstances under which, at 2:30 p.m. on February 14, 2012, Defendant University wrongfully deprived Plaintiff of over $76,000 in Plaintiff's property and liberty interest in her ABA Education in violation of the Plaintiff's protected right to Due Process of Law under the Fifth Amendment. Defendant University's official Deprivation Letter sent by Defendant Strothers gave Plaintiff no reasons for her deprivation, or contained any finding of fact but merely referred to, in quotes, "incidents" as the basis for a deprivation costing Plaintiff over $76,000.

93.     As a result of the wrongful deprivation, Plaintiff was suspended for 13 months, immediately withdrawn from all of her Law School classes, in which Plaintiff was an excellent Law Student earning A- and B- grades, and forced to repay over $15,000 to the University because the University confiscated that money from Plaintiff when she was forcibly withdrawn from her Law School classes, for a total illegal deprivation exceeding $76,000 in actual damages.

94.     Additionally, Plaintiff cannot continue her ABA Education at any other ABA Law School, a violation of her protected liberty interest under the Fifth Amendment, itself an illegal deprivation in its own right.  Nor can Plaintiff even return to the Seminary with her excellent academic record from U.C. Berkeley, the

Jesuit School of Theology at Berkeley, and Harvard University Divinity School now besmirched by Defamation.

95.     Plaintiff did not know at 2:30 p.m. on February 14, 2012, but learned later in preparing her Federal Lawsuit that Plaintiff was entitled to a wholly other set of rules for her deprivation when she discovered the 2008 Federal Court Due Process Stipulation, a Stipulation which would have prevented Plaintiff's deprivation from occurring had she been subject to it from February 8, 2012 to March 2, 2012.

96.     Plaintiff also discovered later that she was also afforded the protection, as part of her Contract with Defendant University, to an ABA-quality Law School that included a new and comprehensive ABA-crafted Complaint Process called ABA Standard 512.

97.     On June 11, 2011, while Plaintiff was still a Nevada resident, the ABA's Council of the Section of Legal Education and Admissions to the Bar under the Hon. Christine M. Durham, acting as Chair, decided that the contractual protection of Plaintiff's DCSL-UDC Honor Code Contract, and other Law School Honor Codes like it, were not enough protection to Law Students. To further protect Law Students, the ABA voted to require on August 8, 2011 that every ABA Law School had to implement a much broader Complaint Process that encompassed anything that was material to the academic environment at the Law School, as the U.S. Department of Education required.  Judge Durham, in her June 2011 memo to the ABA House of Delegates called the "General Information Form," under Agenda Items #4 and #5 respectively, specifically addressed the urgency and necessity of implementing ABA

Standard 512 on August 8, 2011 "immediately" for the 2011-2012 Academic Year.

Judge Durham wrote:

> "The proposed changes modify the existing ABA Standards
> and Rules of Procedure for Law School ...   The
> amendments are required by new DOE regulations and
> must be implemented immediately."

98.     ABA Standard 512 was a Complaint Process that afforded the Plaintiff

a far more comprehensive and much stronger complaint process than that of the

Plaintiff's DCSL-UDC Honor Code Contract.   The ABA had required all Law Schools

who had not yet implemented it in the prior five-year grace period to do so

immediately on August 8, 2011.   Judge Durham's 2011 Memos and Reports to the

ABA House of Delegates concerning ABA Standard 512 are attached as Exhibit E.

99.     Plaintiff's Law School and University refused.

100.    ABA Standard 512 required Law Schools to: (1) take the Complaint of

the Law Student; (2) resolve the Complaint in a timely manner of two to three

weeks; (3) keep a written record of the Complaint and its resolution that any Law

Student or any ABA Officers could view.  Unlike the DCSL-UDC Honor Code Contract,

ABA Standard 512 allows a Law Student to make a complaint about "anything" that

materially affects the academic environment of her ABA Law School.

101.    At all times from August 15, 2011 to March 2, 2012, Plaintiff had the

right to an ABA 512 Complaint Procedure in making her ADA and plagiarism

reports, but had arbitrarily, capricious and irrationally been denied this procedure

by Defendant University and individual Defendants Broderick and Steward, and

deceased Academic Dean Richardson, because the Plaintiff's Law School

Administration and Law Faculty refused to implement ABA Standard 512 for 2011-2012 Academic Year.

102.    The primary aim of ABA Standard 512 was to take the retaliation out of the Complaint Process in order to combat the growing problem of plagiarism on Law Campuses. The growing problem of plagiarism was not adequately being addressed by Honor Codes such as the DCSL-UDC Honor Code contract that had been in use for about 25 years.  The DCSL-UDC Honor Code Contract, for example, did not require the Law School to accept and act on a complaint of plagiarism.  The enactment of ABA Standard 512 cured this deficiency.  It forced the Law School to accept and act on a complaint about plagiarism.

103.    However, the Plaintiff's Law School refused to enact ABA Standard 512 on August 8, 2011 or at any time later in the 2011-2012 Academic Year. Defendants Broderick and Steward, and deceased Academic Dean Richardson, as ABA Law Professors and "legal experts," understood the importance of this ABA 512 protection for Law Students, but arbitrarily, capriciously and irrationally refused to implement it.   Nor did Defendants ever disclose this to the Plaintiff or to others, despite the fact that Plaintiff and others had paid for this contractual protection with their ABA-level tuition.

104.    In rejecting ABA Standard 512, Defendants Broderick and Steward, and deceased Academic Dean Richardson were directly rejecting the ABA's newest and strongest tool to provide an ABA-quality Law School to Plaintiff.  The conduct of Defendant Broderick and Defendant Steward from August 15, 2011 to February 27, 2012 thus interfered with Plaintiff's performance of her DCSL-UDC Honor Code and

Plaintiff's contractual right to an ABA-quality Law School with an ABA 512

Complaint Process.

105.    Here is a list of such acts of contractual interference with Plaintiff's

contracts: (1) on August 18, 2011, Defendant Broderick's refusal to take a

plagiarism complaint by Plaintiff did not comport with ABA Standard 512 and

interfered the DCSL-UDC Honor Code Contract because Defendant Broderick

irrationally, arbitrarily and capriciously rejected a credible and valid complaint of

plagiarism submitted with evidence by Plaintiff and another 1L about an Ohio State

ABA Law School Professor married to a current U.S. Attorney; (2) on or about

October 10, 2011, deceased Academic Dean Richardson's answer to Plaintiff's report

of Defendant Mack's plagiarism did not comport with ABA Standard 512 and the

DCSL-UDC Honor Code Contract because deceased Academic Dean Richardson

irrationally, arbitrarily and capriciously ordered Plaintiff, who came with evidence

and corroboration for this report, to "Stop criticizing my faculty," and then

Defendant Richardson further refused to help Plaintiff obtain ADA status or ADA

"reasonable accommodation;" (3) on February 6, 2012 at 6 p.m., Defendant Evans's

threat of retaliation –either retaliation by her directly or a report of impending

retaliation by Defendant Steward--did not comport with ABA Standard 512 and the

DCSL-UDC Honor Code Contract because it was irrational, arbitrary and capricious

that Defendant Evans, as an ABA Law School Professor did not herself take the

proper steps to complain to anyone at the Law School about this terrible action that

she stated with certainty would soon befall Plaintiff, and if Defendant Evans'

statement was not a warning, then it was a "true threat;" (4) on February 8, 2012 at

8:15 a.m.,  Defendant Steward's rejection of Plaintiff's reports of plagiarism did not

comport with ABA Standard 512 and the DCSL-UDC Honor Code Contract because it

was irrational, arbitrary and capricious to refuse to take complaints of cheating

plagiarism and refuse to investigate them further.

106.    ABA Standard 512 was designed to keep the Law School honest in its

compliance with ABA Rules and Procedures because it mandated a transparent

process.  It forced the Law School to respond to valid and credible complaints about

plagiarism, academic fraud and exam cheating and keep a written record of the

complaint, its solution and its publication.  In the five-year gap between when ABA

Standard 512 was first voluntarily implemented in August 2006 to its mandatory

implementation on August 8, 2011, there was a lack of any documentation about

plagiarism, academic fraud and exam cheating at the Law School open to inspection

as ABA Standard 512 required.

107.    The written record required under ABA Standard 512 was key to

putting new found transparency and fairness into the ABA Law School disciplinary

process.  Under ABA Standard 512, Law Schools were now required to keep a

written record of complaints about anything, such as Plaintiff's complaints about

Law Faculty plagiarism and refusal to grant ADA status and "reasonable

accommodation."  And from that record, at which any Law Student or ABA Officer

was free to look, a legally educated person could detect patterns of compliance and

lack of compliance with ABA Rules and Policies, or spot discriminatory or retaliatory

trends in disciplinary cases that might indicate discrimination or retaliatory acts

against a particular person for protected civil and constitutional activity, or

questionable favors for friends of Law School Donors, and deduce from that written record whether the Law School was truly providing an ABA-quality education.

108.    Therefore, when Plaintiff wanted to see if other Law Students had been in a similar situation of not being afforded ADA "reasonable accommodation," she had nowhere to turn because Defendant University's Law School had kept no records for the past five years because it had failed to implement ABA Standard 512 during the grace period.

109.    ABA Standard 512's demand for a written record also corrected a fairness issue at the heart of due process of law.  Without ABA Standard 512, there was no written record by a Law School of how the same academic problems of plagiarism, academic fraud, exam fraud or requests for ADA "reasonable accommodation" were solved in similar ways over time.  The practical result was this:  every Law Student's complaint about plagiarism was treated *ad hoc* by Defendant Steward and by Defendant University's Law School under the "DCSL-UDC Honor Code Contract," without reference to how other problems like it had been solved in the past.

110.    By failing to keep a written record of how similar material problems in the academic environment were solved in similar ways that was open for inspection to ABA Officers, Law Faculty and Law Students alike, Defendant Steward's actions by definition were arbitrary, capricious and irrational.  Defendant Steward was free to examine each new plagiarism case detached from all precedent. Defendant Steward also retained sole control over whether to consider or ignore any credible allegation of Law Faculty or Law Student plagiarism without any fear

that any ABA Official, Law Faculty or Law Students would ever examine Defendant Steward's actions for fairness.

111.    In other words, ABA Standard 512's demand for a written record prohibited Defendant University's Law School from acting in an arbitrary, capricious, and irrational manner in ADA "reasonable accommodation" or in disciplinary matters related to plagiarism at an ABA Law School as it had with Plaintiff in depriving her of over $76,000.   This is how ABA Standard 512 corrected the deficiency of the Plaintiff's "DCSL-UDC Honor Code Contract."

112.    ABA Standard 512 was the "great equalizer" in terms of who knew what about the integrity of the Law School, both in terms of plagiarism and ADA non-compliance issues.  Without ABA Standard 512, there was a huge "gap" between what Law Faculty knew about the total academic integrity of the Law School, and what the Law Students knew about the total academic integrity of the Law School. And on January 16, 2012, what the Defendants knew about that academic integrity, or the lack of it, and what Plaintiff knew was this: Defendant Mack was the "tip of the plagiarism iceberg" at Defendant University's Law School, so to speak.

113.    By "tip of the plagiarism iceberg," Plaintiff means that, given the lack of a written record of complaints in compliance with ABA Standard 512 over the past five years about plagiarism, academic fraud and exam cheating, it was difficult to function normally as a 1L in the Law School.

114.    A Law Student could not function normally without stepping on some huge, undisclosed and unsolved plagiarism, academic fraud, exam cheating problem or history of ADA status and "reasonable accommodation" retaliation that had gone

unsolved or was very poorly solved by Defendant University's Law School in an arbitrary, capricious and irrational way.  The normal functions of addressing how Law Students studied, how Law Students were taught by Teaching Assistants, how Law Students took exams, how Law Students even obtained Legal Internships in fulfillment of their ABA J.D. graduation requirements at the Law School, how Law Students got ADA "reasonable accommodation" were impeded by wondering when one might run into the other 90% of the "plagiarism iceberg."

115.    Take, for example, how the Law School handled the relatively straightforward process of appointing the Plaintiff's Teaching Assistants for her required First Year Courses. Law Student plagiarism is nothing new.  But the large-scale exam cheating alleged by Prof. Robin Alexander in her Contracts II class at the Law School in May 2010 materially affected the Plaintiff in Fall 2011 when Defendant University's Law School failed to document in a transparent, ABA 512-complaint manner how the allegation was solved because the 1L students had become 3L students in Plaintiff's 1L year.

116.    In May 2010, about 70% of the current 3Ls in Plaintiff's Law School received an A in their Contracts II Final Exam according to Prof. Robin Alexander. According to Prof. Alexander's own email, a member of the Class of 2012 obtained the Contracts II exam that Prof. Alexander had prepared or obtained or guessed its source and 70% of the Class of 2012 received an "A" on the exam.

117.    When deceased Academic Dean Richardson allegedly saw that about 70% of the Contracts II Class taught by Prof. Alexander had received an A on the Contracts II Final Exam in 2010, deceased Academic Dean Richardson should have

taken appropriate action.  But there was no official documentation kept on the

matter by Defendant University's Law School open to inspection as there would

have been under ABA Standard 512 for Plaintiff and other Law Students to see.

118.    Deceased Academic Dean Richardson and Defendant Steward

reportedly gave the Law Students "C" grades.  Plaintiff, as a former College

Instructor for ten years, surmises here that a "C" grade, unlike an "F" grade, would

not attract the attention of the ABA.

119.    Two members of the Class of 2012 later told this to Plaintiff on

February 8 at 3:30 p.m., right after Plaintiff had been issued suspension papers by

Defendant Steward.  These two members of the Class of 2012 said Plaintiff was

being suspended solely because Plaintiff was getting too close to what Dean Steward

did in 2010.

120.    The statements above were the other type of evidence that Plaintiff

was not allowed to introduce at any of her suspension hearings.

121.    These two members of the Class of 2012 also said there was a threat

on *Facebook* too.  Plaintiff saw that these two members of the Class of 2012 were

scared to talk about the *Facebook* threat because they suddenly left when the

Campus Police came by at 3:30 p.m. on February 8, 2012.

122.    Plaintiff learned later that Prof. Alexander said a Class of 2012 Law

Student had posted a cyber threat on the Law School's official *Facebook* web site

that threatened retaliation against anyone who talked about the cheating.  Prof.

Alexander called this an act of "cyber bullying" and said that it was a "genuine cyber

threat of imminent physical harm" to retaliate against anyone who might report the

cheating.  Yet Defendant Broderick did not ask the University Campus Police to

investigate the "cyber threat" nor was the incident reported to the Metropolitan

Police Department.

123.    None of this was disclosed to Plaintiff prior to enrollment on August

15, 2011.  However, if ABA Standard 512 had been "immediately" implemented on

August 8, 2011, as the ABA had demanded, then Plaintiff and others could have

raised legitimate questions about the practices of some Teaching Assistants in some

required 1L Courses.  Some Teaching Assistants were fantastic and gave interested

students lots of their time and loved to talk about the course material—they lived,

breathed and ate it.

124.    Other Teaching Assistants acted in a puzzling manner.  Some

inexplicably did not hold office hours, others did not hold review sessions clearly

labeled by traditional academic terms such as "Exam Review Session," and one even

refused to tell Plaintiff and other 1L students his first name and/or last name.

125.    But without ABA Standard 512, Plaintiff and other Law Students had

no recourse to the arbitrary, capricious and irrational actions of deceased Academic

Dean Richardson and Defendant Steward that materially affected Plaintiff even two

years later in the 2011-2012 Academic Year.

126.    Second, for example, take the rather straightforward process of how

the Law School provided opportunities to fulfill the required 40-hour, 1-unit

internship required to advance to one's 2L year at the Law School.

127.    Plaintiff applied twice for her 40-hour, 1-unit internship with

Defendant Volz who worked with the Institute for Public Safety and Justice (IPSJ) at

Defendant University.  Plaintiff applied once on August 11, 2011 after a personal discussion with Defendant Volz.    Later, at Defendant Volz' request, Plaintiff put the internship request for an IPSJ "internship" in writing after having discussed the internship with Defendant Volz orally several times since August 11, 2011 and sent the letter to Defendant Volz on October 14, 2011.  Plaintiff was turned down by Defendant Volz on October 17, 2011, shortly after making her first report of Defendant Mack's plagiarism to deceased Academic Dean Richardson.   This correspondence between Plaintiff and Defendant Volz is attached as Exhibit F.

128.    Plaintiff could not apply for a Center for Missing and Exploited Children internship to fulfill the 1-unit, 40-hour requirement due to Defendant Broderick's physical and psychological reaction to Plaintiff's *Casa de Cita* report on child sex trafficking in Columbia Heights to *FBI.gov* on October 13, 2011.  Therefore, Plaintiff re-applied to the IPSJ in December 2011 for the Spring 2012 Semester because Plaintiff had what she thought was a successful interview at the FBI's National Recruiting Office in November 2011 to be a Summer 2012 Intern with the FBI.  However, Defendant Volz turned Plaintiff down a second time on or about January 25, 2012, a week after Plaintiff emailed Dean Steward about Defendant Mack's plagiarism a second time.

129.    If Plaintiff had known at the time of her two applications that the IPSJ with which Defendant Volz was associated was run by a Law School Professor with a "diploma mill" doctorate from an offshore University, Plaintiff would never have applied to Defendant Volz to work with him due to his association with the IPSJ Program to fulfill Plaintiff's 1-unit, 40 hour internship.

130.    Again, if an ABA Standard 512 Complaint Process had been in place for the past five years, Plaintiff doubts that such a situation of apparent academic fraud in which an ABA Law School Professor held a "diploma mill" doctorate would not even have arisen in the 2011-2012 Academic Year.

131.    Defendant Volz knew that the Plaintiff was a life-long, hard-core academic from U.C. Berkeley and Harvard. However, Defendant Volz never told Plaintiff the truth about Defendant Flowers.   Plaintiff might just have left the Law School at the end of the Fall 2011 Semester, disgusted at the Law Faculty being unable to police itself under ABA Standard 512 by not even implementing it when ordered by the ABA.

132.    Defendant Volz acted in an arbitrary, capricious and irrational manner in not telling Plaintiff the truth about Defendant Flowers.  Defendant Flowers had exercised, at the minimum, very questionable judgment as a Law Professor with a J.D. from the Georgetown University Law Center because Defendant Flowers knew, in virtue of her Georgetown J.D., the amount of work required for an accredited Ph.D. degree.   Nor did Defendant Volz ever explain to Plaintiff how Defendant Flowers became Co-Chair of the IPSJ and Chair of the M.S. Program in Homeland Security Studies at the University in addition to her Law School position, and the role that Defendant Flowers' "diploma mill" doctorate played in obtaining those positions.

133.    Most diploma mills, according to the U.S. Department of Education, are called "diploma mills" because they accept and grant degrees for what is called, "self-plagiarism," that is, academic work used from one degree is recycled

indiscriminately to provide the credits for another, higher degree.   Therefore, it is

clear that in "self-plagiarizing" a Ph.D. and using it to obtain a Federal Emergency

Management Grant for $2.9 million, Defendant Flowers broke Federal Law by

violating a 2004 Management Directive of the U.S. Department of Homeland

Security, #10500, in effect at the time of her 2007-2012 FEMA Grant, that states that

even "plagiarism in the proposal" of an DHS/FEMA grant application, which includes

submitting a self-plagiarized "doctorate," is "research misconduct" and itself the

grounds for a DHS fraud investigation.   See Appendix G for a copy of that 2004 DHS

Management Directive.

        134.   Defendant Flowers' "diploma mill" doctorate, because it is cited on her

official Law School web page as a "Ph.D." degree, is a also clear violation of the DCSL-

UDC Honor Code, under Rules (1) that requires "honesty in crediting sources" for

academic work, and (3) "honesty in crediting sources" for course work.   This is due

to the fact that the "doctorate" that is referenced on Defendant Flowers' official Law

School website as a "Ph.D." is merely a "diploma mill" doctorate that Defendant

Flowers does not define on her official Law School website as coming from an

institution that does not meet U.S. Department of Education Standards for

accreditation.   Therefore, Defendant Flowers' statement on her official Law School

web page clearly violates the DCSL-UDC Honor Code under (1) and (3).   And

Defendant Steward has interfered with the DCSL-UDC Honor Code Contract in not

addressing Defendant Flowers' violation of it.

        135.   In virtue of her "diploma mill" doctorate, Defendant Flowers now

refers to herself on her official Law School website and at FEMA Presentations

around the nation as "Doctor Flowers." See Exhibit H for "Doctor Flowers" FEMA

$2.9 million, five-year award letter and an example of Defendant Flowers' self-

presentation as "Dr. Flowers" to FEMA at the 48th Annual Governors Homeland

Security and Emergency Management Conference sponsored by the Minnesota

Department of Public Safety, Homeland Security and Emergency Management on

February 12-14, 2013 in Minneapolis, Minnesota.

136.    Defendant Flowers' academic dishonesty created another ABA

Standard 512 problem regarding letters of recommendation sent to the Law School

Data Assembly Service (LSDAS). Two of Defendant Flowers' colleagues in the

Department of Criminal Justice and Social Work, which is the largest "feeder

Department" to the Law School in the University, also have diploma mill "Doctoral"

degrees from the exact same off-shore institution. Therefore, if any of these Faculty

from this Department were writing letters of recommendation to LSAC for

University Students, then LSAC was receiving a letter of recommendation that were

written by a "Doctor" in name only.

137.    When Defendant University and individual Defendants did not report

these problems in academic integrity to Defendant University's Law School for

resolution, their actions were arbitrary, irrational and capricious and did not

comport with ABA Standard 512 and the DCSL-UDC Honor Code.

138.    Third, take how Plaintiff could not get Defendant Broderick or

deceased Academic Dean Richardson to help Plaintiff get ADA status or ADA

"reasonable accommodation," even when Plaintiff had months earlier in good faith

disclosed her physical disability to Defendant University's Law School on her

Application.  When Plaintiff came to Defendant University's Law School on August 15, 2012, Plaintiff thought that such ADA status and "reasonable accommodation" would be provided if she asked, as her requests merely involved managing her 80-85 pound daily Law Book load at the Law School.   All of Plaintiff's Professors saw Plaintiff coming each week or twice a week to class with Plaintiff's Handicapped Book Cart full of 80-85 pounds of Law Books, and knew Plaintiff needed it.  The lack of response of Defendant University's Law School to Plaintiff's ADA status and reasonable accommodation requests did not comport with ABA Standard 512 and were irrational, arbitrary and capricious.

139.   Plaintiff also asked for help for similarly situated students at the Law School.  The nine 1L ADA students and ADA –eligible students, including Plaintiff, only wanted modest accommodations from the Law School costing less than a total of $200:  (1) moving the book lockers outside of Defendant University's Law School's Steam Room where the nightly steam damaged their expensive law book if the students left them overnight in the lockers; (2) turning a small, vacant, and unused room on the Third Floor of Defendant University's Law School building on Connecticut Avenue, N.W., into a study carrel area for ADA students by means of a card-reading pass key lock; (3) and better seating assignments to ease ABA students' entry and exit in law classrooms if they had mobility devices.  Defendant Broderick's response did not comport with the ABA Standard 512, because she denied these "reasonable accommodations" to Plaintiff and others, costing little more than $20 per ADA 1L student, all during the Fall 2011 Semester.  Once Defendant University's Law School denied Plaintiff's ADA status, and then also

denied Plaintiff's request for ADA "reasonable accommodation," without ABA
Standard 512 Plaintiff had nowhere to turn at Defendant University's Law School for
a resolution of this problem.  And there was pressure to stop asking.  As one of the
nine disabled 1L students told Plaintiff in mid-January 2012, "Nancy, if you don't
stop, they are going to kick us all out," meaning, the nine disabled 1L students.

140.    Fourth, the very rules of process to which Plaintiff was subjected on
February 8, February 9, February 14, February 27, and March 2, 2012 by Defendant
University did not comport with ABA Standard 512 because they were arbitrary,
capricious and irrational, but these rules were nevertheless applied deliberately to
the Plaintiff.  But without any ABA 512 Complaint process in place, Plaintiff could
not complain about that either.

141.    Without ABA Standard 512 having been implemented in 2006, during
its voluntary phase-in time frame, insuring that a record of problems and solutions
regarding ADA reasonable accommodation was kept by Defendant University's Law
School, Plaintiff did not learn the following important fact about Defendant
University's Law School that had occurred in 2008 that was material to the
Plaintiff's disciplinary case on February 8, 2012:  This was not the first time that this
type of misuse of disciplinary procedures had happened at Defendant University's
Law School.

142.    In the 2008 Federal Court Due Process Stipulation that Plaintiff
discussed earlier that contained the real rules of Due Process of Law that should
have been applied to Plaintiff, the Court inquired in detail in 2008 what rules of
procedure Defendant University's Law School used on Law Students because the

Court was ruling on a Failure to State a Claim motion by Defendant University's Attorneys, on behalf of the Law School, to dismiss the Complaint of a disabled female Law Student who argued that she had been the victim of retaliation under the ADA by the Law School.   The Court wanted to know all the details of the Due Process of Law procedures that the Law School of Defendant University used on Law Students before the Court ruled on whether the 2008 Plaintiff stated a claim against the Law School for retaliating against her for exercising her civil right to ask for ADA "reasonable accommodation."

143.    The Court held that the 2008 Plaintiff had stated a plausible claim for relief because the Plaintiff pleaded enough facts to support her Complaint that deceased Academic Dean Richardson had retaliated against the 2008 Plaintiff by misusing Defendant University's Law School Disciplinary Code to characterize the 2008 Plaintiff's actions one way, when in fact, the facts showed the Court that the 2008 Plaintiff's conduct was of an entirely different nature.

144.    The Court found that what deceased Academic Dean Richardson called "plagiarism" was in reality the 2008 Plaintiff's attempt to "self-accommodate" when Defendant University's Law School refused to provide the 2008 Plaintiff a daily note-taker as a "reasonable accommodation" under the ADA.  The Court found that the 2008 Plaintiff had stated enough facts to plausibly claim that Defendant Richardson had done this to the 2008 Plaintiff solely in retaliation for the 2008 Plaintiff engaging in the protected activity of seeking ADA "reasonable accommodation" from Defendant University.

145.    However, without ABA Standard 512 being in place in 2008 so that there was a written record of it at the Law School, this Plaintiff, with only two working days to prepare her Defense to Defendant University on February 14, 2012, never learned about this 2008 case in time, and therefore was never able to use its 2008 Federal Court Due Process Stipulation at any of her hearings on February 14, 2012, February 27, 2012 or March 2, 2012 to show that: (1) Plaintiff was arbitrarily and capriciously being subjected to the wrong set of rules; and (2) that Defendant University's Law School had a pattern of activity of retaliating against disabled Law Students solely for asking for ADA "reasonable accommodation" that the Law School wanted to conceal.   Nor was Plaintiff able to go to Federal Court and get an Injunction to stop the process altogether, because Plaintiff needed a case and a legal precedent, and Defendant Broderick and Defendant Steward, and deceased Academic Dean Richardson, withheld that case, as well as Defendant University.

146.    Plaintiff, adept at Civil Procedure and having earned an A- in it, could have readily taken advantage of the 2008 case as Plaintiff prepared her own Defense for February 14, 2012.  But that never happened because ABA Standard 512 had not been in effect for the current Academic Year, nor for the five prior Academic Years when the bulk of the plagiarism, academic fraud and exam cheating that materially affected the Plaintiff's ABA Legal Education at her ABA Law School took place.

147.    Defendant Mack later admitted that he had, as Plaintiff stated, plagiarized his entire 27-page Torts I Outline that he posted on the Law School's official web site.

148.    The next Academic Year, Defendant Tirmazi was appointed to the

rank of Assistant Professor, a tenure-track position, by his three "diploma mill" Ph.D.

colleagues with the approval of Defendant University.  Defendant Tirmazi is

currently employed at Cal State University, Monterrey Bay for the 2013-2014

Academic Year.

### V. Causes of Action

**Count 1:  Violation of Plaintiff's Civil Rights under 29 U.S.C. 701**
*et seq.*, **the Rehabilitation Act of 1973, and under 42 U.S.C. 12101**
*et seq.*, **the Americans with Disabilities Act, and Title VII of the**
**Civil Rights Act**

149.    Plaintiff repeats each and every allegation stated in paragraphs 1-148

above, and incorporates them here as if set forth in its entirety.

150.    While Plaintiff was engaged in the protected activity of seeking ADA

status for herself, and ADA "reasonable accommodation" both for herself and others

under 42 U.S.C. 12101 *et seq.*, and under 29 U.S.C. 701 *et seq.*, the Rehabilitation Act

of 1973, Defendant University, who at all times had actual factual knowledge that

Plaintiff was engaged in civil rights activity protected under the ADA and the

Rehabilitation Act of 1973, nevertheless retaliated against the Plaintiff on February

6, 2012, February 8, 2012, February 9, 2012, February 14, 2012, February 27, 2012

and March 2, 2012 solely for Plaintiff engaging in her protected civil rights activity

by wrongfully depriving Plaintiff of her property and  liberty interest in her ABA

Legal Education totalling more than $76,000.

151.    As a direct and proximate result of Defendant University's actions,

Plaintiff has suffered damage in excess of $76,000.  Plaintiff is entitled to injunctive

relief undoing the retaliatory action by Defendant University as if the retaliatory action never happened to Plaintiff, including Plaintiff's reinstatement to "good standing conduct" status and correction of Plaintiff's Law School Transcript to reflect that, to reasonable fees and costs of suit, and to any other appropriate remedies such as compensatory or punitive damages available under Federal statutes, the exact amount to be determined at trial.

### Count 2: Violation of the Plaintiff's Right to Free Speech under the First Amendment of the United States Constitution

152.    Plaintiff repeats each and every allegation stated in paragraphs 1-151 above, and incorporates them here as if stated in their entirety.

153.    Individual named Defendant Steward, Defendant Broderick, Defendant Strothers, Defendant Tirmazi, Defendant Volz, Defendant Evans and Defendant Mawakana, at all times acting under color of State law, took adverse and retaliatory action against Plaintiff on February 6, 2012, February 8, 2012, February 9, 2012, February 14, 2012, February 27, 201 and March 2, 2012 that taken singularly and as a whole constitutes adverse and retaliatory action that is reasonably likely to deter a reasonable person from engaging in the protected activity of Free Speech under the First Amendment.

154.    All Individual named Defendants listed above in Paragraph 153 are liable to Plaintiff under 42 U.S.C. 1983 for all of the aforesaid damages for having violated Plaintiff's First Amendment right while acting under color of State law.

155.    As a direct and proximate result of all individual Defendants' actions, Plaintiff has suffered damage in excess of $76,000 and Defendants are liable to

Plaintiff for this damage.  Plaintiff is entitled to general and specific damages, exemplary damages and punitive damages, including reasonable fees and costs of suit, as specified under 42 U.S.C. 1983 and other appropriate Federal statutes, the exact amount to be determined at trial.

### Count 3: Violation of Plaintiff's Right to Due Process of Law under the Fifth Amendment of the United States Constitution

156.    Plaintiff repeats each and every allegation stated in paragraphs 1-155 above, and incorporates them here as if stated in their entirety.

157.    On February 8, 2012, February 9, 2012, February 14, 2012, February 27, 2012, and March 2, 2012, Individual named Defendant Steward, Defendant Broderick, Defendant Strothers, Defendant Tirmazi, and Defendant Volz, who at all times were acting under color of State Law, violated Plaintiff's protected right to Due Process of Law under the Fifth Amendment of the United States Constitution by wrongfully depriving Plaintiff of over $76,000 in her property right and liberty interest in her ABA Legal Education without Due Process of Law.

158.    As a direct and proximate result of the action of Individual named Defendants listed above in Paragraph 157, Plaintiff has suffered damage in excess of $76,000 and Defendants are liable for this damage under 42 U.S.C. 1983.  Plaintiff is entitled to general and specific damages, exemplary damages and punitive damages, including reasonable fees and costs of suit, as specified under 42 U.S.C. 1983 and other appropriate Federal statutes, the exact amount to be determined at trial.

### Count 4:  Breach of Written Contract

159.    Plaintiff repeats each and every allegation stated in paragraphs 1-158 above, and incorporates them here as if stated in their entirety.

160.    On February 8, 2012, Defendant University breached its written DCSL-UDC Honor Code Contract with Plaintiff by refusing to take a credible report of Law Faculty plagiarism for investigation as required by the DCSL-UDC Honor Code Contract.

161.    Plaintiff performed all of the terms of the Contract or was lawfully excused from performance.

162.    Defendant University unjustifiably failed to perform under the terms of the DCSL-UDC Honor Code Contract, on whose promises Plaintiff relied to her detriment.

163.    As a direct and proximate result of Defendant University's breach of contract, Plaintiff suffered actual and consequential damages in excess of $76,000, the exact amount to be determined at trial.

### Count 5: Breach of Implied Covenant of Good Faith and Fair Dealing (Tortious Interference)

164.    Plaintiff repeats each and every allegation stated in paragraphs 1-163 above, and incorporates them here as if stated in their entirety.

165.    Plaintiff performed all of the terms of the DCSL-UDC Honor Code Contract.

166.    Defendant University and Individual named Defendants Steward, Defendant Broderick, Defendant Volz, Defendant Flowers, Defendant Mack , Defendant Mawakana, Defendant Evans, Defendant Tirmazi, and Defendant Strothers deliberately and almost immediately contravened the terms of the DCSL-UDC Honor Code Contract, on which the Plaintiff relied to her detriment.

167.    Defendant University and the Individual named Defendants listed above in Paragraph 166 intentionally and maliciously interfered with and impeded Plaintiff's fulfillment of her DCSL-UDC Honor Code Contract by contravening the terms of the DCSL-UDC Honor Code Contract, on which the Plaintiff had relied to her detriment.

168.    As a direct and proximate result of malicious and intentional interference with Plaintiff's Contract by Defendant University, and by the malicious and intentional interference with Plaintiff's Contract by the Individual named Defendants listed above in Paragraph 166, Plaintiff has suffered actual and consequential damages in excess of $76,000, the exact amount to be determined at trial.

### Count 6:  Intentional Misrepresentation and Fraudulent Inducement

169.    Plaintiff repeats each and every allegation stated in paragraphs 1-168 above, and incorporates them here as if stated in their entirety.

170.    Plaintiff offered over $76,000 in consideration for her DCSL-UDC Honor Code Contract and performed all of her obligations under that contract.

171.    At the time of Defendant University's representations to Plaintiff, Defendant University knew its representations were false, or that it had insufficient information to make the representation, on which Plaintiff relied to her detriment.

172.    Defendant University made representations to Plaintiff to induce her to move her domicile from Reno, Nevada to Washington, D.C. to enroll in Defendant University's Law School, using over $25,000 in her own money and indebting herself

more than $51,460 in Federal Student Loans as a result, on which the Plaintiff relied to her detriment.

173.    Plaintiff believed that Defendant University would perform according to the representation made in its contract, and was justified in relying upon Defendant University's representations.

174.    The representations made to Plaintiff by Defendant University were made in conscious disregard of Plaintiff's rights, to subject Plaintiff to cruel and unjust hardship, and in concealment of the true intent of Defendant University with malice, oppression and fraud toward Plaintiff.

175.    As a direct and approximate result of Defendant University's misrepresentations, on which Plaintiff relied to her detriment, Plaintiff has suffered actual and consequential damages in excess of $76,000, the exact amount to be determined at trial.

### Count 7:  Breach of Contract

176.    Plaintiff repeats each and every allegation stated in paragraphs 1-175 above, and incorporates them same here as if stated in their entirety.

177.    On February 8, 2012, Defendant University breached its Contract with Plaintiff by refusing to provide an ABA Law School with an ABA 512 Standard Complaint Process, as specifically ordered to do by the ABA on August 8, 2011.

178.    Plaintiff performed all of the terms of the Contract.

179.    Defendant University unjustifiably failed to perform under the terms of the implied Contract between Plaintiff and the ABA to provide Plaintiff an ABA-

quality Law School with an ABA 512 Complaint Process, on whose promises the Plaintiff relied to her detriment.

180.    As a direct and proximate result of Defendant University's breach of contract, Plaintiff suffered damages actual and consequential in excess of $76,000, the exact amount to be determined at trial.

### Count 8: Breach of Implied Covenant of Good Faith and Fair Dealing

181.    Plaintiff repeats each and every allegation stated in paragraphs 1-180 above, and incorporates them here just as if stated in their entirety.

182.    On February 8, 2012, Defendant University breached its Contract with Plaintiff to provide an ABA Law School with an ABA 512 Complaint Process.

183.    Plaintiff performed all of the terms of her Contract.

184.    Defendant University deliberately and almost immediately contravened the terms of the Contract, on which Plaintiff relied to her detriment.

185.    Defendant University breached its Contract and its duty of good faith by engaging in misconduct and contravening the terms of the Contract almost immediately, on which Plaintiff relied to her detriment, and did breach the Contract on February 8, 2012

186.    As a direct and proximate result of Defendant University's breach of the covenant of good faith and fair dealing, Plaintiff has suffered actual and consequential damages in excess of $76,000, the exact amount to be determined at trial.

### Count 9:  Intentional Misrepresentation and Fraudulent Inducement

187.    Plaintiff repeats each and every allegation set forth in paragraphs 1-186 above, and incorporates them here just as if stated in their entirety.

188.    Defendant University promised Plaintiff an ABA Law School with an ABA 512 Complaint Process as ordered by the ABA on August 8, 2011.

189.    At the time of Defendant University's representations to Plaintiff, Defendant University knew its representations were false, or that it had insufficient information to make them, on which Plaintiff relied to her detriment.

190.    Defendant University made representations not limited to but including those to Plaintiff to induce her to move her domicile from Reno, Nevada to Washington, D.C. to enroll in Defendant University's Law School, spending more than $25,000 in her own money and indebting Plaintiff more than $51,460 in Federal Student Loans.

191.    Plaintiff believed that Defendant University would perform according to the representation made in its contract, and was justified in relying upon Defendant University's representations.

192.    The representations made to Plaintiff by Defendant University were made in conscious disregard of Plaintiff's rights, to subject Plaintiff to cruel and unjust hardship, and with Defendant University acting maliciously, intentionally and fraudulently toward Plaintiff.

193.    As a direct and approximate result of Defendant University's misrepresentations, and Plaintiff's reliance therein, Plaintiff has suffered actual and consequential damages in excess of $76,000, the exact amount to be determined at trial.

**Count 10:  Discriminatory Intent—Unreasonable Restrictions on Participant in School Integration 42 U.S.C. 12182 (b) (1) (C), 42 U.S.C. 12182 (b)(1)(D)(ii) and 29 U.S.C. 701, *et. seq*.**

194.    Plaintiff repeats each and every allegation stated in paragraphs 1-193 above, and incorporates them here just as if stated in their entirety.

195.    Plaintiff, while a student at Defendant University's Law School, was denied integration into school programs and activities until she could guarantee that she would not cause harm to any other students or faculty.

196.    Other students at Defendant University's Law School are permitted to participate in school programs and activities without providing a guarantee that they will not cause harm to any other students or faculty.

197.    Defendant University willfully excluded Plaintiff from integration into Law School programs and activities solely based on Plaintiff's physical disability.

198.    The requirement imposed by Defendant University that Plaintiff not participate in Law School programs and activities until she guarantee that she will not cause harm to any other students or faculty prior to her integration into Law School programs and activities is willful and based solely on Plaintiff's physical disability.

199.    As a direct and proximate result of Defendant University's restriction's placed upon Plaintiff based solely on her physical disability, Plaintiff has suffered damages in excess of $76,000, the exact amount to be determined at trial.

**Count 11: Defamation**

200.   Plaintiff repeats each and every allegation stated in paragraphs 1-199 above, and incorporates them here just as if stated in their entirety.

201.   On March 18, 2013, Defendant University sent a transcript to the Law School Data Assembly Service (LSDAS) available to all ABA Law Schools to see that contained an unprivileged publishing of the results of Plaintiff's deprivation hearing of February 14, 2012 on her Academic Transcript.

202.   Defendant University knew that the statements in Plaintiff's Transcript sent to LSDAS on March 18, 2013 were intentionally falsely and maliciously statements because the statements on Plaintiff's 1L Academic Transcript were themselves a compilation of intentionally false, utterly baseless statements that were recklessly made with actual malice and deliberate and intentional disregard to the truth by Individual named Defendant Strothers, Defendant Tirmazi, Defendant Steward, Defendant Volz, Defendant Broderick and John/Jane Does I-X, from February 8, 2012 to March 18, 2013.

203.   As a result of these intentionally false statements made with actual malice against Plaintiff by the Individual named Defendants listed above, Plaintiff has suffered enormous damage to her Law School career, her reputation in the ABA Community, and her reputation as a University Academic and Language Instructor in Theology in excess of $76,000.

## Prayer for Relief

Based on all of the above, Plaintiff prays for Judgment against Defendant University and all named individual Defendants as follows:

1.      General damages in an amount in excess of Seventy Six Thousand

Dollars ($76,000.00), the exact amount to be determined at trial;

      2.      Reasonable fees and costs pursuant to 42 U.S.C. 1983;

      3.      Plaintiff is entitled to a Declaratory Injunction that Plaintiff's

Civil Rights as a physically disabled person have been violated, and that Plaintiff's

Constitutional Rights have been violated, and Plaintiff is also entitled to Injunctive

Relief barring all Defendants from further retaliation and discrimination, and

enjoining all Defendants to undo their wrongful acts against Plaintiff as if these acts

had never taken place.

      4.      Any other relief under Federal and State Law as the Court finds just

and appropriate in this matter.

      Dated this 10th Day of March, 2014.

Respectfully submitted by Plaintiff *Pro Se*
Nancy Shinabargar
4604 Neil Road #119
Reno, Nevada 89502
775-827-1645 or *dclawpup@gmail.com*

# Exhibit A

**Business Cards of David Bos, Federal Public Defender for Oscar Ortega-Hernandez and Gregg Maisel, Chief, National Security Section, U.S. Department of Justice**



**UNITED STATES DEPARTMENT OF JUSTICE**
**UNITED STATES ATTORNEY'S OFFICE**
**FOR THE DISTRICT OF COLUMBIA**

## GREGG A. MAISEL
**CHIEF**
**NATIONAL SECURITY SECTION**

252-7812

555 FOURTH STREET, N.W.
WASHINGTON, DC 20530

TEL: (202) ~~614-7740~~
FAX: (202) 307-6059
Gregg.Maisel@usdoj.gov



## FEDERAL PUBLIC DEFENDER

### David W. Bos
Assistant Federal Public Defender

625 Indiana Ave., N.W.
Suite 550
Washington, DC  20004

Telephone:   (202) 208-7500
Fax:              (202) 208-7515
E-mail:  david_bos@fd.org

## Exhibit B

**Bar Complaint Against Defendant Annamaria Steward, who also serves as a Governor of the District of Columbia Board of Governors**



# OFFICE OF BAR COUNSEL
## THE BOARD ON PROFESSIONAL RESPONSIBILITY
## DISTRICT OF COLUMBIA COURT OF APPEALS

515 Fifth Street, N.W.
Building A, Room 117
Washington, D.C. 20001
(202) 638-1501   Fax (202) 638-0862

*(Please print or type.)*

Date: 02/26/2014

A.   Your Name: (Dr.)
(Mr.)
(Ms.)
(Mrs.) Nancy Anne Shinabargar

(First)              (Initial)                    (Last)

Address: 4604 Neil Road #119

(Street)                                    (Apt. #)

Reno, NV 89502

(City)              (State)                    (Zip)

Business Telephone:_____ Home Telephone: 775-827-1645   Cell:_____

(NOTE: It is very important that we have your telephone number(s) and that you inform our office if you have a change of address.)

B.   Attorney Complained Of:

Name: Annamaria Steward-Dymond

(First)              (Initial)                    (Last)

Address: David A. Clarke School of Law Dean, 4340 Connecticut Avenue

(Street)                                    (Apt. #)

Washington, D.C. 20008

(City)              (State)                    (Zip)

Telephone No.: 202-274-7400_____ Attorney's Bar No., if known: _____

C.   Have you filed a complaint about this matter anywhere else? YES   If yes, please give details.

U.S. District Court, Reno, NV Case # 3:14-cv-00072.

D.   Do you have a written retainer agreement with the attorney? YES   If yes, please attach a copy.

Law School Dean--Violated Honor Code Contract

E.   Where applicable, state the name of the court where the underlying case was filed, and the case name and number.

see U.S. District Court, Reno, NV, Nancy Shinabargar v. the Board of Trustees of the University of the District of Columbia, et alii

F.   Do you have other documents that are relevant? If yes, please give details and provide copies._____

See my U.S. District Court Case, # 3:14-cv-00072

### SEE REVERSE SIDE FOR REQUIRED DETAILS & SIGNATURE

G.   DETAILS OF COMPLAINT: On February 8, 2012, Annamaria Steward confronted me at

8:15 a.m. at the Law School and refused to take any more complaints about Law Faculty and

Continued on next side ➪

Law Student Plagiarism at our Law School in direct violation/breach of our Honor Code Contract.  She came with a policeman with a gun.  She told me she had "studied that way"--meaning she had plagiarized other law students' briefs to study.  I told her what she described to me was plagiarism.  Six hours later, she had me suspended from the Law School on totally baseless charges that I was a "Terrorist."

The  next day, she refused to follow the proper due process procedure that the Law School had stipulated to Federal Court in 2008 was the proper procedure. When I mentioned to some law students at lunch on Feb. 9, 2012 that I could get an injunction to block the false suspension, about 45 minutes later she had five UDCPD attempt to arrest me and then subjected me for 2 1/2 hours to a totally fake and fictitious U.S. Secret Service interrogation on the 3rd Floor at the Law School where I was held at gunpoint with no probable cause and then forced to sign over my medical, legal, educational and financial records to her.

I am a handicapped student and I had asked for ADA "reasonable accommodation" since August 2011 and had been denied it by her.

At 3:30 pm on Feb. 9, 2012, she had a friend, Marc Strothers, immediately suspend me and later claimed, totally falsely, on Feb. 27, 2012, that I made a death threat against President Obama.  To prove this charge is utterly baseless and fake,

I have U.S. Secret Service FOIA docs  indicating that the whole episode was faked by Dean Steward, who: (1) refused to honor the Honor Code; (2) refused to grant me and other disabled students reasonable accommodation under the ADA; (3) refused to implement ABA Standard 512, so that we could submit a written complaint, as the ABA ordered on August 8, 2011.  I also have FBI testimony about how much cheating is going on at the Law School which Dean Steward has at all times concealed from entering students such as myself.

**The Undersigned hereby certifies to the Office of Bar Counsel
that the statements in the foregoing Complaint are true and
correct to the best of my knowledge.**

SIGNATURE

**Exhibit C**

**Statement of Plaintiff on September 4, 2013 to the U.S. Department of Education asking for an investigation of the February 9, 2012 Fake U.S. Secret Service Interrogation of Plaintiff at gunpoint on the Third Floor of the Law School as a Hate Crime due to Disability Bias under 18 U.S.C. 249, in which the predicate felony was an 18 U.S.C. 912 felony, the Impersonation of a Federal Official under the direction of Dean Steward**

Nancy Shinabargar
4604 Neil Road #119
Reno, NV 89502
September 4, 2013

Arne Duncan, U.S. Secretary of Education
U.S. Department of Education
400 Maryland Ave., S.W.
Washington, D.C. 20202

Dear Secretary Duncan,

I was a victim of a violent Federal Hate Crime as defined under 18 U.S.C. 249, the Matthew Shepherd and James Byrd, Jr. Hate Crimes Prevention Act of 2009 at my ABA law school, the University of the District of Columbia's David A. Clarke Law School, from 12:56 p.m. to 3:30 p.m. on February 9, 2012. I ask you as head of the Department of Education to investigate this crime and provide me with a remedy.

### My Disability and Protected Activity from Jan. 16, 2012 to Feb. 9, 2012

I am a physically disabled student with a severe degenerative spinal disease called OPLL that was treated by a neurosurgeon in Nevada in 2005 who rebuilt my spine surgically with Titanium rods and screws attached to my cervical vertebrae. My ability to bear weight is severely restricted. UDC Law knew this since my application for admission in January 2011. I also have lymphangioma resulting in a partially amputated left foot from two childhood operations by a plastic surgeon. I am also legally blind without my glasses. UDC awarded me the Rosa Parks Scholarship (see **Appendix A**).

From January 16, 2012 to Feb. 9, 2012, I had engaged in the protected activity of asking for reasonable disability accommodations for myself and other 1L students. The law school repeatedly denied me this. I had also found credible evidence that UDC Law Faculty Member Thomas Mack, the ex-Dean of UDC Law, had plagiarized his entire 27-page course outline, seven additional cases of UDC Law Faculty plagiarism, and over 80 cases of undisclosed UDC Law student plagiarism from 2010 to 2012.

I also was on the verge of discovering the Federal Grant Fraud of UDC Law Professor Angelyn Flowers, who had turned me down twice—in September 2011 and January 2012, for a "UDC Institute of Public Safety and Justice" internship. Prof. Flowers had committed Federal Grant Fraud in 2007. Prof. Flowers bought a fake Ph.D. from an off-shore diploma mill and used it to obtain a $2.9 million Department of Homeland Security Grant, to which neither she nor her corporate partner, General Physics of Maryland, was entitled, violating 18 U.S.C. 666—the Honest Services Fraud statute.

### UDC's Retaliation Against Me as a Disabled Law Student on Feb. 9, 2012

On Feb. 9, 2012, I was held at gunpoint by UDC Law Dean of Students Anna Marie Stewart and subjected to a fake U.S. Secret Service interrogation from 12:56 to 3:30 p.m. on the third floor of UDC Law. Under Dean Stewart's supervision, a UDC PD officer held a gun to me while two persons, a male and female, presented "fake" U.S.

Secret Service identifications with no photo-I.D. on it.   The female "Agent" physically searched me, both "Agents" interrogated me for two hours, and then both "Agents" forced me to sign over my medical, legal and financial records at gunpoint. I objected. But because of the UDC PD officer's gun at the door, I was not free to leave.

This action violated my 4th Amendment Right, as no probable cause for the search or seizure existed.

As to my 5th Amendment Right to Due Process, Dean Stewart cleverly used the *University* to suspend me from the *Law School*.  The *University* then claimed at all times that, as the *University*, it was not required to follow the guidelines that *UDC Law* had stated to Federal Court in 2008. The process outlined by UDC Law in 2008 for law student suspensions of 12 months or more was a procedure that Federal Court *had found* met the requirements of Due Process.

The standard of Due Process that the Federal Judge *had found acceptable in 2008* for suspending a UDC Law student for 12 or more months included: (1) a written three-page decision; (2) based on evidence provided to the law student; (3) following a fact-finding process; (4) which evidence was given to the law student and to which he/she is allowed to respond before a written decision is rendered (see **Appendix B**).

However, no similar process was afforded to me.

Dean Broderick, who was Dean of the Law School and who supervised Dean Stewart, knew it had been UDC *as an institution* that had made this stipulation on Due Process to the Federal Judge in 2008 *on behalf of UDC Law*.  Dean Broderick knew, however, that UDC *as an institution* was ignoring its own 2008 stipulation in my case. But she did nothing to stop Dean Stewart.

Therefore, I faced a kind of *double subterfuge*—one act of subterfuge from the *Law School*, who asked the *University* to deprive me of the Due Process it had stipulated to Federal Court in 2008, and another act of subterfuge from *UDC itself*, which repudiated *its own 2008 Federal Court stipulation* to suspend me as law student.

That is why I received no Due Process at all from the University at the so-called "Student Suspension Hearings and Appeals."  Starting at 12:56 p.m. on Feb. 9, 2012, Dean Stewart had the University simply declare me to be a "terrorist" and had me suspended from the Law School for 13 months: (1) without any fact-finding process; (2) without being informed of any charges naming a time, date, place, act or manner of action of which I was accused; (3) denied any opportunity to respond to any actual factually-based allegations by offering facts and witnesses to the contrary; (4) denied any written decision of at least a page per allegation based on a finding of fact that cited evidence.

UDC and Dean Stewart's actions from 12:56 p.m. on Feb. 9 to March 2, 2012 at 3:30 p.m. violated my 5th Amendment rights to Due Process. I objected to this at the time.

At 3:30 p.m. on Feb. 9, 2012 after the fake U.S. Secret Service interrogation, I walked down to the Law Library, wondering what had just happened to me.  Mr. Marc Strothers, a UDC employee whom I had never met before, and five UDC PD Officers confronted me.   Mr. Strothers declared that I was a "terrorist."  He suspended me for 13 months by withdrawing me from my law classes at 3:30 p.m. on Feb. 9, 2012.  However, Mr. Strothers refused to call or allow me to call the "L" Street office of the U.S. Secret

Service to verify whether U.S. Secret Service Agents had come —and not just some friends of Prof. Flowers or Dean Stewart, with fake identifications.

On Feb. 14, 2012, Mr. Mohammed Tirmazi pronounced me a "terrorist" at the so-called "Student Judicial Hearing." Mr. Tirmazi worked under Prof. Angelyn Flowers, the DHS Grant Fraudster, in the UDC Social Work Department. No facts, charges, opportunity to respond, or written decision were provided. On Feb. 27 and March 2, 2012, Mr. Strothers and Dean Thomas introduced an e-mail of Dean Stewart. Dean Stewart's e-mail was a malicious parody of an e-mail report of a Metro Transit Bus Driver named Duvon Craig that I had sent to *FBI.gov* as a law enforcement report for him at 5:30 p.m. Jan. 16, 2012. No facts, charges, opportunity to respond, or written decision were provided.

UDC refused to give me Dean Stewart's e-mail, the "key" piece of evidence for my 13-month suspension, or even a *redaction of it*, from Feb. 9, 2012 to the present.

From Feb. 9, 2012 to the present, UDC: (1) knew Dean Stewart's e-mail and the other charges were totally false and baseless; (2) denied me the opportunity to prove they were totally false and baseless by calling UDC Law Faculty, the U.S. Secret Service, or submit law enforcement reports to refute it from Feb. 9 to March 2, 2012; (3) deprived me of a $21,000 refund in tuition for Spring Semester 2012; (4) refused to send my transcript to any other ABA law school for 13 months, from Feb. 9, 2012 to March 18, 2013, when all financial obligations were met, depriving me of the chance to continue my legal education at another ABA Law School; (5) deprived me, without the Due Process they had stipulated to Federal Court that UDC Law students were afforded, of $42,000 in my property interest in my legal education; (6) deprived me, without Due Process that they had stipulated to Federal Court that UDC Law students are afforded, of my liberty interest in my professional reputation and career choice to be a lawyer by irreparably harming my legal reputation in the ABA.

## Additional Protected Activity--the UDC Law Honor Code as a Legally Binding Contract and the AALS Statement of Good Practices

We sign the Honor Code upon matriculation as a legally binding contract. A copy is attached (see **Appendix C**). It is an expressed contract upheld by a Federal Court in the District of Columbia in Washington, D.C. in 2008.

The Honor Code Contract requires us to report plagiarism to the Academic Dean or to the Dean of Students. The Academic Dean had refused to take the report in October 2011, telling me to "stop criticizing my faculty." I had formally re-reported Prof. Mack's plagiarism on Jan. 16, 2012 to the Dean of Students after obtaining two 3L students from the HIV/AIDS Clinic to corroborate my accusations against Prof. Mack.

I had written to my U.S. Senator about the plagiarism on Feb. 6. 2012. The letter to U.S. Senator Harry Reid (D-NV), detailing Prof. Mack's plagiarism and sexual harassment, is attached. The letter was taken from my desk later that day, on Feb. 6, 2012, after class (see **Appendix D**). The "charges" by Dean Stewart were backdated to Feb. 4, 2012.

On Feb. 8, 2012, UDC PD Chief Larry Volz agreed to take a UDC PD report about Prof. Mack's sexual harassment and plagiarism. Mack was getting out of hand, even coming to UDC Law inebriated during Semester break. UDC PD saw him drunk.

Before that could happen, UDC Law Dean of Students Stewart suddenly confronted me about 8:15 a.m. on Feb. 8, 2012 in a UDC Law study lounge. She had refused to respond to my e-mail of Jan. 16, 2012 until then. In the Jan. 16, 2012 e-mail, I had discussed two matters: (1) Prof. Mack's 27-page plagiarism of his official course outline; and (2) a report by a Metro Bus Driver about a gun incident in front of the White House on H Street that Mr. Craig personally witnessed and which he had asked me to make to the U.S. Secret Service for him.

The 27-page plagiarism of Prof. Mack, UDC's ex-Dean, was far more egregious than that of Michael O'Neill, a Professor of Criminal Law at George Mason University Law School in 2008. Prof. O'Neill was both a faculty member of GMU Law and the Majority Counsel for the U.S. Senate Judiciary Committee. However, Prof. O'Neill was "let go" from George Mason University Law School in 2008 after GMU Law Dean Daniel Polsby learned of Prof. O'Neill's deliberate plagiarism of a few scholarly paragraphs. Ultimately, Prof. O'Neill had his Federal Judicial nomination to Federal District Court for the District of Columbia withdrawn on Jan. 2, 2009 because of his plagiarism.

George Mason Law's Dean Polsby was not afraid to "let go" a Professor who was on-track to become a U.S. Supreme Court Justice from his law school for plagiarism. As the late Sen. Arlen Specter said in introducing the nomination of Prof. O'Neill to the U.S. Senate on June 23, 2008, Prof. O'Neill was part of a long line of Majority Counsels for the U.S. Senate Judiciary Committee whom, Sen. Specter hoped, would go on to serve his country in even greater ways—just like U.S. Supreme Court Justice Steven Breyer had, who had gone from the position of Majority Counsel for the U.S. Senate Judiciary Committee to Federal Court in D.C. to the U.S. Supreme Court (see **Appendix E**).

Of course, everyone who was a professor at UDC Law knew the O'Neill debacle. George Mason Law is legally part of the Consortium of D.C. area law schools that includes: (1) George Washington, (2) Georgetown, (2) American, (4) Catholic University, (5) the University of Maryland, and (6) UDC Law.

So Dean Stewart knew that penalties for faculty plagiarism at an ABA Law School in the Washington, D.C. area –the Nation's Capital-- were severe from the Michael O'Neill debacle. But she refused to respond to my Jan. 16, 2012 e-mail about ex-Dean Mack's plagiarism until Feb. 8, 2012.

The American Association of Law Schools (AALS) *Good Practices Statement* requires that Prof. Mack **"fairly summarize and candidly acknowledge"** any **"significant contribution"** of student work in **"every context in which ideas are exchanged"**—such as the law school classroom (**see Appendix F**). On Feb. 8, 2012 about 8:15 a.m., Dean Stewart refused to look into Prof. Mack's substantive plagiarism that he violated the AALS *Good Practices Statement*, nor the other cases of substantive faculty cheating. She refused to look at any student or faculty plagiarism, which was rampant. I told her at that time that UDC Law's cheating and plagiarism was so bad that other law schools knew of it. In fact, a Law Librarian at the Library of Congress just two weeks before, with a very recent J.D. from the University of Baltimore School of Law, said, I "just had to get used to it."

Six hours later, at 3 p.m. on Feb. 8, 2012, Dean Stewart issued suspension papers to me by e-mail. She called me a "terrorist."

### UDC's Fake U.S. Secret Service Interrogation on Feb. 9, 2012

On Feb. 9, 2012, I tried to make an appointment to understand why she wanted me suspended.  Instead, Dean Stewart called UDC PD-—twice—at 8:30 and at 10:30 a.m.  To their credit, UDC PD refused to arrest me because I had done nothing wrong.  But at 8:30 a.m., because I still thought ---mistakenly it turned out—that she would respond to me in a professional academic manner, I had asked her opinion of the contents of my Jan. 16, 2012 e-mail—specifically about Mr. Craig's report that I had made to the U.S. Secret Service and to *FBI.gov*.  I got no reply, so I left (see **Appendix G**).

A little over four hours later, during my lunch hour, Dean Stewart staged the fake U.S. Secret Service interrogation on the third floor of the law school starting at 12:56 p.m.  Dean Stewart intercepted me after lunch just as I was going to my Criminal Procedure Class with Senior Chief Justice of the D.C. Court of Appeals William "Bill" Pryor.  Dean Stewart had five UDC PD in tow with guns and handcuffs.  Suddenly two "alleged" U.S. Secret Service Officers wearing yellow "U.S.S.S." parkas appeared.  They took me into a small third-floor conference room away from student classrooms.  A UDC PD officer stood at the door with a gun.  Then two alleged "U.S. Secret Service" Agents represented to me that they were "U.S.S.S. Agents."

Judge Pryor was our Criminal Law Professor in Fall 2011, and our current Criminal Procedure Professor in Spring 2012.

The two "Agents" began to question me.  Most of the questions that the "U.S. Secret Service Agents" asked from 12:56 to 3:30 p.m. were about Presidential Assassinations.  These two "U.S. Secret Service Agents" did not seem to know who Judge Pryor was.  Judge Pryor was John Hinckley's Judge in the District of Columbia for over 20 years.  John Hinckley was the near-assassin of President Reagan on March 30, 1981.  Hinckley was tried in the District of Columbia Court system as a "State" Court—and not a Federal Court, in 1981.  Judge Pryor became John Hinckley's Judge in 1984.

Nor did these "U.S. Secret Service Agents" know the extent to which Judge Pryor interacted with his 1L students about his John Hinckley cases. Judge Pryor not only talked about his Hinckley cases after class, but also put them on his exams.  He also brought us to see his *Gordy* Appeal, a "competency" case, and asked for information on other cases, because Judge Pryor was still an active Judge in 2011-12.

At the time I was enrolled in Judge Pryor's classes, he was the Senior Judicial official in the District of Columbia and he was writing the D.C. Court of Appeals Opinion on Gordy, a *pro se* defendant who had attempted to kill U.S. Supreme Court Justice Roberts with a sawed-off shotgun up on 2nd Street, N.E. by the Supreme Court in 2005. When the Oscar Ortega Hernandez incident happened in November 2011, Judge Pryor sent me to the Ortega preliminary hearings because these hearings involved competency issues similar to those in the *Gordy* Appeal. I enjoyed Federal Court and Judge Pryor found the Ortega competency information useful for his Gordy Opinion.

### Violation of Due Process by UDC on Feb. 9, 2012 per the 2008 Stipulation

I tried to explain Judge Pryor's discussions on his *Hinckley* and *Gordy* cases in my suspension hearings, but Mr. Strothers and Mr. Tirmazi refused to admit or listen to

any evidence at all that I produced on Feb. 9, 2012, Feb. 14, 2012, Feb. 27, 2012 and March 2, 2012.

For example, Mr. Strothers would not allow me to call by cell phone or subpoena the U.S. Secret Service on Feb. 9, 2012 to clarify who exactly had interrogated me. Mr. Strothers again refused on Feb. 14, 2012 to call the U.S. Secret Service by cell phone and check their official logs, or issue a subpoena for the Feb. 27, 2012 "appeal."

When a failing 1L student came to the Feb. 27, 2012 "Student Judicial Appeal," who said he *thought* that he *might* have heard me *once* say the words "Obama" and "assassination," *unconnected* by any verb, Mr. Strothers would not allow me to introduce or refer to any law enforcement reports to explain the use of those words, nor to Judge Pryor's *Hinckley* and *Gordy* cases that we had been assigned to read in Crim Law and Crim Procedure.

Nor was I allowed to introduce a law enforcement report in the form of a letter that I had written to Sen. Harry Reid, who is closely connected to the NRA, on June 20, 2011. This report was about the availability of ammunition at the 6303 Richmond Highway Walmart in Alexandria, VA. I was alarmed when I came to Washington, D.C. in June 2011 and saw that handgun ammunition was being sold so close to the Nation's Capital. My husband works for Walmart in Nevada. There had been a shooting incident a few months earlier at the Walmart where he works.

My letter to Sen. Reid used the words, "Obama" and "shooting."

The Reid Letter was a "target *comperanda*" report. I focused on the closest Walmart to D.C.—the 6303 Richmond Highway Walmart in Alexandria, VA. I compared the distances that Jared Loughner had traveled from his Tuscon, AZ Walmart to the distances from the 6303 Richmond Highway Walmart to potential terrorist sites-- the White House, the Lincoln Memorial, and the North Parking Lot of the Pentagon. My report showed that the 6303 Richmond Highway Walmart was closer to potential D.C. terrorist sites than the Tuscon, AZ Walmart had been to Jared Loughner's shooting site. Loughner needed only a few minutes to buy, travel and shoot his victims such as Congresswoman Gabby Giffords and Federal Judge Roll. I expressed my concern to Sen. Reid about this proximity (see **Appendix H**).

Nor would Mr. Strothers or Mr. Tirmazi admit into evidence a document from November 2011 from Federal Court in D.C.--the Detention Memorandum for Oscar Ortega Hernandez, whose hearing I attended for Judge Pryor. In that Federal Court Memorandum, reported in the *Washington Post*, the U.S. Park Service stated that Ortega Hernandez had bought ammunition on November 11, 2012 at the 6303 Richmond Highway Walmart--the *exact Walmart* where I said a potential presidential assassin might buy ammunition in my June 20, 2011 letter to Sen. Reid. Ortega also bought it in almost the identical way I said: by asking someone with a VA Drivers License to get him a gift card for the purchase as an out-of-state resident (See **Appendix I**).

Many black patrons at the 6303 Richmond Highway Walmart in June 2011 told me that they found it "offensive" that ammunition was being sold so close to the White House. They said it appeared "somebody" wanted Obama assassinated for the next election. They said Walmart sold it because Virginia Law Enforcement found it "convenient."

Nor would UDC admit into evidence an FBI report of a white male with a gun that Mr. Craig, a Metro Transit Bus Driver, had asked me to make for him on January 16,

2012, because he feared retaliation from Metro Transit P.D.  That report stated that Duvon Craig, my bus driver on 16th Street NW, had seen a white man with a gun at the "H" Street bus stop, at Lafayette Square, directly in front of the White House, get on to his bus with a concealed-carry handgun on the day before Martin Luther King Day, January 17, 2012, which explained the use of the name, "President Obama."

To me that was a frightening incident, as it would be to any reasonable person, so I made the report for Duvon.  The FBI has a copy of this e-mail sent on 4:46 p.m. on January 16, 2012 to *FBI.gov*.  At the time, a Uniformed Division (U.D.) Officer of the U.S. Secret Service at the 17th Street Office told me there are "2,000 guns around the White House" everyday and that he did not want the report because "it happened yesterday," or words to that effect.

With this additional information, I realized that Mr. Craig might have observed either a legitimate U.S. Secret Service security exercise testing the perimeter of the White House, or that Mr. Craig might have seen an actual threat in progress by a man who was seeking to determine by the use of his handgun whether or not the White House perimeter out to Lafayette Park was protected by metal detectors.

I therefore made Mr. Craig's report to *FBI.gov* at 4:46 p.m. on Jan. 16, 2012 based on this new information provided by the U.D. U.S.S.S. Officer.  I do not have his name but he was young, white and overweight.  He stood outside the 17th Street Office in the New Executive Office Building just across from the McDonalds on 17th St, N.W.  I also—unfortunately—was so shocked when he said so glibly there were "2,000 guns around the White House" that I mentioned that I thought this was sensitive information about the White House to give an ordinary citizen, or words to that effect.  He got angry.  I thanked him and quickly left.  However, it seemed—the Capital was so awash in guns and ammunition that even people in Federal Law Enforcement had lost perspective.

I had also sent a screen-shot to Judge Pryor, based on an original internet search when I had found the Kentucky Highway Patrol had sold a Romanian Cugir 7 mm rifle identical to the one that Ortega Hernandez used—I described it critically in an e-mail to Judge Pryor as an "assassination gun" –capable of taking an 800-yard shot--on the official Kentucky Highway Patrol Website.  Being from Nevada, an 800-yard shot to kill an antelope is not uncommon.  However, I wondered if police in East Coast jurisdictions really understood the power of such a gun in D.C.  I was really alarmed at this type of police behavior.  I expressed my concern to Judge Pryor in the days after the Ortega Hernandez attempt in discussions after his classes where other 1Ls were present, meaning the words "Obama" and "assassination" were again spoken together.

I also found that the GSA was selling the exact type of once-fired shell that Ortega Hernandez had used—a 7mm NATO round--by the ton—on the *GSA.gov* website.  It was literally tons of spent shells—being sold all over the country by the GSA at *GSA.gov*—for as little as $35 a ton—and sent screen-shots of *GSA.gov* web sites that confirmed these sales to Judge Pryor and discussed it with him after class.  Occasionally, other law students were present.  It seemed to me—what good was gun control without ammunition control? (see **Appendix J**).

Yet I was not allowed to explain any of this to Mr. Strothers or in my "Appeals" at the so-called "Student Judicial Hearings."  There was no finding of fact.  I was just "papered" with labels with no time, date, place, manner or act attached at the behest of

Dean Stewart, and without the power of subpoena, I was helpless to compel faculty such as Dean Stewart to appear to defend myself and get at the facts of the case.

I got an FBI Summer 2012 Volunteer Internship Interview for a coveted spot at 935 Pennsylvania Avenue, Washington, D.C. at FBI Headquarters—out of thousands of students.  I even very briefly mentioned to an FBI Agent who worked at the DOJ about the Kentucky Highway Patrol's sale of an "assassination gun" at my interview at the FBI's National Recruiting Office on "G" Street before my interview on November 16, 2011.  One of the two FBI Agents present had a daughter at American University—a 2nd year law student.  She was interviewing too.  I asked him specifically if the DOJ was doing Asset Forfeiture Sales of Cigur-like rifles on their web sites—capable of long-range shots—over 800 yards—because I thought that might pose a problem for Attorney General Eric Holder in terms of *respondeat superior* liability if one turned up in another assassination attempt. At that time, there was no head of the ATF to whom one could report an incident such as this (the ATF is under the DOJ).  It seemed it was just not worth the money for the DOJ to sell these long-range shooting guns.

So the FBI thought that I was smart, but all I got from UDC was defamation.

### Dean Stewart Knew My Statements Were Made in the Context of Law Enforcement Reports, Had Qualified Immunity, and Did Not Constitute Threats

As a Law School Dean, Dean Stewart knew that my statements about "Obama" and "assassination and/or "Obama" and "shooting" were professional statements, made as law enforcements reports to law enforcement agencies, Congressional representatives, or the Senior Chief Justice of the D.C. Court of Appeals who was writing the Appellate Decision for the *Gordy* case, which involved the attempted assassination of John Roberts, the Chief Justice of the U.S. Supreme Court.  Dean Stewart knew that these reports enjoyed qualified immunity from prosecution even in a so-called "Student Judicial Hearing."  These were reports about a crime(s) that had occurred, were occurring, or were likely to occur.

Therefore, Dean Stewart had actual factual knowledge these reports by me were not "threats."  These included my reports given:

(a) on June 20, 2011 to my U.S. Senator who worked closely with the NRA about ammunition sales at 6303 Richmond Highway, Alexandria, VA;

(b) on November 16, 2011 to an FBI Agent working for the DOJ in a personal conversation at the FBI's G Street National Recruiting Headquarters about DOJ Asset Forfeiture Sales of "assassination guns" on national and regional DOJ websites;

(c) on January 16, 2012 to the U.S. Secret Service on 17th Street for a Metro Transit Bus Driver about a white male in a business suit with a concealed-carry handgun at H Street in front of the White House, made also to *FBI.gov* at 4:46 p.m. on the same date;

(d) between November 16, 2011 and Feb. 9, 2012, I sent a report and screen-shots on sales around the country by the GSA from its *GSA.gov* website of NATO 7mm spent shell rounds, and the sale of "assassination guns" such as a Cugir 7 mm rifle from official police

web sites, such as that of the Kentucky Highway Patrol, to the Senior
Judicial official in D.C. writing the Appellate Opinion on the
attempted assassination of the Chief Justice Roberts of the U.S.
Supreme Court;

(e) between Nov. 11, 2011 and February 9, 2012 I had various
conversations about the reports of (a) through (d) above with Prof.
John Brittan of UDC Law (who had been an applicant for the Majority
Counsel on the House Select Committee on Assassinations in 1978—
we both knew Bernard Fensterwald in 1978—the famous Harvard
attorney who was also an applicant for the Majority Counsel position)
and with Judge Pryor in the presence of other 1L students about the
reports of (a) through (d) above in Criminal Law and Criminal
Procedure.

Yet how did Dean Stewart treat these reports that had qualified immunity?

Here is how. I had summarized Mr. Craig's report of January 16, 2012 in my Jan.
16, 2012 e-mail to Dean Stewart. On Feb. 9, 2012 at 8:30 a.m., because she had not
gotten back to me on this, I asked her opinion why the U.S. Secret Service had reacted
this way. She said nothing and I left. However, she maliciously parodied this *FBI.gov*
report in a totally false, reckless and defamatory e-mail that she sent to Dean Broderick at
12:56 p.m. on Feb. 9, 2012. Dean Stewart's e-mail said that I had threatened Pres.
Obama's life.

Why did Dean Stewart do this? Because Dean Stewart wanted me out of UDC at
any price. Dean Stewart had never set up an ABA Complaint Process as the ABA
required. She could be fired for this, let alone, sued by students such as myself for breach
of contract. Unknown to me at the time, all of my communications about the lack of
disability accommodation for me and other 1L students, the law school's refusal to take
paperwork from my neurosurgeon who has an M.D. and Ph.D. in Neurosurgery from the
University of Pennsylvania regarding my OPLL disabled status, the complaints by me
and other students about Prof. Mack, and complaints by me and other students about
physical and verbal threats for reporting cheating--should have gone to a written
"complaint" process mandated by the Department of Education under Federal Standard
4.5 and required as of August 8, 2011 by the ABA under ABA Standard 512.

Federal Standard 4.5 is a process of insuring that a student can file a written
complaint, and that a record is kept of it so that other students may reference it in their
written complaints. On June 11, 2011, the ABA voted to require ALL ABA law schools
to implement this policy by August 8, 2011 for the 2011-12 Academic Year. This was the
year I began law school as a 1L at UDC Law. The ABA calls it "ABA Standard 512."

But Dean Stewart did not want to take written complaints—there were so many.
Therefore, under the negligent supervision of Dean Broderick, Dean Stewart willfully
disregarded ABA Standard 512, and failed to comply with the ABA's August 11, 2011
deadline.

And that is why she wrote a defamatory e-mail about me at 12:56 p.m. on Feb. 9,
2012, why she refused to speak with Mr. Strothers at 3:30 p.m. on Feb. 9, 2012, or come
to any of my suspension appeals on Feb. 14, Feb. 27, and March 2, 2012. I was a
complainer—but one of many who were concerned about the well-being of our law

school.   She was afraid to go on the record and say she had failed to implement ABA Standard 512.

### Dean Stewart's Subversion of Due Process under UDC's 2008 Stipulation

As a Law School Dean, Dean Stewart knew that a Student Judicial Hearing gave me no power to subpoena her.  As a skilled attorney, Dean Stewart used that lack of subpoena power to her personal advantage.

Dean Stewart committed defamation at 12:56 p.m. on Feb. 9, 2012 in her official law school e-mail to Dean Broderick by maliciously parodying Mr. Craig's real *FBI.gov* e-mail statement and concocting a totally false statement that I had threatened the life of President Obama.  Dean Stewart then refused to explain this **material fact** to Mr. Strothers on Feb. 9, 2012 when he called me a "terrorist" at 3:30 p.m. and immediately suspended me at her request.  Nor would she come to ANY of my hearings and appeals on Feb. 14, Feb. 27 and March 2, 2012 to explain this **material fact**.  She knew that as a law student I would have no power to subpoena her and get at the actual facts to defend myself in any so-called "Student Judicial Hearings."  So that is the forum and venue she chose.

When she made this false statement in her 12:56 p.m. Feb. 9, 2012 e-mail, Dean Stewart: (1) knew at the time her e-mail was false, (2) did it with reckless disregard for the truth, (3) knew that it would be put one way or another on my transcript and "published" when the transcript was sent to LSAC—either as a "charge" or as a "W"—a "Forced Withdrawal;" (4) and that her act would harm me by costing me my legal career.

She herself had admitted plagiarizing to me on Feb. 8, 2012.  Now she used a fabricated and malicious e-mail to kick me out on Feb. 9, 2012 based on her false report to Dean Broderick, who relayed it to UDC PD.  The legal term for Dean Stewart's subterfuge is fraud.   In Civil Procedure, I could expose Dean Stewart's subversion of the legal process by making a Rule 60 Motion for Fraud on the Court—but not in a so-called "Student Judicial Hearing."  Mr. Strothers, Mr. Tirmazi and Dean Thomas would not allow me to factually contest her false and malicious e-mail at any time.

I was shown Dean Stewart's e-mail to Dean Broderick for less than 30 seconds on Feb. 27, 2012.  Dean Duane Thomas, who gave me the Rosa Parks Scholarship, held it, read the first six or ten words about President Obama, and said, "That's a threat."  I was only allowed a glance at it.

However, from what I read, **Dean Stewart's e-mail to Dean Broderick at 12:56 p.m. on Feb. 9, 2012 was**-- to an experienced college and high school teacher such as myself— **not a Law School Dean's e-mail—but an "Angry Kid" e-mail**.  The e-mail sounded like a High School student had written it about a really hated "Teacher" who had just failed him.  The e-mail was a compendium of hate and anger about me, made right about the time Fall 2011 grades had come out in February 2012.

Dean Stewart's alleged "Obama" e-mail actually packed a laundry list of egregious misdeeds into a few lines--ranging from President Obama to Native Americans to domestic violence issues.  There were at least dozen brief allegations--I can't even remember all of them now.

There was no elaboration or ordering of these "allegations."  The allegations were just indiscriminately thrown out ----as in a brainstorming session—with no time, date,

place or manner of act.  They ranged from six to ten words saying that I had "threatened President Obama's life" to alleging that I "hated Native Americans," to some totally false and absurd point about another student's domestic violence issues—a 2L or 3L or part-time 1L whom I did not even know and had never met.

    The only "Native American" comment I had made was a very pro-Native American interpretation about the 1948 Indians Claims Commission case we had just read in Contracts.  I was one of four students to get an A or A- grade in Contracts I without cheating.  However, about 70% of the 3L students, including many of our Teaching Assistants, had cheated on their Contracts II exam as a result of one of them stealing the Professor's exam.  They were now preparing their Bar applications.

    I did not know on Feb. 9, 2012 that 70% of the 3Ls had cheated. But I was almost universally hated and despised at UDC Law just because I could answer the Professor's questions in Contracts I.

    To me, as an experienced high school and college teacher, Dean Stewart's e-mail was an **"Angry Student" e-mail**.  When I saw Dean Stewart's 12:56 p.m. Feb. 9, 2012 e-mail—less than 30 seconds—the "genre" that popped into my mind as I glanced at it was an **"Angry Student" speech-where the "Angry Student" gets back at "Teacher."** Therefore, I wondered at the time—was Dean Stewart actually the author of it? Or was it a composite of snippets of several **"Angry Student"** e-mails that Dean Stewart had stitched together into an e-mail and then e-mailed to Dean Broderick?

    UDC would never tell me whether Dean Stewart was the e-mail's author.  Nor would Mr. Strothers and Dean Thomas allow me to factually challenge each allegation in it starting with the totally false and baseless allegation that I threatened President Obama's life, by introducing the evidence that I have discussed, in order to show that it was a fabrication based upon Mr. Craig's report sent to *FBI.gov*.  Dean Stewart herself had only read Mr. Craig's report for the first time only a little more than four hours earlier—at 8:30 a.m. on Feb. 9, 2012.  A couple of 1L students had heard me discussing it with Judge Pryor.  I had told her about it in my Jan. 16, 2012 e-mail to her.  But I had never shown her the actual report until Feb. 9, 2012 at 8:30 a.m. when I asked her opinion about it.

    Further, as I stated, UDC REFUSED to give even a *redaction* of its charges—let alone a copy--on Feb. 27, 2012 or at any time since then.  I was not allowed to analyze it linguistically—as I had done to Prof. Mack's outline when I caught him plagiarizing.  I could easily refute Dean Stewart's e-mail in any fact-finding process, using a combination of linguistic analysis, law enforcement reports, class discussions, and testimony by Judge Pryor.  But UDC refused to allow me to defend myself in any way regarding her e-mail.

    Nor did Mr. Strothers and UDC, in a repudiation of UDC's statement to Federal Court, ever write a three-page finding of fact, incorporate Dean Stewart's e-mail as the key piece of evidence, present his linguistic analysis, and base his written decision on his fact-finding of separating the truth from fiction in this e-mail to justify my suspension.

    There was no "written decision."  The e-mail just "papered" me with the word "terrorist," and for Mr. Strothers, that was enough.

    My 13-month suspension and the ruin of my legal career was based on what appeared to me to be an **"Angry Student"** e-mail that Dean Stewart represented to Dean Broderick as her own e-mail.  Dean Stewart: (1) didn't even allow me to fully read the e-

mail or know what its contents alleged; (2) refused to give me a *redaction* of the charges or a copy of the e-mail itself; (3) refused to subject the e-mail to any fact-finding process that could determine what was true in the e-mail and what was false; (4) deliberately concealed the e-mail from any written record by the University.

Dean Stewart chose a *University process* that she knew ahead of time would produce *no written record*.  She knew I did not yet know about the 2008 Federal Court case involving UDC, as she and all UDC Faculty did, so there was little chance I would understand the illegal nature of the University's action in suspending me as a UDC law student who had been deprived of the Due Process stipulated in that case.

This amounted to a repudiation of UDC's 2008 Federal Court stipulation.

Obviously, Dean Stewart did not want a record to be made.

If Dean Stewart had done this in a criminal legal context, she would be said to have committed *obstruction of justice*.

But because of her lack of implementation of ABA Standard 512, I could not even complain about that.

Finally, there was no student "misconduct" involved in reporting the sale of ammunition, in making Mr. Craig's report to law enforcement, nor in discussing assigned cases with Judge Pryor after class with other interested students. Nor was there "misconduct" in meeting, through Judge Pryor, David Bos, the Federal Public Defender of Ortega Hernandez, or Gregg Maisel, the National Security Section Chief for the Department of Justice, the man who has President Obama's daily schedule. In fact, Judge Pryor had even given me his own "instructors only" (#41004439) copy of Leslie W. Abramson's new book, *Quick Review: Criminal Procedure,* only four days before the "fake" U.S. Secret Service interrogation.

Judge Pryor's problem, however, was that he should have reported the eight cases of faculty plagiarism and over 80 cases of student plagiarism to the D.C. Bar.  But Judge Pryor did not do this, thus committing a serious judicial ethics infraction as the Senior Chief Justice of the D.C. Court of Appeals.

### The Lack of Any Complaint Process at the School Despite Federal Standard 4.5 and the ABA's 512 Standard for a Written Complaint Process Starting August 8, 2011 for the 2011-12 Academic Year and Beyond

UDC staged this fake interrogation as a pretext to remove me from the Law School because as an institution it had failed to establish a valid complaint process that satisfied Federal Standard 4.5 and ABA Standard 512.  As a Title IV institution, UDC Law is required to have a complaint process under its contract with the Department of Education under Federal Standard 4.5.  ABA Standard 512 implements Federal Standard 4.5 in a law school context.  As an ABA accredited law school, UDC Law was required to adhere to ABA Standard 512, enacted on June 11, 2011, by August 8, 2011.  Failure to do so could lead to the loss of its ABA accreditation.

That Federal Standard 4.5 is simple and states that, in order to be accredited by its regional body, UDC Law must demonstrate that:

> "The institution has adequate procedures for addressing
> written student complaints and is responsible for

demonstrating that it follows those procedures when
resolving student complaints."

As an ABA accredited law school, UDC Law was required to have established a
valid complaint procedure that comported with ABA Standard 512 by August 8, 2011.
Yet even as of August 22, 2013, two years later, UDC Law had failed to comply with
ABA Standard 512 in its electronic Handbooks.

ABA Standard 512 addresses complaints about accreditation—such as cheating,
failure to follow the Honor Code, and other accreditation issues that I had raised
repeatedly with Deans who had rebuffed me.  This even includes written complaints with
the law school about compliance with ADA procedures.

ABA Standard 512 reads this way:
 "*ABA Standard 512: Student Complaints
 Implicating Compliance with the Standards*
  (a) A law school shall establish, publish, and comply with policies
      with respect to addressing student complaints.
  (b)A law school shall maintain a record of student complaints
      submitted during the most recent accreditation period. The
      record shall include the resolution of the complaints.
  (c) A "complaint" is a communication in writing that seeks to bring
      to the attention of the law school a significant problem that
      directly implicates the school's program of legal education and
      its compliance with the Standards."

I was not even allowed to ask for ADA accommodation, nor present the requisite
documents to demonstrate my disability of OPLL and lymphangioma.  Dean Broderick
refused to help me apply for it, and Dean Richardson would not let me talk to her because
she did not like the fact that I had "criticized" her faculty in October 2011.  I had
plenty of medical documentation, but the school would not accept it.  And I could not
make a written complaint about it due to the lack of an ABA Standard 512 written
complaint procedure that was not in place at the time.

The school had refused for weeks to get disabled students lockers, and when they
did, they were in the basement steam room and ruined our law books.  Nor would the law
school provide carrels that were secure, nor a study room where 1L disabled students
could leave their 80 pounds of books each day and take them home at night.

UDC Law simply refused to take any complaints or keep a record of them that
might affect its accreditation by the ABA—written or oral.

## Seven Cases of UDC Faculty Plagiarism and Over 80 Cases of UDC Law Student From May 2010 to May 2012

UDC Law had to establish an Honor Code because of the loss of its ABA
accreditation in the 1980's.  The Honor Code is a legally binding contract upheld in
Federal Court in 2008 in a case involving a disabled female law student who was
suspended for one year for doing exactly what Prof. Thomas Mack did—she copied her
outline from someone else.  Dean Stewart is in charge of the UDC Honor Code.
Plagiarism by students and professors (and sexual harassment by students) fall under the

Honor Code.   The Honor Code was made expressly a bi-lateral contract by UDC Law, governing both students AND faculty.

I found that for the past six years the law school had unjustly and inequitably used the Honor Code to target disabled law students for suspension, while giving non-disabled law students and non-disabled faculty a "pass" for even the most egregious and violent acts to defend their cheating under the Honor Code. This included giving a "pass" to non-disabled law students had who made "cyber threats" on the law school's official *Facebook* web page such as "Snitches Get Stitches." About 70% of UDC Law 1L students were caught cheating on a Final Exam in Contracts II and earned an "A" grade.

The law school refused to suspend any of them despite this threat that a UDC Law professor called an "imminent threat of physical harm" and the fact that the Maryland Appeals Court had upheld "Snitches get Stitches" to be a death threat in a May 27, 2010 decision contemporaneous with UDC Law's cheating scandal and *Facebook* posting (see **Appendix K**).

### The 2008 Federal Lawsuit in the District of Columbia and Dean Stewart's Disability Bias

In 2008, a disabled female law student sued UDC Law for her suspension in Federal Court.  She argued the law school retaliated against her and had failed to accommodate her reasonable request for a note take.  No attorney in Washington, D.C. would represent her—she filed *pro se*.  But she won. In 2003, she had quietly copied another student's outline and studied from it—and added a few unattributed paragraphs from the Internet on an exam.  That was her "Honor Code" offense.  The Federal Judge found that she had plagiarized.  But she did it, he reasoned, because the law school would not provide a note taker for her.  The Federal Judge ruled that the law school had failed to accommodate her disability before suspending her (see previous **Appendix B**).

In the course of that ruling, UDC Law stipulated to the Federal Judge that UDC Law has **"zero tolerance"** for plagiarism.  The law school said that their standard punishment for the **plagiarism of an outline is a one-year suspension.**  The Federal Judge ruled, based on UDC Law arguments, that the Honor Code is a legally binding contact that could be arbitrated in Federal Court by a Federal Judge to uphold the promises made not to plagiarize between the professors of the law school and the law students.  The contract of the Honor Code is attached.

### Law School's Honor Code and AALS "Good Practices" on Attribution

UDC Law understood from 2008 forward –from its own statements in Federal District Court--that if any member of its law school community who is a signatory to the Honor Code –faculty or students--copies someone else's entire outline, that act provides sufficient grounds for a year's suspension.

Why is an outline such a big deal—a "Federal case?"  Because an outline is considered the heart of one's professional work product as law students and as law school professors.  It is where we learn and practice integrity, and its conciseness is a valuable tool for interpreting difficult legal cases.

The American Association of Law School's *Good Practices* statement, as we saw, sees a law professor's "re-use" of a student outline as a type of fraud. For a professor to use a student's outline is the same, in the eyes of the AALS, as if a Ford or Chevy dealer sold a "used" car to a customer as a "new" car. As law students, we pay tuition for a "new" outline -- written by the professor himself or herself—and not "used" ones that a professor recycles from a law student.

The AALS states that for any "published" work—covering web or scholarly journal publication— **"significant contributions"** must be cited by the AALS professor in one of three ways: (1) *shared authorship*; (2) *attribution by footnote or endnote*; (3) *discussion of another's contributions within the main text*. Prof. Mack, as an ex-Dean of an AALS school, was clearly aware of these guidelines but chose to commit fraud and give us an "old" outline on the official UDC Law website whose authorship he refused to acknowledge in any of these three AALS-approved ways (see previous **Appendix F**).

### Dean Stewart's Disability Bias and UDC Law's Honor Code Contract

Disability bias in the application of the Honor Code was atmospheric at the law school by Fall 2011 when I entered as a first-year law student on August 15, 2011. From May 2010 to May 2012, Dean Stewart failed to discipline the plagiarism of seven faculty and over 80 law students. These non—disabled students received just a slap on the hand. Some plagiarizing 1L students were even rewarded with a Teaching Assistantship the year in which I entered—their 3L year-- and became our Teaching Assistants in Fall 2011-- even when the plagiarism and cheating involved ILLEGAL and VIOLENT acts.

I will start with the faculty. Seven plagiarism incidents involved UDC Professors and one involved a law professor at Ohio State who was a friend of our law school faculty. All of these incidents occurred under Dean Stewart. Not a single faculty member, including Michelle Alexander at Ohio State Law, was disciplined:

(1) **Dean Broderick, Dean of UDC Law----Failure to Report Law Faculty Scholarly Plagiarism at Ohio State Law per the UDC Honor Code Contract and her ABA Contract**
On August 17, 2011, Keana, a fellow 1L from Howard University and I reported to Dean Broderick that **Michelle Alexander, who teaches at Ohio State Law, and is the wife of U.S. Attorney Carter Stewart,** had plagiarized an entire chapter in her book, *The New Jim Crow*. We had been required to read this book for Orientation Week and Dean Broderick had just given a speech on the importance of not plagiarizing. Dean Broderick did nothing— she did not call the Dean of Ohio State, nor in any way thank or respond to Keana and I; in fact, in 2013, Michelle Alexander wrote a column for the *New York Times* on her book and I e-mailed the *Times*, and they have not carried her again as a columnist or op-ed contributor.

(2) **Prof. Michelle Alexander**—see above; her case is identical to that of Michael O'Neill—she lifted passages from a 1970's magazine article for her book, *The New Jim Crow*. The only difference is that: (1) she is married to a U.S. Attorney who is a personal friend of Eric Holder; (2) Ohio State Law has not

yet fired her.  I made the complaint with Keana precisely because I was concerned that as a law professor, she might be nominated to be a Federal Judge and this would prove to be an embarrassment to President Obama, just as Michael O'Neill was a true embarrassment to President Bush.

(3) **Prof. Kermit Mawakawa, UDC Law Professor –Plagiarized Assignment**
On August 18, 2011, he plagiarized his opening assignment for Contracts I; he took it from an older *Readers' Digest* "History of the World" column without attribution, citation or acknowledgement.   It was a use that copied the idea, form and manner of the *RD* article and presented it as his original idea. Plagiarism is never a good way for a professor to say "hello" at his/her first class.

(4)     **Senior Chief Justice William Pryor of the DC Court of Appeals, UDC Criminal Law Professor—Failure to Report a Theft of a Final Exam and a CYBER THREAT of Imminent Bodily Harm on the Law School's official *Facebook* site run by Mr. Michael Harris, a UDC Law Administrator**

In May 2010 he failed to report ANY of the 70 students involved in the May 2010 cheating scandal to State Bars, committing a serious breach of judicial ethics because he:
   (a) failed to report these 70 students to the D.C. or Maryland Bar prior to their taking the bar exam during 2011-2012 academic year--their 3L year—as they applied to the D.C. and Maryland Bars;
   (b) wrote letters of recommendation for at least one of the cheats for a D.C. Public Defender Internship in 2011 when she was a 2L;
   (c) saw that his colleagues at UDC Law made at least two of these students our Teaching Assistants in Torts, contrary to every ABA practice, for 2011-12 when I was a 1L in Prof. Mack's class;
   (d) failed to report a cyber threat to UDC PD or Metro PD that a law student who was among the cheats in 2010 wrote, "Snitches Get Stitches" on the official FACEBOOK web site of UDC Law, a site that is run by Mr. Michael Harris, an Administrator at the Law School itself, which remained up even when I was a student and which is a phrase that  Professor Robin Alexander—the law professor whose exam was taken, called it "cyber bullying" and a "threat of imminent of bodily harm" (see previous **Appendix E**);
   (e) other students such as John Miller and his plagiarism was rewarded by Prof. Pryor with an "A" grade and a TA-ship under Judge Pryor.

(5) **Prof. Angelyn Flowers --UDC Law and the UDC Department of Criminal Justice—felony violation of 18 U.S.C. 666, Honest Services Fraud,** by using a **FAKE Ph.D.** to obtain a **$2.9 million Department of Homeland**

**Security Grant along with her Corporate Partner, General Physics of Maryland**

In September 2011 and January 2012, I was turned down for a position as an **Institute of Public Safety and Justice Intern** as part of a requirement to do a 40-hour Internship for my J.D., not knowing at that time that the woman in charge of that Program, UDC Law **Professor Angelyn Flowers,** who headed the Institute, had a fake Ph.D. for which she had paid approximately $3,400 and which she used to:

> (a) illegally obtain a position as **Chair of the Homeland Security M.A. Program at UDC,** which she could not otherwise obtain without a Ph.D.;
>
> (b) employed two friends who also had fake Ph.D.'s from the same institution in the British Virgin Islands to work on this grant as full-time faculty in the UDC Department of Criminal Justice, that included **Mayor Marion Berry's former Head of the D.C. Department of Corrections**;
>
> (c) without the fake Ph.D., none of the three had the qualifications to even teach in the M.A. in Homeland Security at UDC, let alone serve as Chair of it, as grading Masters students requires not merely a J.D. but a Ph.D. according to accreditation rules;
>
> (d) had used this fake Ph.D. to illegally obtain, with her corporate sponsor, **General Physics of Maryland, a $2.9 million DHS Grant,** when Prof. Flowers knew that Laura Callahan had been fired from a salaried position with DHS for merely using a diploma mill Ph.D. to gain a position at DHS in 2003;
>
> (f) General Physics is contracted with DHS around the country to run "active shooter" training programs— in Florida, Iowa and Tennessee, yet cannot vet its own "trainers" on such exercises as Angelyn Flowers for Federal Grant Fraud;
>
> (g) The so-called "Dr." Flowers has submitted as recently as 2013 a scholarly article to an international academic journal, **The Journal of Homeland Security and Cyber Security,** without disclosing that her so-called "doctorate" is fake and her conclusions cannot be relied upon to protect from a terrorist attack (see **Appendix L**).

**(6) Prof. Thomas Mack—UDC Law Torts I Professor -- Plagiarism of His Official Torts I Course Outline on his official UDC Law Webpage**

By October 6, 2011, I believed that Prof. Mack had plagiarized his outline. When he forced us to visit him in his office hours, I asked him about it, he denied it, and he sexually harassed me—making an obscene offer of sex. UDC PD Officer Reeves told me to report this to Chief Volz in late January 2012. A forensic linguistic examination of Mack's outline demonstrated that it was plagiarized, and I had two 3L students from the HIV/Aid clinic who were willing to testify to this on Jan. 16 when I e-mailed Dean Stewart,   who subsequently suspended me as a "terrorist" at gunpoint;

### (7) Professor Houston—UDC Law Legal Writing Program Chair—Failure to Report Student Plagiarism

October 2011, Prof. Houston, from Harvard Law, who headed the Lawyering Process/Legal Writing Program, was allowing first-year UDC Law students to pay attorneys and law students at UDC and other law schools and have their law papers all but "written for" them—meaning— the tutor could dictate the ideas but not physically "type" them.  This was a clear violation of the Honor Code.  Those with the ability to pay were all non-disabled students; additionally, Prof. Houston bragged at UDC Law that she is a close personal friend of U.S. Attorney General **Eric Holder**;

### (8)  Karen Evans, LP Professor at UDC Law, who is also a U.S. Naval Reserve Officer, and an Associate at Jack Olender--THREAT

On Feb. 6. 2012, two days before I received suspension papers, Prof. Evans, in her LP Class, threatened me in the hearing of the Class, said that if I pursued the Prof. Mack plagiarism allegation that, "I would get into more trouble than I could imagine" or words to that effect if I re-reported the allegation with the testimony of two 3L students as corroboration to Dean Richardson. Prof. Evans did not dispute that Prof. Mack had plagiarized, or that many of the 3L students knew that factually, only that she did not want me to report it to UDC PD or re-report it to Academic Dean Richardson.

STUDENTS: ALL NON-DISABLED

(9)    **John Miller—3L**
In October 2011, I learned that John Miller, a T.A. for Judge William Pryor's Criminal Law class in which I was a student, had paid a J.D. student who advertised at several law schools each semester in the Washington, D.C. to write his study outline for Criminal Law, from which he studied for the final, and whose work product Mr. Miller employed in earning an "A" and becoming a TA for Judge Pryor. Mr. Miller wanted to be a District Attorney in Oregon.  Mr. Miller told me, "It doesn't matter how you get the professional knowledge" or words to that effect in a later conversation with me. Judge Pryor is  the Senior Chief Justice of the District of Columbia Court of Appeals.

(9) In May 2010 --**Exam Theft of the Contracts II Final Exam**—report by Dean Stewart, the correspondence and report of the "Cyber Threat" on *Facebook* is

attached (see previous **Appendix E**).  In this May 2010 incident, 70% of 1L students cheated.  This should have been disclosed to us by the Law School to entering 1L students because many of the cheats became our Teaching Assistants in 2011-12 in their 3L year. Yet—we had not a single disabled T.A. Dean Stewart suspended no one. She changed their fake "A" grade to a "C" instead of an "F" so as not to attract the attention of the ABA or the D.C. and Maryland Bars, another act of subterfuge.

It was an ILLEGAL and VIOLENT incident in which the students:

      (a) broke into the Prof. Robin Alexander's office;

      (b) took the exam from her office—a felony THEFT never reported to UDC PD;

      (c) shared it with each other and constructed answers;

      (d) wrote what Prof. Alexander called "cyber bullying"—a "threat of imminent physical harm"—on the Official UDC Law *Facebook* web site administered by Mr. Michael Harris of UDC Law, that if anyone were to talk about the cheating, then, "Snitches Get Stitches;"

      (e) the letters exchanged between Dean Stewart and Prof. Robin Alexander about this are attached as **Appendix K**;

      (f) After the "CYBER THREAT" was posted on the law school's OFFICIAL FACBOOK web site warning anyone from reporting this cheating, that said, "Snitches Get Stitches," Dean Broderick left it up for months and months. This appeared to a reasonable person to be a continuing threat endorsed by the law school itself not to report cheating. Why? Many had become our Teaching Assistants by 2011 and it was more than an embarrassment to the law school  (see previous **Appendix K**).

**(10)   Fall 2011: "Cyber Bullies" Made Teaching Assistants**

      Two non-disabled 3L cheats from the 2010 episode detailed above became Teaching Assistants in Torts I while disabled students who had not cheated were rejected. Other cheats from 2010 were hired in other classes that included Criminal Law; other 3L students who cheated were allowed to become UDC Law Student Association presidents and officers. Dean Stewart disclosed none of this to our entering 1L Class. So we had "cyber bullies" as our Teaching Assistants.

**(11) November 2011: Plagiarism of Assignments**

      ▓▓▓▓▓▓▓▓▓, was using a 2L UDC Law student to create his professional work product in Torts I that he presented in class as his own work; he was also a non-disabled student;

**(12) November 2011: Plagiarism of Outline**

      ▓▓▓▓▓▓▓, employed the same tutor for the same purpose that John Miller had used in Criminal Law, who prepared a canned outline which they used for the Crim Law Final.

(13) **December 2011: Unreported Racial Taunts**

      3L UDC Law students refused to report violations of conduct or academic deficiency—for example; a 1L whose friend was failing and who had nearly hit me had screamed at me, "Old white thing, why are you here?" She had screamed this over and over outside a door where a faculty meeting was taking place on the third floor of the law school, and her friends threw books at me.

(14) **Feb. 7, 2012: Daddy's Old Georgetown Briefs Read in Class**

      Dean Stewart failed to investigate the plagiarism of another 1L who was reading his Father's old briefs from Georgetown Law in class as his own work--verbatim—this is 4th grade cheating—using your parents' work—at the start of the semester too! His father was a big attorney in D.C. from Georgetown Law and the father was best friends with Dean Broderick, also from Georgetown Law. A former employee for the U.S. Senate Judiciary Committee was also using the briefs of others to prepare her own briefs that she read in class and represented as her own –just like Michael O'Neill.

(15) **Feb. 9, 2012: More Taunts**

      (15) On Feb. 9, Royal Sims and others taunted me after the "fake" U.S. Secret Service interview, saying, "How does it feel to be interviewed by the Secret Service." Royale had been assigned to be a partner in Prof. Evens LP Class, and he had done next to nothing on an assignment worth 25% of our grade. I had earned a 24.75% out of 25% grade. However, Royale was resentful that I told Prof. Evans he had done next to nothing. He called me an "Ageist" and taunted me in other ways—just for asking him to do his job. That is why the ABA prohibits these types of assignments. So Royale was angry I caught him cheating.

**Dean Stewart's Own Plagiarism in Law School and Her Conflict of Interest in Administering the UDC Honor Code Contract**

      Finally, when Dean Stewart on Feb. 8, 2012 at 8:30 told me that she had extensively used the briefs of past law school students to write her own briefs in law school, I replied, using the words of the UDC Honor Code, "If you used the words, thoughts and ideas of others without attribution on your exam or on in-class answers to the professor that you claimed as your own, then you committed plagiarism." She looked shocked and immediately turned around and left. Dean Stewart did not even realize that she had gotten through law school and made law review as a plagiarizer. This was at 8:30 am. I received my suspension papers from her about 6 hours later, at 3 p.m.

**Does Dean Stewart's Impersonation and Disability Bias Warrant Criminal Charges under 18 U.S.C. 912 or 18 U.S.C. 249, the Matthew Shepherd and James Byrd, Jr. Hate Crimes Prevention Act of 2009?**

      Let's be clear. Impersonating a Federal Officer is a felony under 18 U.S.C. 912.

According to the DOJ Prosecution Manual, prosecution of this felony requires one of two prongs to be met: (1) an **overt act** such as the presentation of false identification, or (2) the solicitation of the victim to obtain **something of value** for the perpetrator's alleged "office"—such as my financial records. The actions of the U.S. Secret Service imposters on Feb. 9, 2012 met both of these prongs. As to (1), the **overt act**, the school knew the identifications were false, as indeed the U.S. Secret Service told me that they were on February 13, 2012 when I asked them to re-check their official logs. As to (2), **solicitation**, they demanded my **financial records.**  I had **a 780 credit score.**

On Feb. 13, 2012, I checked with the U.S. Secret Service on "L" Street—their Washington Field Office because UDC had refused to contact them on Feb. 9, 2012. A U.S. Secret Service Agent examined their official logs and told me that no one from the U.S. Secret Service ever came to the law school on Feb. 9, 2012. The U.S. Secret Service Agent also demonstrated that the identifications presented by the so-called "U.S. Secret Service Agents" were false. I have made a FOIA to the U.S. Secret Service to confirm this conversation, and received a reply on May 17, 2013. I give you permission to access my FOIA #20130333 (see **Appendix M**).

From Feb. 9 to March 2, 2012, Dean Stewart refused to come and explain the **FAKE** U.S Secret Service Interrogation of me at gunpoint at ANY of my suspension hearings or appeals. She also refused to compel ANY of the five faculty who had broken the Honor Code, a legally binding contract upheld in Federal Court in 2008, to come to any hearing, or explain or put into context our study of Judge Pryor's rulings on the John Hinckley or Oscar Ortega Ramirez cases in Federal Court in 2011-12. This included: Prof. Mawakawa, Senior D.C. Court of Appeals Justice and Prof. Bill Pryor, Prof. Mack, Prof. Flowers, or Dean Broderick.

Dean Stewart's actions betray her own consciousness of her guilt.

As an ABA Law School Dean in Washington, D.C., she knew that the U.S. Secret Service may only legally testify in response to a subpoena, and therefore she violated **my 5th Amendment right to Due Process, and illegally deprived me of my property right in my legal education and the $41,000 I had invested in it,** by faking this U.S. Secret Service interrogation and then preventing me from simply calling by cell phone or issuing a subpoena to the U.S. Secret Service to find out the real facts.

She also **violated my 4th Amendment rights** by seeking my financial and medical records at gunpoint without a search warrant at the end of the fake U.S. Secret Service interrogation. Such an act constitutes an admission by her, UDC and UDC PD that **no probable cause ever existed** to even detain me or accuse me of wrongdoing or suspend me even for one minute from the moment UDC served me with suspension papers at 3 pm on Feb. 8, 2012.

How much " Due Process" was I owed?  I was owed enough "Due Process" to defend myself.  And if that meant it took a cell-phone call or a subpoena to get at the truth, then it took a cell-phone call or a subpoena.

## Dean Stewart's Awareness of the Financial Cost of Exposing AALS Law Faculty Plagiarism as a Reason Why She Targeted my Disability on Feb. 9, 2012

Dean Stewart and Dean Broderick targeted me as a disabled person because they both had an unforgettable lesson in how law students can dig up acts of plagiarism by an

ABA law school professor, at his/her law school, and sink his academic and Federal Judicial career for plagiarism right in D.C.

It was the example of Michael O'Neill of George Mason University School of Law, "let go" for plagiarism in 2008 and whose plagiarism became public after being nominated to the Federal District Court for the District of Columbia by President Bush.

Mr. O'Neil earned his J.D. from BYU Law—a law school that takes its Honor Code very seriously. However, not as seriously as George Mason University Law School takes its Honor Code.   Mr. O'Neill's failure in his U.S. Senate Judiciary Confirmation Hearings was an unforgettable lesson for UDC Law on how a real law school, such as GMU Law, handles a case of plagiarism by a professor.  Prof. O'Neill: (1) taught at UDC Law's consortium of D.C. law schools; (2) was nominated to the Federal Judicial District in which UDC Law was located; (3) had plagiarized not a 27-page outline but merely a few paragraphs; (4) was discovered by his law students to be a plagiarizer; (5) was "let go" just 10 miles away from UDC Law; (6) and had his Federal nomination withdrawn for plagiarism.  Although Michael O'Neill had steered the nominations of Samuel Alito and others through the U.S. Senate as a skilled and powerful attorney, nevertheless, Mr. O'Neill's nomination was withdrawn in 2009 after the extent of his plagiarism was reported by the *New York Times* in 2008 (see **Appendix N**).

### The Law School at All Times was the Physical Aggressor From August 2011 to March 2012 under Dean Stewart

As you can see, reporting cheating at UDC Law, as opposed to George Mason Law just 10 miles away, or to the U.S. Senate Judiciary Committee, is a dangerous activity.  As the *Facebook* website of UDC Law says, "Snitches Get Stitches."

The physical threats against me were made by students and by UDC Law School personnel such as Dean Broderick and Dean Stewart.   UDC PD tolerated these acts of physical bullying that were on top of the verbal taunting.

The acts started the first week of class, August 15, 2011, and UDC PD would do nothing for the rest of my time at UDC Law.

The very first week of law school, after reporting the Michelle Alexander plagiarism incident, a 1L student attempted to assault me—in class.  I reported it to UDC PD Assistant Chief Cathy Hilton, a good friend of Dean Broderick.  Cathy Hilton refused to act.  Instead of saying, "Nancy, this was bad.  If this ever happens to you again, please contact us immediately," Chief Hilton said there was nothing UDC PD could do for me. I was forced to stay in my Lawyering Process class all semester with her even though several students saw her try to hit me in the head when she was angry at losing some contest in our Contracts I class.   Why did this student not get an Honor Court hearing?

Because there was no ABA Standard 512 Written Complaint procedure in place, I could not complain.

Here is another case from October 12, 2011.

I was interested in child prostitution as a possible area in which to work.  The wife of a 3L—who was a former Uniformed Division U.S. Secret Service officer in Washington, D.C., told me through her husband that there were FOUR Hispanic underage brothels in Washington, D.C.---FOUR.  When I confirmed the location of TWO of them, I-emailed the FBI and got this reply—it said—go immediately to MPD and

report it.  These Hispanic brothels serve approximately 80,000 Hispanic undocumented workers in D.C. Sgt. Perez of MPD in Georgetown confirmed this.  The trouble was—MPD did not want this report.  I did not know it at the time, but Cathy Lanier, the MPD Chief, was under investigation at that time by **Human Rights Watch** for unreported and unprosecuted rape in D.C., and this only added to Chief Lanier's problems  (see **Appendix O**).

The next day, Oct. 13, 2011, Dean Broderick came up to me in the first-floor foyer of the law school and said, "What do you think you are doing?" Or words to that effect.  She physically confronted me—just like the students—and would not let me pass.  She was upset I had made the report—to help children—because Cathy Lanier was a personal friend of hers, a fact I did not know. Of course, it did not help that Cathy Hilton had worked at MPD for 24 years, most recently as a top aide to MPD Chief Cathy Lanier, while Chief Lanier's alleged suppression of rape and the reporting of these four child brothels had occurred.

Because there was no ABA 512 Standard Complaint procedure in place, I could not make a complaint.  Why did not Dean Broderick say instead, "Nancy, let me help you find a place for your 40 hour internship at the International Center for Missing and Exploited Children—just across the Potomac Bridge in Alexandria?"

Even a UDC Law staff member—with whom I was discussing Biblical Hebrew—screamed at me when I just touched her secular Hebrew grammar, telling her that I had spent the Summer of 2009 at Harvard Divinity School doing Intensive Intermediate Hebrew and would love to help her with any grammatical problems she might have in learning Biblical Hebrew.  I've taught Biblical languages for years, it was a secular grammar, not a religious one, and her actions were disgusting.

But there was no ABA 512 Standard Complaint Procedure in place.

Another disabled law student, a 1L from Nevada like myself, told me in December 2011, knowing I was asking for reasonable accommodations for all of the 1L students said, **"Nancy, if you don't shut up, they are going to kick us all out,"** meaning—the disabled 1L students. The law school had refused to provide study carrels where we could leave our 80 pounds of books, as the ABA requires, and the lockers the law school gave the disabled students were in the building's steam room, so the steam ruined our $300 books if we left them there overnight.  The law school had refused to give us better lockers or a room with a key pass and plastic tables on which to study.

In January 2012, during a class, Former Dean Edgar Cahn told me that the law faculty "did not like me" but refused to say why.  But there was no ABA Standard 512 Complaint Process to lodge my concern in writing.

Finally—students reported to me that someone had broken my handicapped "Mega Cart" by stepping on it in December 2011 after a Crim Law class.  She/he must have weighed over 250 pounds because the "Mega Cart" had a load limit of 250 pounds, and its wheels can only be broken by a weight load of 250 pounds or more. Judge Pryor had used my "Mega Cart" to illustrate the concept of "possession" in his law class in October 2011 Judge Pryor had referred to it on exam time in December 2011, so everyone in that class knew that I was disabled and had to use the cart to get around with my 80 pounds of books.

Again, without a 512 ABA Complaint Process in place, so no a 1L classmate could come to my aid and tell the Law School Administration who did this.

I just asked Dean Broderick for UDC Law to pay for it in January 2012 so that I could purchase a new one. UDC Law refused to pay for it in January 2012. I was prohibited from calling any of the 1L witnesses to testify at my so-called Student Judicial Council Hearings because Mr. Strothers screamed at me, "This is about you," even though the person whom many people told me did it reportedly came to the hearings.

I had also even offered to tutor this person in Civ Pro for the Spring 2012 in January 2012, just to show there were no hard feelings. I was getting an "A" and she/he was getting an "F." I just believed in turning the other cheek.

This is only a partial list of the physical and verbal abuse, which ranged from blocking me going into the elevator numerous times, to the head of the Christian Legal Society screaming at me in the basement hallway at the top of her lungs—that the pedophile crisis in the Catholic Church—(she was from Boston) was invented by enemies of Catholicism. Oh yes—a Torts TA and 3L screamed at me—after I came back from the Godoch incest prostitution prelim hearing in Federal Court in early January 2012 from another case (the Godoch prelim hearing was Dec. 23, 2011 and the Complaint was sealed so no one knew who the Defendant or what the Charges were until Judge Faciola unsealed it), "Nancy, control your Jews"—over and over, along with another 3L, taunting me. You can clearly see— the Law School was the real "terrorist" here. Dean Stewart knew of but refused to do anything about these incidents. Nor would UDC PD. It was just the law school's policy that "Snitches Get Stitches."

Why? Because there was no ABA Standard 512 Complaint Procedure in effect, since Dean Stewart had willfully refused to implement one and Dean Broderick approved that decision. Therefore, it was not possible to make a written, reasoned, thoughtful, signed complaint and, absent such a policy, the Law School therefore neglected to keep any record of complaints to reveal patters of abuse, such as these verbal and physical assaults against a disabled student such as myself from August 15, 2011 to Feb. 9, 2012.

## UDC's Violation of Due Process Despite Its 2008 Federal Court Stipulation

In the 2008 Honor Code case in Federal Court, UDC Law told Federal Court that its standard for suspension of a student was to: (1) state clearly the time, date, place and nature of the violation; (2) allow a student to factually refute each charge; and (3) provide a written three-page explanation of the Honor Code Decision for each violation based on a fact-finding process.

Other ABA Law Schools follow this procedure since the advent of the Honor code in 1983.

Despite 5 ½ hours of so-called hearings when UDC Law had ample opportunity to present any evidence, UDC could produce only two words, unconnected by any verb or even attached to any date, time, place or person as "evidence." These were the words "Obama" and "assassination." Those are not "facts."

And despite 5 ½ hours of hearings, UDC produced no written decision based on any finding of fact. Nor did UDC give me a copy of Dean Stewart's Feb. 9, 2012 12:56 p.m. e-mail because Dean Stewart and UDC knew at the time it was false and malicious.

Therefore, as to (1) UDC neither informed me of the charges nor submitted into evidence any time, date, place, manner of any alleged act--so there were no "facts" that I could refute.  As to (2) I was denied any written reason for any so-called "fact finding,"

the key evidence was withheld, and there was no written decision, again in complete contradiction to UDC Law's 2008 Federal Court stipulation.

UDC never: (1) stated the charges as to time, manner, place, manner, etc.; (2) allowed me to factually refute each charge;  (3) accepted evidence that contested factually-based allegations in a fact-finding process; or (4) never provided a written reason of at least one page per allegation for its decision based on a finding of fact, as they have previously stipulated to Federal Court is UDC's procedure for 12-month or more suspensions in order to meet the requirements of Due Process for a law student.

As I mentioned, it had been UDC *as an institution* that had made this stipulation on Due Process to the Federal Judge in 2008 *on behalf of UDC Law*, and now UDC *as an institution* was ignoring that stipulation.

Under *Dixon* (294 F.d2 at 155) I was entitled to as much Due Process from UDC as a state actor before my deprivation as was necessary to ensure, "the minimal procedural requirements necessary to satisfy due process" based on "the circumstances and interests of the parties."

Therefore, if law faculty such as Dean Stewart or Judge Pryor refused to come because they were afraid of losing their own State Bar license or their own judicial appointment, and it took a subpoena to get them to come in order to get at the facts and to clear my name in these my circumstances to defend my property and liberty interest, then it took a subpoena.  But this did not happen.

Without ABA Standard 512, I could not even leave a record for other law students to inspect.

### Chief Volz of UDC PD Calls My Broken Handicapped Cart a "Threat"

From Feb. 14 to March 2, 2012 at all of these so-called "Student Judicial Hearings Appeals," UDC PD Chief Larry Volz would not allow me to bring my broken handicapped "Mega Cart" to them. Chief Volz called my broken "Mega Cart" a "threat" to UDC PD. Chief Volz also told me on Feb. 14 and Feb. 27 2012, in direct contradiction to what the "L" Street Office of the U.S. Secret Service had said, that the U.S. Secret Service had come to interrogate me on Feb. 9, 2012.  I told him that the U.S. Secret Service denied coming, but he maintained that they did come on Feb. 9, 2012.

Chief Volz refused to explain why the U.S. Secret Service had used false identifications.

Chief Volz refused to attend any hearing to answer any questions.

Chief Volz just kept saying over and over, "the U.S. Secret Service came."

Mr. Strothers refused to use a cell phone and call the U.S. Secret Service on Feb. 9, Feb. 14 or Feb. 27 to refute these charges.  Nor would he answer who were the individuals on Feb. 9, 2012 who presented false identifications and whose questions I was forced to answer at gunpoint (see previous **Appendix M**).

Mr. Tirmazi refused to state for the record: (1) his name; (2) his position at UDC; (3) his academic qualifications--and the fact he was a visiting assistant professor from Howard University, not Montana, as he falsely stated after these so-called "hearings," and that he neglected to mention he was applying for a tenure track position in the UDC Social Work program at the time of the hearings, where three of his colleagues held fake Ph.D.'s from the same off-shore diploma mill; (4) his financial connection to Prof.

Flowers' $2.9 million DHS Grant; (5) his knowledge of her felony action in obtaining a Federal Grant by using a fake Ph.D.; (6) who at UDC was falsely certifying Prof. Flowers' "progress" on a Federal Grant to which she did not have the academic qualifications to have in the first place.

Mr. Strothers refused to allow me to discuss any plagiarism, bellowing and striking out physically at me over and over, saying, "This is about you."

### What a Reasonable Person Would Conclude from Feb. 9, 2012

It was a mystery to me why Dean Stewart, UDC's Chief Volz, Mr. Strothers, and Mr. Tirmazi even thought they even had jurisdiction over such an allegation as a Presidential Assassination –this allegation clearly falls under Federal Law.  If there had been any credibility to such a report, the real U.S. Secret Service with Agents who officially "logged in" would surely have been called.

Instead, the "predicate interrogation" from 12:56 p.m. to 3:30 p.m. on Feb. 9, 2012 ("predicate" because it proceeded my "immediate suspension" at 3:30 p.m.) demonstrates that there never was any probable cause to detain me—because the "fake interrogation" –perhaps an "off the log" interrogation--was done *after* the 12:56 p.m. fake e-mail on Feb. 9, 2012 was sent with its fake President Obama death threat by Dean Stewart.  A reasonable person would therefore have to infer—if the "predicate interrogation" were fake, then the e-mail sent just minutes earlier on which the "predicated interrogation" was based was also fake—because the "predicate interrogation" was an investigation by fakes—who could investigate nothing.  And therefore, a reasonable person would have to infer that my "immediate suspension" by Mr. Strothers was based on entirely "fake" chain of events—a fake e-mail bolstered by a "fake" or "off the log" interrogation.  Mr. Strothers knew this.

### Dean Stewart's Specific Intent to Harm Me with a Gun as a Disabled Person Violating 18 U.S.C. 249

Dean Stewart knew that Prof. Mack had plagiarized his ENTIRE 27-page outline, not just a few paragraphs. Based on the Michael O'Neill incident, she was aware that proportionately greater AALS sanctions should fall on ex-Dean Mack.

Because I was a disabled student, of limited financial means, who had spent most of my Father's inheritance on medical care just trying to stay alive, she knew that my physical disability of OPLL from my January 2011 application to UDC Law that I was a vulnerable target.  I also suffer from the effects of lymphangioma, a disease with which the law school was acquainted because UDC Law's Constitutional Law Professor has it.

If Dean Stewart had not intended to harm me with a gun, the following would have been a better solution. On January 18, 2012, she could have e-mailed me back and said, "Nancy, I see your point.  The ABA promised you a new outline, not a used one. Tom Mack is just like a Ford dealer who sells a customer a used car while calling it new. So here is what we will do.  As soon as your Fall Semester 2011 grades come in, we will convene an Honor Court for Professor Mack. We look forward to you suing him." But she could not do that because it would have cost Dean Stewart her own job.

### A Felony Violation of 18 U.S.C. 912 is Converted to an 18 U.S.C. 249 Violent Federal Hate Crime by use of a Gun under the Motivation of Disability Bias

The use of the gun in the commission of another Felony, coupled with the specific intent to harm a person as a disabled person converts an 18 U.S.C. 912 felony into a violent Federal Hate Crime, an 18 U.S.C. 249 violation.

Only about 35 cases a year that are violent Federal Hate Crimes against a physically disabled person are prosecuted by the DOJ.  If you consult the FBI/DOJ prosecution manual requirement for prosecuting an 18 U.S.C. 249 violent Federal hate crime, you will see that my case meets the elements.

The use of a gun by Dean Stewart makes her acts an 18 U.S.C. 249 violent Federal Hate Crime, and not merely an 18 U.S.C. 912 felony of impersonation.

I will be forwarding this to FBI Director Comey. The actions of Dean Stewart caused me to lose out on that FBI Internship.

### The Remedy That I Seek from the Department of Education

I ask you to investigate and provide a suitable remedy. This would include: (1) a written apology from UDC Law for breaching the UDC Law Honor Code Contract; (2) a refund of my Spring 2012 UDC Law tuition and all other funds; (3) a suitable remedy for my property/liberty interest in my legal education, of which I was illegally deprived in violation of my 4th, 5th and 14th Amendments without Due Process of Law; (4) removing all "W" grades from my forced withdrawal for Spring 2012 and all suspension proceedings from my academic record; (5) a written apology by UDC that states there was never at any time any threat to anyone at UDC.

You have my permission to access my U.S. Secret Service FOIA #20130333.

Sincerely,

Nancy Shinabargar
(775-827-1645)
dclawpup@gmail.com


Cc:  U.S. Senator Harry Reid
c/o Michael Esposito, Reno, NV
Cc: FBI Director James Comey
Cc: Former FBI Director Robert S. Mueller, III
Cc: U.S. Secret Service FOIA Office

# Exhibit D

## U.S. Secret Service Letters in Reply to the FOIA Requests of Plaintiff and Plaintiff's Husband, Victor Atkocaitis

1. February 6, 2014 Letter to Victor Atkocaitis, FOIA #20140082, notifying him that his FOIA request has been "perfected;"

2. November 12, 2013 Letter to Victor Atkocaitis, FOIA #20140082, notifying him that his FOIA Request needs to be perfected by a Third-Party Affidavit;

3. October 30, 2013 Letter to Nancy Shinabargar, FOIA #20130333, notifying Plaintiff that her FOIA request documents have been located and are being processed;

4. February 28, 2013 Letter to Nancy Shinabargar, FOIA #20130333, notifying Plaintiff that her FOIA Requests of February 5, 2013 and February 7, 2013, sent on January 29, 2013 and February 7, 2013, are being processed as FOIA #20130333.

6



**DEPARTMENT OF HOMELAND SECURITY**
UNITED STATES SECRET SERVICE
WASHINGTON, D.C. 20223

Freedom of Information Act & Privacy Act Branch
Communications Center
245 Murray Lane, SW, Building T-5
Washington, D.C. 20223

Date:   FEB   6   2014

Victor Atkocaitis
4604 Neil Road #119
Reno, NV 89502

File Number:   20140082

Dear Requester:

This letter is intended to acknowledge the receipt of your perfected Freedom of Information
Act/Privacy Acts (FOIA/PA) request received by the United States Secret Service (USSS) on
January 8, 2014, for information pertaining to Nancy Shinabargar interrogation, specifically to
confirm or deny that the person who represented herself to you as a "U.S. Secret Service Agent"
was in fact an employee of the U.S. Secret Service.

Due to the increasing number of FOIA/PA requests received by this office, we may encounter some delay
in processing your request. Per Section 5.5(a) of the FOIA regulations, 6 C.F.R, Chapter I, Part 5, the
USSS processes FOIA/PA requests according to their order of receipt.

Furthermore, provisions of the Acts allow us to recover part of the cost of complying with your request. We
shall charge you for the records in accordance with Interim FOIA regulations as they apply to "all other"
requesters. The first 100 pages of duplication are free of charge. As an "all other" requester, you will be
charged .10 cents a page for the duplication of each additional page. As an "all other" requester, the first 2
hours of search time are free of charge, after which you will be charged the per quarter-hour rate ($4.00, $7.00,
$10.25) of the searcher.

Please be advised, the submission of your request is considered a firm commitment, by you, to pay all
applicable duplication and search time costs charged, under 6 C.F.R., Chapter I, Part 5 § 5.11, up to $25.00.
A search for files responsive to your request is being conducted. The appropriate components of the USSS
are being queried for responsive documents. If any responsive records are located, they will be reviewed
for determination of releasability. You will be contacted before any additional fees are accrued.

Your request has been assigned FOIA File No. 20140082.  We solicit your cooperation and assure you that the search will be conducted as expeditiously as possible.  To check the status of your FOIA request, please contact this office at (202) 406-5838.  Please use the file number indicated above in all future correspondence with this office.

Sincerely,

Julie A. Ferrell
Acting Special Agent In Charge
Acting Freedom of Information Act & Privacy Act Officer



**DEPARTMENT OF HOMELAND SECURITY**
UNITED STATES SECRET SERVICE
WASHINGTON, D.C. 20223

Freedom of Information Act & Privacy Act Branch
Communications Center
245 Murray Lane, S.W., Building T-5
Washington, D.C. 20223

Date:   NOV 1 2 2013

Victor Atkocaitis
4604 Neil Road #119
Reno, NV 89502

File Number:   20140082

Dear Requester:

This letter is intended to acknowledge the receipt of your recent Freedom of Information
Act/Privacy Acts (FOIA/PA) request received by the United States Secret Service (USSS) on
October 28, 2013, for information pertaining to an agent calling your home phone to interview you
about Nancy Shinabargar, specifically to confirm or deny that the person who represented herself to
you as a "U.S. Secret Service Agent" was in fact an employee of the U.S. Secret Service. You are
also requesting a copy of the agent's report.

Pursuant to Title 6 C.F.R., Part 5, Subpart B § 5.21(f), in the case of third party information
requests, a statement from the individual verifying his/her identity (full name, current address, date
of birth, and place of birth) and certifying that individual's agreement that records concerning
him/her may be accessed, analyzed and released to a third party.

Your request constitutes a third party request. As you have failed to provide the required
documentation, to include a notarized release from the agent mentioned above, we can neither
initiate a search for responsive documents nor confirm or deny the existence of investigatory
information pertaining to the person mentioned in your request. To assist you, we are enclosing a
copy of the portion of the Department of Homeland Security regulations implementing certain
provisions of the Freedom of Information Act of 1986, relating to the proper form for making a
FOIA request.

Please be advised, this is not a denial of your request. Upon receipt of a notarized release, you will
be advised as to the status of your request. Failure to respond, within thirty (30) days from the date
of this letter, will result in the administrative closure of your file.

If you have any questions or would like to discuss this matter, please contact this office at (202) 406-5838.  Please use the file number indicated above in all correspondence with this office.

Sincerely,

Brady J. Mills
Special Agent In Charge
Freedom of Information Act & Privacy Act Officer


Enclosure(s):

☒     Homeland Security Freedom of Information and Privacy Act Guidelines



# DEPARTMENT OF HOMELAND SECURITY
UNITED STATES SECRET SERVICE
WASHINGTON, D.C. 20223

Freedom of Information Act & Privacy Acts Branch
Communications Center
245 Murray Lane, S.W., Building T-5
Washington, D.C. 20223

Date:   OCT 3 0 2013

Nancy Shinabargar
4604 Neil Road #119
Reno, NY 89502

File Number:  20130333

Dear Requester:

Reference is made to your Freedom of Information Act/Privacy Acts (FOIA/PA) request which was
originally submitted to the United States Secret Service (USSS) on February 5, 2013, for
information pertaining to yourself.

In our acknowledgement letter to you, dated February 28, 2013,  we advised you that due to the
increasing number of FOIA requests received by this office, we could encounter some delay in
processing your request.  However, we want to let you know that we have been making every effort
to reduce the backlog of cases, and your file is scheduled to be reviewed in the near future.

For your information, documents responsive to your request have been located, forwarded to this
office for review and are in processing.  Upon completion of the processing, all documents that can
be released will be made available to you at the earliest possible date.  We sincerely apologize for
the delay you are experiencing and appreciate your continued patience.

We solicit your cooperation and assure you that we will process your request as expeditiously as
possible.  If you have any questions or would like to discuss this matter, please contact this office at
(202) 406-5838.  Please use the file number indicated above in all future correspondence with this
office.

Sincerely,

Brady J. Mills
Special Agent In Charge
Freedom of Information Act & Privacy Acts Officer



**DEPARTMENT OF HOMELAND SECURITY**
UNITED STATES SECRET SERVICE
WASHINGTON, D.C. 20223

Freedom of Information Act & Privacy Acts Branch
Communications Center
245 Murray Lane, SW, Building T-5
Washington, D.C. 20223

Date:   FEB 2 8 2013

Nancy Shinabargar
4604 Neil Road #119
Reno, NV 89502

File Number:   20130333

Dear Requester:

This letter is intended to acknowledge the receipt of your recent Freedom of Information
Act/Privacy Acts (FOIA/PA) request originally received by the United States Secret Service
(USSS) on February 5, 2013, for information pertaining to yourself. Please note, an additional
request was received in our office by fax on February 7, 2013.

Due to the increasing number of FOIA/PA requests received by this office, we may encounter some delay
in processing your request.  Per Section 5.5(a) of the FOIA regulations, 6 C.F.R, Chapter I, Part 5, the
USSS processes FOIA/PA requests according to their order of receipt.

Furthermore, provisions of the Acts allow us to recover part of the cost of complying with your request.  We
shall charge you for the records in accordance with Interim FOIA regulations as they apply to "all other"
requesters.  The first 100 pages of duplication are free of charge.  As an "all other" requester, you will be
charged .10 cents a page for the duplication of each additional page.  As an "all other" requester, the first 2
hours of search time are free of charge, after which you will be charged the per quarter-hour rate ($4.00, $7.00,
$10.25) of the searcher.

Please be advised, the submission of your request is considered a firm commitment, by you, to pay all
applicable duplication and search time costs charged, under 6 C.F.R., Chapter I, Part 5 § 5.11, up to $25.00.
A search for files responsive to your request is being conducted.  The appropriate components of the USSS
are being queried for responsive documents.  If any responsive records are located, they will be reviewed
for determination of releasability.  You will be contacted before any additional fees are accrued.

We solicit your cooperation and assure you that the search will be conducted as expeditiously as possible. If you have any questions or would like to discuss this matter, please contact this office at (202) 406-5838. Please use the file number indicated above in all future correspondence with this office.

Sincerely,

Brady J. Mills
Special Agent In Charge
Freedom of Information Act & Privacy Act Officer

**EXHIBIT E**

1.   **ABA Standard 512 General Information Form**

2.   **ABA Standard 512 Executive Summary**

3.   **ABA Standard 512 Report**

4.   **ABA Standard 512 Resolution of Approval**

## GENERAL INFORMATION FORM

Submitting Entity:    American Bar Association
                      Section of Legal Education and Admissions to the Bar

Submitted By:         Hon. Christine M. Durham, Chair

1.   <u>Summary of Resolution(s)</u>.

     RESOLVED, That the American Bar Association House of Delegates concurs in the
     action of the Council of the Section of Legal Education and Admissions to the Bar in
     making amendments dated August 2011, to the ABA *Standards and Rules of Procedure
     for Approval of Law Schools*:
     1.   Standard 512. STUDENT COMPLAINTS
     2.   Standard 306. DISTANCE EDUCATION
     3.   Standard 105. MAJOR CHANGE IN PROGRAM OR STRUCTURE
     4.   Rule 20.  Major Change in the Organizational Structure of a Provisionally or
          Fully Approved Law School
     5.   Rule 24.  Complaints Concerning Law School Non-Compliance with the
          Standards

2.   <u>Approval by Submitting Entity</u>.

     The changes to Standard 105 and Rule 20 were approved by the Council at its meeting in
     March 2011 to be circulated for Notice and Comment.  A public hearing was held on
     May 5, 2011.  The changes to Standard 512, Standard 306 and Rule 24 are on the agenda
     of the June 2011 Council meeting for approval to be circulated for Notice and Comment.
     A public hearing will be held on July 8, 2011.  All of the changes are on the Council's
     agenda for approval at its meeting in August 2011.

3.   <u>Has this or a similar resolution been submitted to the House or Board previously</u>?

     No

4.   <u>What existing Association policies are relevant to this resolution and how would they be
     affected by its adoption</u>?

     The proposed changes modify the existing ABA Standards and Rule of Procedures for
     Law Schools.

5.   <u>What urgency exists which requires action at this meeting of the House</u>?

     The amendments are required by new DOE regulations and must be implemented
     immediately.

6.   <u>Status of Legislation</u>.  (If applicable.)
     n/a

## REPORT

The Section of Legal Education and Admissions to the Bar requests concurrence of the ABA House of Delegates in changes to Standards 105 and 512 and Rules 20 and 24 of the *Standards and Rules of Procedure for Approval of Law Schools*. These changes are required to bring the Section into compliance with United States Department of Education ("DOE") regulations.

The changes to Standard 105 and Rule 20 were approved by the Council at its meeting in March 2011 to be circulated for Notice and Comment. A public hearing was held on May 5, 2011 and the changes were approved at the Council's June 10-11, 2011 meeting.

The changes to Standard 512, Standard 306 and Rule 24 were approved by the Council at its June 10-11, 2011 meeting to be circulated for Notice and Comment. A public hearing will be held on July 8, 2011. The changes are on the Council's agenda for approval at its meeting in August 2011.

### 1.    Standard 512 Student Complaints

The new Standard codifies the Council's practice to require site teams to review law school records of student complaints; clarifies the responsibility of law schools to maintain records of student complaints; and complies with Department of Education requirements that the Council's requirement be specifically stated in the Standards.

### 2.    Standard 306. Distance Education

The new Standard complies with Department of Education requirements that accrediting agencies must have a standard that addresses verification of student identity.

### 3.    Standard 105. MAJOR CHANGE IN PROGRAM OR STRUCTURE
### 4.    Rule 20. Major Change in the Organizational Structure of a Provisionally or Fully Approved Law School

The proposed changes to Standard 105 and Rule 20 conform to new DOE regulations regarding major changes in a school's program of legal education. A proposed major change requires a school to apply to the Accreditation Committee and, in most instances, to the Council as well, for acquiescence *before* the school can implement the major change. The most common major change applications the Section currently receives are for creating a new degree-granting program in addition to the J.D. (e.g., a new LL.M. program) and opening of a satellite or branch campus. The additional major changes, each of which is required by DOE regulations, that would require an application for acquiescence are:

> --contracting with another educational entity that is not certified to participate in Title IV, whereby a student could earn 25 percent or more of the course credits required for graduation from the approved law school [proposed Interpretation 105-1(16); Rule 20(a)(10)];

1

--the addition of a permanent location at which a law school will be conducting a teach-out for students at another law school that has ceased operations [proposed Interpretation 105-1(17); Rule 20(a)(11)];
--a significant change in the mission or objectives of the law school [proposed Interpretation 105-1(18); Rule 20(a)(12)] and,
--the addition of courses or programs that represent a significant departure from existing offerings or method of delivery since the last accreditation period.  [proposed Interpretation 105-1(19); Rule 20(a)(13)]

The amendments to Rule 20 also clarify that decisions are effective upon the decision of the Council and cannot be retroactive.

5.    **Rule 24.  Complaints Concerning Law School Non-Compliance with the Standards**

The new Standard complies with Department of Education requirements that policies of an accrediting agency may not prevent the agency from considering complaints against an institution/program when that institution/program is involved in litigation or other actions by a third party.

Respectfully submitted,

Hon. Christine M. Durham, Chair
Section of Legal Education
and Admissions to the Bar

August 2011

## EXECUTIVE SUMMARY

### A. Summary of Resolution

RESOLVED, That the American Bar Association House of Delegates concurs in the action of the Council of the Section of Legal Education and Admissions to the Bar in making amendments dated August 2011, to the ABA *Standards and Rules of Procedure for Approval of Law Schools*:

1.   Standard 512. STUDENT COMPLAINTS
2.   Standard 306. DISTANCE EDUCATION
3.   Standard 105. MAJOR CHANGE IN PROGRAM OR STRUCTURE
4.   Rule 20. Major Change in the Organizational Structure of a Provisionally or Fully Approved Law School
5.   Rule 24. Complaints Concerning Law School Non-Compliance with the Standards

### B. Issue Resolution Addresses

The resolution addresses compliance with United States Department of Education requirements for accrediting agencies.

### C. How Proposed Policy Will Address the Issue

The proposed changes will bring the Section of Legal Education and Admissions to the Bar into compliance with United States Department of Education requirements for accrediting agencies.

### D. Minority Views or Opposition

Not that the Section is aware of.

**AMERICAN BAR ASSOCIATION**

**ADOPTED BY THE HOUSE OF DELEGATES**

**AUGUST 8-9, 2011**

**<u>RESOLUTION</u>**

RESOLVED, That the American Bar Association House of Delegates concurs in the action of the Council of the Section of Legal Education and Admissions to the Bar in making amendments dated August 2011, to the ABA *Standards and Rules of Procedure for Approval of Law Schools*:

1.     Standard 512. STUDENT COMPLAINTS
2.     Standard 306. DISTANCE EDUCATION
3.     Standard 105. MAJOR CHANGE IN PROGRAM OR STRUCTURE
4.     Rule 20. Major Change in the Organizational Structure of a Provisionally or Fully Approved Law School
5.     Rule 24. Complaints Concerning Law School Non-Compliance with the Standards

**<u>Standard 512. STUDENT COMPLAINTS</u>**

<u>(a) A law school shall establish, publish, and comply with policies with respect to handling student complaints.</u>

<u>(b) A law school shall maintain a record of student complaints submitted during the most recent accreditation period that directly implicate the school's program of legal education and its compliance with the Standards.  The record shall include the resolution of the complaints.</u>

***<u>Interpretation 512-1</u>***
*<u>A law school's policies on student complaints must address, at a minimum, complaint procedures, appeal rights and timelines.</u>*

**Standard 306. DISTANCE EDUCATION**

(a) A law school may offer credit toward the J.D. degree for study offered through distance education consistent with the provisions of this Standard and Interpretations of this Standard. Such credit shall be awarded only if the academic content, the method of course delivery, and the method of evaluating student performance are approved as part of the school's regular curriculum approval process.

(b) Distance education is an educational process characterized by the separation, in time or place, between instructor and student. It includes courses offered principally by means of:

**EXHIBIT F**

**One of Plaintiff's two applications to work for the IPSJ for her 40-hour, 1 Unit Internship at the Law School and Defendant Volz's Email Response**

Nancy Shinabargar
3636 16th Street NW A 530
Washington, DC 20010
October 14, 2011

Chief Larry Volz, UDC Police Department
4200 Connecticut Avenue
Building 39, Room 34
Washington, DC 20010

Dear Chief Volz,

I would like to apply to be a legal intern with the University of the District of Columbia Police Department. I am a 1L at the David A. Clarke School of Law at UDC. I am interested in working in any aspect of public safety which may require legal skills. My interest in protecting the UDC Campus comes from my experience of going through a shooting at the Wal-Mart in Reno, NV, in October 2010 where my husband works. Had he been working the day of the attack, in which three Wal-Mart employees were shot and nearly killed, he would have been shot. He knew the shooter.

My special interest with the UDC Police Department is developing with your Department and the U.S. Secret Service the idea of "proxy attacks" on college campuses. I define a "proxy" attack to mean an attack on the university of which a Presidential candidate or other high official is an alumnus or alumna. This is in preparation for the 2012 election, and in the light of the Jared Loughner attack in Arizona. I think that historically black colleges, or universities in the District of Columbia area, could be targets of such an attack during Presidential and Congressional election cycles, especially 2012.

I have spent many years on university campuses, working with a wide variety of people, and know they are vulnerable to such attacks. There are also other safety issues on a campus. Recently, at UC Berkeley, where I spent many years teaching and studying, a doctor was arrested (April 2010) who had worked at the Student Health Center for approximately 24 years, and had molested many freshmen and sophomores on the campus while working in his official capacity as a University Doctor. This will cost UC Berkeley many tens of millions of dollars to settle, and the litigation has already begun.

UDC, because it is in DC, and is an historically black college at a time when President Obama is running for re-election, and is situated in the midst of diplomatic communities, is a university with special vulnerabilities to proxy attacks.

I would enjoy working in any capacity in your department to fulfill my 40-hour internship requirement, starting in December. I would also enjoy continuing on beyond the 40-hour requirement in the Spring Semester. This is a long-term, career-interest for me as a prospective attorney. I would like to protect campuses in the District of Columbia from active shooters, and identify problematic people who might cost the campus community millions of dollars for reasons that might not be readily apparent.

Thank you for your time and consideration.

Sincerely,

Nancy Shinabargar



**Nancy Shinabargar< dclawpup@gmail.com>**

---

## Appilcation for an Internship at UDCPD

2 messages

---

**Volz, Larry**< lvolz@udc.edu>                                    Mon, Oct 17, 2011 at 6:45 AM
To: "dclawpup@gmail.com" <dclawpup@gmail.com>
Cc: "Volz, Larry" <lvolz@udc.edu>

Ms. Shinabargar,


Currently we are not handling internships at UDCPD for this semester. We may next semester, but we
have to evaluate our needs and what we need performed for the department.


Thanks,


**Chief Larry Volz**

Office of Public Safety/Police

University of the District of Columbia (UDC)

4200 Connecticut Ave.

Building 39, Room C-04

Washington D.C. 20008

202 274 6195 office

202 510 1935 cell

202 274 7486 fax


*If you SEE something, SAY something.*

# Exhibit G

## 2004 Department of Homeland Security Management Directive #10500 Defining "Research Misconduct"

**Department of Homeland Security**
**Management Directive System**
**MD Number: 10500**
# RESEARCH MISCONDUCT

## 1.   Purpose

This directive establishes Department of Homeland Security (DHS) policy regarding research misconduct.

## 2.   Scope

This directive applies to all DHS organizational elements, and to all entities who apply for research-related grants or cooperative agreements in support of DHS activities.

## 3.   Authorities

The Homeland Security Act of 2002, Section 306, subparagraph (C), codified in Title 6, U. S. Code.

## 4.   Definitions

A.   ***Research misconduct***:  Fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results. Research misconduct does not include honest error or differences of opinion.

B.   ***Fabrication***:  Making up data or results and recording or reporting them.

C.   ***Falsification***:  Manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.

D.   ***Plagiarism***:  The appropriation of another person's ideas, processes, results, or words without giving appropriate credit.

## 5.   Responsibilities

A.   The ***Office of Inspector General***: shall oversee investigations of research misconduct and conducts any inquiries and investigations into suspected or alleged research misconduct involving DHS staff.

B.   ***Institutions performing research with DHS funds***: shall establish policies and procedures for investigating and reporting instances of alleged or apparent misconduct.

## 6.   Policy & Procedures

MD # 10500

A.      Until DHS establishes formal, permanent policy addressing this topic, DHS shall adhere to the government-wide policy developed by the National Science and Technology Council on behalf of the Office of Science and Technology Policy and issued on December 6, 2000. The Council's policy establishes the responsibilities, basic guidelines, and potential actions associated with alleged or suspected infractions.

B.      DHS will find research misconduct only after careful inquiry and investigation by an awardee institution, by another Federal agency, or by DHS.

C.      DHS will take appropriate action against individuals or institutions upon a finding that research misconduct has occurred.

D.      Investigative and adjudicative research misconduct records maintained by DHS agency are exempt from public disclosure under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a) to the extent permitted by law and regulation.

E.      Any questions or concerns regarding this directive should be addressed to the Office of the Inspector General.

MD # 10500

# EXHIBIT H

## Defendant Flowers $2.9 Million FEMA Grant, its relation to the IPSJ, and Defendant Flowers self-presentation as "Doctor" Flowers to FEMA

# University of the District of Columbia

**UDC News**

**October 11 , 2007**

## UDC and General Physics Corporation awarded $2.9 million Grant from Department of Homeland Security

*Washington, D.C.,* - The University of the District of Columbia (UDC) and General Physics Corporation (GP) were successfully awarded $2.9 million under the FY 2007 U.S. Department of Homeland Security National Training Program (HSNTP) and the Competitive Training Grant Program (CTGP). The award will fund the development and deliverance of innovative training programs addressing high priority national homeland security training needs.

UDC teamed with GP in May 2007 to submit an application for funding under the of Homeland Security (DHS) National Preparedness Training Program (NPTP), Competitive Training Grants Program (CTGP). On September 28, 2007, DHS announced $113 million in grant money for national preparedness training initiatives under both the 2007 Homeland Security National Training Program (HSNTP) and the Competitive Training Grant Program (CTGP). A DHS FY07 CTGP award of $29.1 million to state, local, tribal, and territorial governments, national associations, higher education institutions, non-profit organizations, and the private sector will fund competitively selected applicants. Legal issues in preparation, response, and recovery comprised one of five focus areas identified by DHS for its FY07 CTGP competitive funding awards. The UDC/GP team's CTGP National Legal Preparedness Training Program (NLPTP) was successfully awarded funding of $2.9 million under the FY07 CTGP to develop and deliver this innovative training program over the next three years.

"This is an enormous honor and opportunity to assist DHS in developing a multi-faceted curriculum to address our country's legal preparedness needs," said Dr. Angelyn Flowers, JD, PhD, NLPTP Director and Professor at the UDC's Institute for Public Safety and Justice. "The National Legal Preparedness Training Program will help fill the gap in the Nation's arsenal of innovative training programs addressing high priority homeland security training needs. Based on our combined background and experience, the UDC/GP team is poised to deliver the required services in accordance with best practices and industry standards for a blended learning environment to enhance the efficiency and effectiveness of training and education for our partners in the homeland security arena."

The NLPTP will provide for a review of laws, guidelines and plans, while aiding in the development and advancement of legal tools to ensure that agencies and their respective personnel understand their roles and the required legal authority needed to provide critical services to their communities. The educational thrust of the NLPTP will provide career professionals with a relevant and expansive curriculum to develop the necessary knowledge and skills to meet growing homeland security demands. This program will ensure consistency and soundness of legal recommendations and decisions made throughout the preparedness, response and recovery cycle, further aiding in the mitigation of exposure to liability and enhancing the ability to provide meaningful and prompt legal assistance to emergency managers and response agencies at all stages.

MINNESOTA DEPARTMENT OF PUBLIC SAFETY
HOMELAND SECURITY AND EMERGENCY MANAGEMENT

# 48th

# Annual

Governor's Homeland Security and
Emergency Management Conference

## February 12-14, 2013
Earle Brown Heritage Center
Minneapolis, MN

 



*hsem.dps.mn.gov*

Rev. 12/20/2012

**PRE-CONFERENCE**

**Monday, February 11, 2013**

| Time | |
|---|---|
| 9 a.m. | AMEM Board Meeting (Board members only) |
| 4-7 p.m. | Early conference check-in |

**Tuesday, February 12, 2013      DAY ONE - CONFERENCE SCHEDULE**

| Time | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 7:00 a.m. | Registration Desk Opens | | | | | | | |
| 8:00 - 9:30 | Behavioral Health and the Duluth Flooding - Nancy Carlton, MDH and Joanne Enspamer, Carlton County | This is NOT a Drill - Off Hours Emergency Response to EOC's - Patrick McLaughlin, HSEM | How To's of Running an Effective and Efficient Meeting - Tom Gmeinder | AWR 136 - Essentials of Community Cyber Security - Consortium Course - TEEX - 4 hour course - Carla Collins 8:00am to 12:00 noon | MGT 366 - Legal Issues and Disasters - Dr. Angelyn Flowers, University of the District of Columbia 8 hour course 8:00am to 12:00 noon | Livestock Emergency Response - Jennifer Woods - 4 hour course 8:00am to 12:00 noon | New Director's Workshop All Day Course 8:00am to 12:00 noon | Decision Making and Problem Solving - PDS 241 Eric Waage 8:00am to 12:00 noon |
| 9:30 | Break | | | | | | | |
| 9:45 - 11:15 | MN Climate Adaptation: Some Data and Evidence - Dr. Mark Seeley, Of and Paul Moss, MPCA | Continuity Conundrum - David Wulff, MDH; Linda Erickson, MMT; Cathy Hackett, MMB | BP Deepwater Horizon Oil Split - Brock Long, Hagerty Consulting | | | | | |
| 11:15 - 12:00 Noon | Break - Exhibitor Show and VendorQuest Opens | | | | | | | |
| | Luncheon | | | | | | | |
| 1:00 - 2:30 | Medical Surge and Healthcare Coalitions - Judy Marchetti, MDH | Mass Evacuations - Improvements in Evacuation Planning and Sheltering Capability - Brock Long, Hagerty Consulting | National Flood Insurance Program - Ceil Strauss, DNR | Understanding Risk as a Whole Community - Practical Application of PPD 8 and the National Preparedness Goal - Grant Hosmer, Amy Card, HSEM and Panel | AWR 136 - Essentials of Community Cyber Security - Consortium Course - TEEX - 4 hour course - Carla Collins Session 2 1:00pm - 5:00pm | Continued - MGT 366 - Legal Issues and Disasters - Dr. Angelyn Flowers, University of the District of Columbia 8 hour course -continued- 1:00 - 5:00pm | Livestock Emergency Response - Jennifer Woods - 4 hour course Session 2 1:00pm - 5:00pm | Continued - New Director's Workshop - All Day Course -continued- 1:00 - 5:00pm | PDS 242 - Effective Communication - Julie Anderson 1:00pm - 5:00pm |
| 2:30 | Break | | | | | | | |
| 2:45 - 4:15 | US Coast Guard Roles and Responsibilities in a Disaster - USCG Staff | Tribal and U.S. Government Relationships from 1492-2012 - Harrell French - United South and Eastern Tribes (USET) | Northeast Minnesota IA Experience: Lessons Learned - John Strongitharm, Denise Baran, Brian Belich and Barb Fonkert | Understanding Risk as a Whole Community - Practical Application of PPD 8 and the National Preparedness Goal - Grant Hosmer, Amy Card, HSEM and Panel | | | | |
| 4:15 - 4:45 | Break - VendorQuest | | | | | | | |
| 5:00 | Regional Meetings | | | | | | | |
| 6:00 p.m. | Registration Desk Closes | | | | | | | |