**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NANCY SHINABARGAR,<br><br>    Plaintiff,<br><br>    v.<br><br>BOARD OF TRUSTEES OF THE<br>UNIVERSITY OF THE DISTRICT OF<br>COLUMBIA, *et al.*,<br><br>    Defendants. | Civil Action No. 15-330 (BAH)<br><br>Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

The plaintiff, Nancy Shinabargar, proceeding *pro se*, brings this lawsuit against the Board of Trustees of the University of the District of Columbia ("UDC"), where the plaintiff formerly attended law school, and ten UDC employees, including the Dean and Associate Dean of the Law School, five professors, the Director of Public Safety, who also serves as the Campus Police Chief ("Director of Public Safety"), and the Assistant to the Vice President for Student Affairs, to challenge her suspension from the school.  First Am. Compl. ("FAC") ¶¶ 9–19, ECF No. 12. [1] The gravamen of the plaintiff's complaint is that she was suspended in retaliation for both her repeated reports of plagiarism by professors and other law students and for her repeated requests for accommodations for her alleged disabilities, *see* FAC ¶¶ 149–203, contrary to the stated explanations for her suspension, after three hearings, that the plaintiff engaged in threatening and otherwise inappropriate conduct, *id.* ¶¶ 150, 153.  The defendants have moved to dismiss this case, *see* Defs.' Mot. Dismiss ("Defs.' Mot."), ECF No. 52, and, for the reasons set forth below, this motion is granted.

---

[1]   In addition to the eleven named defendants, the Complaint asserts claims against "John/Jane Does I–X," who have not been named.  FAC ¶ 19.

## I.    BACKGROUND

At the outset, the Court notes that the record on this motion to dismiss is extensive.  The plaintiff's First Amended Complaint references numerous documents, 57 pages of which are attached as exhibits to her pleading.  *See generally* FAC.  The defendants' moving papers include 35 additional pages of documentation referenced in the plaintiff's First Amended Complaint,  *see* Defs.' Mot., Exs. A–F, ECF No. 52-1,[2] and the plaintiff, in opposition to the defendants' motion, submitted over 200 pages of further documentation as exhibits, *see* Pl.'s Opp'n Defs.' Mot. Dismiss ("Pl.'s Opp'n"), Exs. 1–35, ECF No. 54-1.  In resolving the pending motion, the exhibits referenced in and attached to the plaintiff's First Amended Complaint are considered.  *Mpoy v. Rhee*, 758 F.3d 285, 291 n.1 (D.C. Cir. 2014) ("'In determining whether a complaint fails to state a claim, we may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice.'" (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997))).  In addition, because the plaintiff is proceeding *pro* se, any additional exhibits, "including those in [] opposition to [] [defendants'] motion to dismiss," must be considered in construing the sufficiency of the plaintiff's claims.  *Brown v. Whole Foods Market Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015) (reversing dismissal order where district court did not consider "the facts alleged in *all* of [the plaintiff's] pleadings" (emphasis in the original)).  The relevant facts distilled from this ample record are summarized below.

The plaintiff matriculated at the University of District of Columbia's David A. Clarke School of Law ("UDC Law School") on August 15, 2011, and completed only one semester,

---

[2]        The defendants' exhibits include: (A) the UDC Honor Code; (B) Notice of Disciplinary Hearing, dated Feb. 8, 2012; (C) Notice of Interim Suspension, dated Feb. 9, 2012; (D) Notice of Suspension, dated Feb. 15, 2012; (E) UDC Law School Student Handbook; (F) ABA Standards and Rules for 2011-2012.

before her suspension on February 9, 2012.  FAC ¶¶ 69, 101; Pl.'s Opp'n at 5.  During her brief tenure at the law school, she made repeated complaints of purported acts of plagiarism, starting as early as only several days after classes began.[3]  In total, the plaintiff made at least fourteen reports of plagiarism to UDC officials, FAC ¶ 22, and several more to various government officials, including a United States Senator, the Secretary of Education, and the Director of the FBI, Pl.'s Opp'n, Ex. 19 (Pl.'s Letter to Sen. Reid, dated Sept. 10, 2011) at 101, ECF No. 54-1; Pl.'s Opp'n, Ex. 19 (Pl.'s Letter to Sen. Reid, dated Feb. 6, 2012) at 98, ECF No. 54-1; FAC, Ex. C (Pl.'s Letter to the Secretary of Education, dated Sept. 4, 2013) at 67, ECF No. 12; Pl.'s Opp'n, Ex. 17 (Pl.'s Letter to Director of FBI, dated Dec. 8, 2011), ECF No. 54-1.

By the time of her suspension, the plaintiff, who suffers from spinal disorder and lymphangioma in her foot, also made numerous requests for reasonable accommodations to help her in "managing her 80-85 pound daily Law Book load," since her conditions affected her mobility and her ability to lift weight.  FAC ¶¶ 5, 138.  In October 2011, the plaintiff obtained, through a lottery, a book locker, Pl.'s Opp'n at 5, but she complained, that this locker was inadequate because it was located "outside of Defendant University Law School's Steam Room where the nightly steam damaged [her] expensive law books if . . . left . . . overnight,"  FAC ¶ 139.  Unsatisfied with the accommodation she received, the plaintiff requested for herself, and on behalf of "similarly situated students at the Law School," lockers in another location to

---

[3]     On August 18, 2011, the plaintiff made a plagiarism report to the Dean of the Law School about a professor at another law school, FAC ¶ 105; on or about August 23, 2011, the plaintiff made a plagiarism report to the former Academic Dean of the Law School about her own contracts professor, whom she alleges "plagiariz[ed] an assignment" he gave to first year students, id. ¶ 53, by adapting an old magazine article, Pl.'s Opp'n, Ex. 19 (Pl.'s Letter to Sen. Reid, dated Sept. 10, 2011) at 101, ECF No. 54-1; on October 10, 2011, the plaintiff made the first of many plagiarism reports to the law school about her torts professor, FAC ¶ 28, whom she alleges "plagiarized his entire 27-page Torts I Outline," which he posted online as a study aid, id. ¶ 33, an allegation based upon the plaintiff's own "forensic linguistic examination of [the] outline," and the word of two third year law students, FAC, Ex. C (Pl.'s Letter to the Secretary of Education, dated Sept. 4, 2013) at 84, ECF No. 12; on February 7, 2012, the plaintiff reported to the Associate Dean that a fellow classmate "appeared to be reading someone else's briefs verbatim" in class, FAC ¶ 31.

prevent steam damage to her books.  *Id.*  Additionally, the plaintiff, who does not allege that her accessibility to classrooms and libraries was in any way limited, requested, as a reasonable accommodation, that the school turn a room into a private "study carrel area for ADA students," accessible "by means of a card-reading pass key lock," and better seating assignments for students with mobility devices.  *Id.*  Ultimately, the plaintiff alleges she made "28 explicit requests for ADA reasonable accommodation from Defendant Board," including requests she made to a United States Senator, an Ombudsman for the United States Department of Education, the Equal Opportunity, ADA and Title IX Coordinator at UDC, and the Secretary of Education.  Pl.'s Opp'n, Ex. 1 ("List of 28 ADA Requests") at 2, 8 ECF No. 54-1.  The plaintiff claims that UDC rejected these requests for accommodations.  FAC ¶ 139.

On February 8, 2011, during the plaintiff's second semester at UDC Law School, the plaintiff received an email notice from the Assistant to the Vice President for Student Affairs about "an incident report," accusing her of violating the UDC Code of Student Conduct, and directing her to "appear for a . . . hearing  . . . on Wednesday, February 15, 2012."  Pl.'s Opp'n, Ex. 21 ("Notice of Disciplinary Hearing, dated Feb. 8, 2012") at 114–15, ECF No. 54-1.  The Notice accused the plaintiff of the following inappropriate conduct: (1) "using lewd, threatening, and racially insensitive remarks towards another UDC Law School Student," on February 4, 2012; (2) making "false remarks/statements (rumors) about another UDC Law School student to [sic] where [she] made claims and speculated that the student was addicted to drugs and looked 'strung out,'" and "spreading rumors . . . that this same student . . . is the victim of spousal abuse," on February 7, 2012;  and (3) being "verbally abusive and accused another UDC Law School student of stealing [her] Civ Pro notes," on February 8, 2012.  *Id.* at 114.  The Notice

advised the plaintiff of her "right to bring to this hearing any information, evidence, witnesses, or an advisor." *Id.* at 115.

The next day, on February 9, 2012, the plaintiff alleges she met with the Associate Dean of Students to discuss, among other things, an FBI report the plaintiff made regarding a potential security threat near the White House. Pl.'s Letter to the Secretary of Education, dated Sept. 4, 2013 at 71. The Associate Dean, however, understood the plaintiff's statements during the conversation to represent a threat upon the life of the President of the United States, prompting the Associate Dean to email the Dean of the Law School to report the threat. *Id.* at 75. Later the same day, at around 1p.m., the Associate Dean appeared with "five UDC PD in tow, with guns and handcuffs," FAC ¶ 62, and they led the plaintiff to a conference room "at gunpoint," *id*. ¶ 63. The plaintiff alleges that two United States Secret Service Agents then arrived to interrogate the plaintiff for two hours regarding her "politics and about 'assassinations.'" *Id.* ¶ 64. According to the plaintiff, the interrogation was fake and "staged" by the Associate Dean, as evidenced by the fact the "two 'U.S. Secret Service Agents' did not seem to know [] Judge Pryor[,]" a senior judge on the D.C. Court of Appeals, and a criminal law professor at UDC Law School. Pl.'s Letter to the Secretary of Education, dated Sept. 4, 2013 at 71.

After the interrogation, the plaintiff alleges five UDC campus policemen approached her as she was walking towards the library. FAC ¶ 68. One of the police officers pushed her "against the wall until Plaintiff fell to the ground," *id.*, at which point, the Assistant to the Vice President for Student Affairs "thrust" another letter notifying the plaintiff that she had been placed on "interim suspension," *id.* ¶ 69, due to misconduct in the office of the Associate Dean earlier in the same day. The letter accused the plaintiff of "inappropriate behavior" in violation of, *inter alia*, a section of the UDC Code of Student Conduct section regarding "Terroristic

Threats." Pl.'s Opp'n, Ex. 25 ("Notice of Interim Suspension, dated Feb. 9, 2012") at 133, ECF
No. 54-1.   A disciplinary hearing was scheduled for February 14, 2012, to determine whether
the plaintiff should remain suspended. *Id.* The letter, again, advised the plaintiff that she had
"the right to bring to this hearing any information, evidence, witnesses, or an advisor." *Id.* at
134.

On February 14, 2012, the plaintiff attended the scheduled disciplinary hearing, where
she "denied all of the terms and contents ascribing wrongdoing to her in the University's official
notices." FAC ¶¶ 72, 80, 85. During the hearing, the plaintiff alleges that "(1) no evidence or a
list of witnesses" were provided; "(2) no fact-finding process based on any factually-based
allegation or witness statement occurred . . . ; (3) Plaintiff was not allowed to respond with her
own facts and witnesses; and (4) there was no summary of any violation Plaintiff had
committed." *Id.* ¶ 72. The plaintiff further alleges that she was not allowed (1) to describe any
of the "disability slurs or disability stunts" made against the plaintiff by her fellow classmates,
*id.* ¶ 80, such as a student who "used to make the Sign of the Cross whenever Plaintiff came into
the classroom," *id.* ¶ 79; (2) to bring "her Handicapped Book Cart into the hearing" in order to
"demonstrate how it might have irrationally bothered some Law Students," *id.* ¶ 81; or (3) to
"discuss any plagiarism," Pl.'s Letter to the Secretary of Education, dated Sept. 3, 2013 at 92.
According to the plaintiff, the Assistant to the Vice President for Student Affairs at UDC denied
her the opportunity to raise these other issues on grounds that "[t]his is about [the plaintiff]"
rather than the behavior of other students and faculty members. *Id.*

On February 15, 2015, the plaintiff received a letter informing her that, following the
disciplinary hearing from the previous day, her "interim suspension has been modified to a
suspension." Pl.'s Opp'n, Ex. 26 ("Notice of Suspension, dated Feb. 15, 2012") at 140, ECF No.

54-1.  UDC conditioned the plaintiff's readmission on her obtaining "a psychological assessment with an external agent (i.e. Psychologist, Psychiatrist, or Licensed Clinical Social Worker)," and clearance from the external agent.  *Id.* at 139.  Finally, UDC apprised the plaintiff of her "right to appeal the result of this hearing," within five business days, based on "(1) Discovery of New Information, (2) Procedural Error, and (3) Sanction not within permissible scope of discipline." *Id.*  The plaintiff appealed her suspension the next day to the Vice President for Student Affairs, claiming that (1) an administrative law judge did not preside over her hearing; (2) the student witness against her was not credible; (3) the plaintiff denied knowing "the exact date, time and person(s) and elements of the violations;" and (4) she wanted to "introduce[] new facts as to why false allegations may have been made," such as making an "EEOC Complaint" against a professor for "sexual harassment" for sitting with his legs open during office hours, and for complaining about a UDC campus police officer who made "a sexually lewd comment to [the plaintiff.]"  Pl.'s Opp'n, Ex. 26 (Pl.'s First Appeal, dated Feb. 16, 2012) at 143–45, ECF No. 54-1.  The plaintiff accused UDC of "not [playing] by the rules of the United States Constitution" because "UDC is an AFSCME shop[,] it plays by AFSCME rules," and she threatened to "take [her] concerns to the ABA."  *Id.* at 146.  Finally, the plaintiff asked the Vice President to "please tell AFSCME and the Other Unions in DC that [she] will be going to Portland, OR" to reopen a court case there.  *Id.*

On February 27, 2012, the plaintiff attended an appeal hearing at UDC, regarding her challenge to the February 15, 2012 decision to suspend her.  Pl.'s Letter to the Secretary of Education, dated Sept. 4, 2013 at 72.  During the hearing, another first-year student at the law school testified that he heard the plaintiff "say the words 'Obama' and 'assassination.'"  *Id.* Additionally, the Associate Dean's email to the Dean of the Law School, which detailed the

plaintiff's threat upon the President's life, was presented as further evidence of the plaintiff's "inappropriate behavior" leading to her suspension.  *Id.* at 69.

On March 1, 2012, the plaintiff attended a third disciplinary hearing concerning the first notice, dated February 8, 2012, regarding her offensive behavior toward other students at the law school, in violation of the UDC Code of Student Conduct.  Pl.'s Opp'n, Ex. 26 (Denial of Pl.'s Appeal, dated Mar. 15, 2015) at 147, ECF No. 54-1.  The plaintiff was found guilty of the violations listed in the Notice and remained suspended.  The plaintiff appealed that decision to the Vice President for Student Affairs on March 6, 2012, raising both procedural and factual objections.  Pl.'s Opp'n, Ex. 26 (Pl.'s Second Appeal, dated Mar. 6, 2012) at 149, ECF No. 54-1.  The Vice President denied the appeal because the plaintiff "fail[ed] to demonstrate failure by the University to conform to the Code of Student Conduct in a manner reasonably likely to have affected the outcome of [her] hearing," and because the factual objections raised by the plaintiff in her appeal were not "new information . . . that was unavailable to [her] at the time of the hearing," and, in any event, she had failed to demonstrate that "the new information is likely to affect the outcome of the hearing."  Denial of Pl.'s Appeal, dated Mar. 15, 2015 at 147–48.

Even after the plaintiff was suspended, she continued to report plagiarism at the law school, *see e.g.*, Pl.'s Opp'n, Ex. 29 (Pl.'s Email to UDC Law School Dean, dated Mar. 22, 2012) at 169, ECF No. 54-1; *id.*, Ex. 29 (Pl.'s Email to UDC VP, dated Feb. 27, 2012) at 170, ECF No. 54-1, and to protest UDC Law School's purported refusal to accommodate her disabilities, *see e.g.*, *id.*, Ex. 1 (Pl.'s Letter to UDC ADA Coordinator, dated Mar. 22, 2012); *id.*, Ex. 2 (Pl.'s Emails to Dep't of Ed., dated Mar. 22, 2012) at 16, ECF No. 54-1;  *id.*, Ex. 2 (Pl.'s Emails to Dep't of Ed., dated Apr. 3, 2012) at 17, ECF No. 54-1.

The plaintiff also continued to challenge her suspension.  On September 3, 2013, the plaintiff allegedly sent to the Secretary of Education a 27-page single-spaced letter alleging that her suspension was a cover-up orchestrated by the Associate Dean to hide that she "never set up an ABA Complaint Process as the ABA required."  Pl.'s Letter to the Secretary of Education, dated Sept. 3, 2013 at 75.  On February 4, 2014, two years after her suspension from UDC Law School, the plaintiff filed the instant complaint in the United States District Court for the District of Nevada.  *See generally* Compl., ECF No. 1.  On March 4, 2015, the district court granted in part the defendants' motion to dismiss, transferring the action to the United States District Court for the District of Columbia.  *See* Order Granting, in Part, Defendants' Motion to Dismiss, dated Mar. 4, 2015, ECF No. 46.

In her First Amended Complaint, the plaintiff asserts a total of eleven claims, alleging retaliation in violation of the Rehabilitation Act, U.S.C. 29 U.S.C. § 701, *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the First Amendment, FAC (Counts 1 and 2), violation of the Due Process Clause of the Fifth Amendment, *id.* (Count 3); breach of contract and the implied covenant of good faith and fair dealing, *id.* (Counts 4, 5, 7, 8); fraudulent misrepresentations, *id.* (Counts 6 and 9); exclusion from the law school due to her disability in violation of the Rehabilitation Act and the ADA, *id.* (Count 10); and defamation, *id.* (Count 11).

The defendants' second motion to dismiss is now ripe for resolution.  *See generally* Defs.' Mot. Dismiss, ECF No. 52.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," to encourage brevity

and, at the same time, "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (ellipses in original; internal quotations and citations omitted); *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 319 (2007).   The Supreme Court has cautioned that although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, []  it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (quoting *Iqbal*, 556 U.S. at 678).   A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability," but "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556–57); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012). Although "detailed factual allegations" are not required to withstand a Rule 12(b)(6) motion, a complaint must offer "more than labels and conclusions" or "formulaic recitation of the elements of a cause of action" to provide "grounds" of "entitle[ment] to relief," *Twombly*, 550 U.S. at 555 (alteration in original), and "nudge[ ] [the] claims across the line from conceivable to plausible," *id*. at 570. Thus, "a complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (second alteration in the original).   In considering a motion to dismiss for failure to plead a claim on which relief can be granted, the court must consider the complaint in its entirety, accepting all factual allegations in the complaint as true, even if doubtful in fact. *Twombly*, 550 U.S. at 555;

*Harris v. D.C. Water and Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (in considering Rule

12(b)(6) motion, the "court must accept as true all of the allegations contained in a complaint"

and "to draw the reasonable inference" therefrom "that the defendant is liable for the misconduct

alleged," but that tenet "is inapplicable to legal conclusions," and "threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice" (internal

quotations and citations omitted)).

Where, as here, the plaintiff is proceeding *pro se*, the court must "'liberally construe[]'"

the complaint, applying "'less stringent standards than formal pleadings drafted by lawyers.'"

*Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 533 (D.C. Cir. 2015) (quoting

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)); *Cutler v. U.S. Dep't of Health and

Human Servs.*, 797 F.3d 1173, 1179 (D.C. Cir. 2015) (same).  The Court must consider "a *pro se*

litigant's complaint in light of" all filings," *Brown*, 789 F.3d at 152 (internal quotations omitted),

including any "affidavits and exhibits . . . filed by a *pro se* litigant [that] were intended to clarify

the allegations in the complaint," *Abdelfattah*, 787 F.3d at 529 (citing *Atherton*, 567 F.3d at 677).

Thus, the *pro se* litigant may, "in effect, supplement his complaint with the allegations included

in his opposition." *Brown*, 789 F.3d at 152.  Nonetheless, the *pro se* plaintiff must still "plead

'factual matters that permit [us] to infer more than the mere possibility of misconduct."

*Abdelfattah* at 533 (quoting *Jones v. Horne*, 634 F.3d 588, 596 (D.C. Cir. 2011)).

## III.  DISCUSSION

The defendants seek dismissal of all eleven claims asserted by the plaintiff for failure to

state a claim, under Federal Rule of Civil Procedure 12(b)(6).[4]  The parties' arguments regarding

each claim are discussed *seriatim* below.

___

[4]     The defendants also seek dismissal of the complaint for failure to comply with Federal Rules of Civil
Procedure 8(a), which requires a complaint to contain "a short and plain statement of the claim showing that the

**A.      Count 1: Retaliation Claim Under the Rehabilitation Act, the ADA and Title VII**

In Count 1, the plaintiff alleges that UDC violated the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, by suspending her "solely" for "engaging in her protected civil rights activity," and seeking "reasonable accommodation" as required by the ADA and the Rehabilitation Act.[5]  FAC ¶ 150. The sufficiency of the plaintiff's allegations to support these claims is analyzed after review of the statutory framework.

**1.      Statutory Framework**

Congress enacted the Rehabilitation Act in recognition that "individuals with disabilities continually encounter various forms of discrimination in such critical areas as . . . education."  29 U.S.C. § 701.  To that end, section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29

---

pleader is entitled to relief."  Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem.") at 7, ECF No. 52; Defs.' Reply Mem. Supp. Mot. Dismiss ("Defs.' Reply") at 3, ECF No. 56.  The standard is relaxed for *pro se* plaintiffs, however, and "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."  *Abdelfattah*, 787 F.3d at 533.  The plaintiff's 117-page First Amended Complaint is indisputably inartfully pled, rambling and cryptic, requiring the reader to piece together the plaintiff's legal claims with clues strewn throughout 203 paragraphs of allegations.  Despite its flaws, the complaint accomplishes its purpose.  It gives defendants "fair notice of the claim[s] being asserted so as to permit . . . the opportunity to file a responsive answer . . . . [and] sharpen[s] the issues to be litigated," *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977) (describing the dual purposes of Rule 8(a)), as evidenced by the defendants' briefs, which ably analyze each of the plaintiff's eleven claims, *see generally* Defs.' Mem. at 8–33; Defs.' Reply.   Accordingly, the defendants' motion to dismiss the complaint based on failure to comply with Rule 8(a) is denied.  As described in more detail below, the First Amended Complaint is nonetheless dismissed on other grounds.

[5]      The plaintiff has also seems to assert a retaliation claim against UDC under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.*  Am. Compl. ¶ 150.  The plaintiff, however, has failed to plead either an employment relationship between her and UDC, or that UDC retaliated against her for one of the protected reasons under Title VII, namely "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Accordingly, such a Title VII retaliation claim is not legally cognizable and, to the extent the plaintiff intends to plead such a claim, it is dismissed.

U.S.C. § 794(a).  In practice, this requires federally funded educational programs to make "academic adjustments."[6]  45 C.F.R. § 84.44.  Such required adjustments are described in regulations promulgated by the Department of Education, and include "modifications to . . . academic requirements as are necessary to ensure that such requirements do not discriminate or have the effect of discriminating," and may require suspension of certain rules for handicapped students if application would "have the effect of limiting the participation of handicapped students in the recipient's education program or activity."  34 C.F.R. § 104.44; 45 C.F.R. § 84.44.[7]

The ADA, enacted later, also seeks to protect individuals with disabilities.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or by subjected to discrimination by any such entity."  42 U.S.C. § 12132. Public entities include state- or local government-funded universities.  *Id.* § 12183(1)(B). Similarly to the Rehabilitation Act, the ADA requires public entities to "make reasonable modifications," unless they "can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).

---

[6]     The parties refer to the modifications the plaintiff sought to accommodate her disabilities as "reasonable accommodation."  *See e.g.*, FAC ¶ 150; Defs.' Mem. at 10.  The term "reasonable accommodation" applies in the employment context to describe the accommodations that employers are required to make for handicapped applicants or employees.  *See* 45 C.F.R. 84.12.  By contrast, in the educational context, the term "academic adjustments" describes adjustments necessary to ensure a disabled student is not excluded from participation in, or denied the benefit of, any educational program that receives federal funds.  *See* 45 C.F.R. § 84.44.  For consistency, the term "reasonable accommodation," which is used by the parties, will refer to academic adjustments that the plaintiff requested from UDC Law School.

[7]     34 C.F.R. § 104.44, promulgated by the Department of Education, and 45 C.F.R. § 84.44, promulgated by the Department of Health and Human Services ("HHS"), are identical.  When the Department of Health, Education and Welfare was divided into the separate Departments of Education and HHS in 1980, many of the regulations promulgated by the Department of Health, Education and Welfare, codified in Title 45 of the Code of Federal Regulations were adopted by the newly-created Department of Education.  *See* Conforming Amendments to the Regulations Governing Nondiscrimination on the Basis of race, Color, National Origin, Disability, Sex, and Age Under the Civil Rights Restoration Act of 1987, 65 Fed. Reg. 68,050-01, 68,502 (Nov. 13, 2000) (codified at 34 C.F.R. pts. 100, 104, 106, 110).

Both the Rehabilitation Act and the ADA, in addition to prohibiting direct discrimination on the basis of disability, also prohibit retaliation for engaging in protected activity. The ADA explicitly provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). The Rehabilitation Act, unlike the ADA, does not independently prohibit retaliation but rather incorporates by reference the retaliation provisions of other statutory schemes. For a complaint alleging employment discrimination, for example, the Rehabilitation Act adopts the retaliation provision of the ADA. *See* 29 U.S.C. § 794(d). For all other complaints arising under section 504 of the Rehabilitation Act, such as the instant claim, the Act makes available the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq.*)," 29 U.S.C. § 794a(2), which prohibits retaliation.[8]

## 2. Analysis

To prevail on a retaliation claim under both the ADA and Section 504 of the Rehabilitation Act, the plaintiff must establish essentially the same elements. Specifically, the plaintiff must show "(1) she engaged in a protected activity, (2) the defendant took a materially adverse action against her, and (3) there was a causal connection between the protected activity and the adverse action." *Kimmel*, 639 F. Supp. 2d at 43 (describing the elements of a retaliation claim under Title VI); *see also Minter v. District of Columbia*, No. 14-7118, 2015 WL 9466224,

---

[8]    While the D.C. Circuit has not directly addressed this issue, other courts consistently agree that Title VI prohibits retaliation. S*ee Peters v. Jenney*, 327 F.3d 314, 318–19 (4th Cir. 2003); *Whitfield v. Notre Dame Middle Sch.*, 412 Fed. App'x 517, 522 (3d Cir. 2011) (citing *Peters*, 327 F.3d at 320); *Kimmel v. Gallaudet Univ.*, 639 F. Supp. 2d 34, 42 (D.D.C. 2009) (quoting *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 83 (D.D.C. 2003)); *Alston v. District of Columbia*, 561 F. Supp. 2d 29, 40 (D.D.C. 2008) (citing *Weber v. Cranston*, 212 F.3d 41, 48 (1st Cir. 2000) (quoting 34 C.F.R. § 100.7(e))). The Supreme Court, interpreting language similar to Title VI in Title IX, held that the Title IX anti-discrimination statute impliedly prohibits retaliation "because such retaliation is intentional 'discrimination' 'on the basis of sex.'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 178 (2005). In any event, the defendants do not contest that the plaintiff *may* allege a retaliation claim under Section 504, merely that she did not adequately plead a retaliation claim. *See* Defs.' Mem. at 8–10.

at *3 (D.C. Cir. Dec. 29, 2015) ("To establish a retaliation claim, Minter must show, *inter alia*, that there 'existed a causal link' between her termination and her request for an accommodation." (italics added)); *Peters v. Jenney*, 327 F.3d 314, 320 (4th Cir. 2003) (same); *Alston v. District of Columbia*, 561 F. Supp. 2d 29, 40 (D.D.C. 2008) (listing the same three elements for a retaliation claim arising under both ADA and Section 504, noting that "[a]lthough this test was developed in the employment discrimination context, every circuit to consider the issue has applied the same or a similar test in retaliation cases regarding public programs" (citing *Albra v. City of Fort Lauderdale*, 232 Fed. App'x. 885, 891 (11th Cir. 2007); *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148–49 (2d Cir. 2002); and *Johnson v. Oklahoma*, Nos. 99-6322, 99-6427, 2000 WL 1114194, at *1 (10th Cir. 2000))).

The defendants do not dispute that the plaintiff's requests for accommodations amount to protected activity. *See* Defs.' Mem. at 8–10; *see also Floyd v. Lee*, 968 F. Supp. 2d 308, 332–333 (D.D.C. 2013) (collecting cases from other circuits and this Court finding that a request for reasonable accommodation, without filing a formal charge, is protected activity under the ADA); *Alston*, 561 F. Supp. 2d at 42 ("[S]eeking reasonable accommodations from school officials so that a child can return to school is a protected activity." (citing *Weixel*, 287 F.3d at 149)). Likewise, the defendants do not dispute that the plaintiff's suspension amounts to a materially adverse action. *See* Defs.' Mem. at 8–10; *see also Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010) (defining "adverse actions" as any action that "might have dissuaded a reasonable [person] from making or supporting a charge of discrimination"). Thus, the only dispute is whether the plaintiff has sufficiently pleaded the necessary causal link between her requests for reasonable accommodations and her suspension. Defs.' Mem. at 10.

Review of the ample record in this case, even granting the plaintiff the benefit of assuming her factual allegations to be true and drawing reasonable inferences in her favor, demonstrates that she has failed to plead sufficiently the necessary causal link between the protected activity, in the form of her requests for accommodation, and the adverse action.  The plaintiff herself alleges that her suspension resulted after three separate hearings, in front of a visiting professor, whom the plaintiff herself alleges she had never previously met.  FAC ¶ 83.  She makes no allegation that this presiding professor had any information about her other than that presented at the hearings, or that he was aware of her engaging in protected activity or otherwise had any motivation to retaliate against her.  Moreover, her written appeals were reviewed by the UDC Vice President for Student Affairs, who similarly is not alleged to have had any knowledge of, or information about, the plaintiff's protected activity.  Pl.'s First Appeal, dated Feb. 16, 2012 at 142; Pl.'s Second Appeal, dated Mar. 6, 2012 at 149.  The plaintiff's own allegations describing the arduous suspension process undertaken by UDC Law School, including the series of hearings and appeals, conducted by persons unfamiliar with the plaintiff, undercuts any claim of retaliation.  Instead, the record presented by the plaintiff supports the reasonable inference that the plaintiff was suspended for violating the UDC Code of Student Conduct by acting erratically towards students and faculty alike, in ways that could be, and were, interpreted as threatening to students and the President of the United States.  In other words, the plaintiff's own submissions directly contradict her allegation that her suspension was prompted by her repeated requests for reasonable accommodation.

The plaintiff nevertheless attempts to link her requests for reasonable accommodations with her suspension, arguing both that an inference of causation is supported by the "temporal nexus between the last request," which she allegedly made on February 7, 2012, "and the adverse

action," which she describes as her interim suspension beginning on February 9, 2012.  Pl.'s

Opp'n at 20.  She also asserts that the Associate Dean used UDC as "the 'conduit' to unlawfully

retaliate against Plaintiff solely for asking her for ADA accommodation six times in nine days,"

*id.* at 22.  Both of the plaintiff's contentions are without merit.

The D.C. Circuit has made clear that "[t]emporal proximity can indeed support an

inference of causation."  *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007).  The Court has

cautioned, however, that an inference of causation may be drawn only when "the two events"—

the protected events and the adverse actions—"are 'very close' in time," 482 F.3d at 529

(quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)), citing favorably a

Tenth Circuit opinion "reject[ing] such an inference where the events were three months apart,"

*id.* (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)).  *See also Walker v.*

*Johnson*, 501 F. Supp. 2d 156, 174 (D.D.C. 2007) ("This Court has held that a span of three

months between the employee's EEO activity and the employer's adverse action may be too long

to support a presumption of causation." (citing *Sullivan-Obst v. Powell*, 300 F. Supp. 2d 85, 94

(D.D.C. 2004))).

In this case, the plaintiff has provided such fulsome allegations and documentation that

she has pleaded herself out of any inference of causation from mere temporal proximity.  In

addition to the request she made on February 7, 2012, two days before she was put on interim

suspension, the plaintiff alleges she made a total of "28 explicit requests for ADA reasonable

accommodation from Defendant Board," starting from December 30, 2010, more than a year

prior to her suspension, when the plaintiff alleges she requested accommodation on her law

school application, continuing through October 2011, four months before the suspension, when

she visited the Associate Dean "at least five times . . . [to] discuss[] [the] three types of ADA

accommodation . . . for 1Ls including Plaintiff to remedy defective lockers." List of 28 ADA

Requests at 2–3. Consequently, the plaintiff's alleged protected activity started over a year prior

to the plaintiff's interim suspension and continued throughout the plaintiff's time at UDC Law

School but with no adverse consequences until February 9, 2012, the same day that the school

found the plaintiff made a threat upon the President's life, triggering the need for an interrogation

by two United States Secret Service agents. FAC ¶ 64.

Next, the plaintiff discounts the argument that UDC officials, who ultimately found her

guilty of violations of the UDC Code of Student Conduct, were unaware of her requests for

accommodation. In the plaintiff's view, these officials acted as "conduit[s]" for the Associate

Dean, who "targeted Plaintiff . . . because of Plaintiff's disability," relying on a "cat's paw"

theory of liability. Pl.'s Opp'n at 22. The Supreme Court in *Staub v. Proctor Hosp.*, 562 U.S.

411, 421 (2011), recognized that an impartial decision maker may be influenced by a non-

decision maker's illicit intent to retaliate, or used as the "cat's paw," such that an employer may

not avoid liability if the impartial decision maker "takes [] into account" a biased, retaliatory

report, "without determining that the adverse action was, apart from [the non-decision maker's]

recommendation, entirely justified." This theory does not support a finding of retaliation,

however, if the impartial decision maker makes an independent determination that adverse action

is warranted for reasons "unrelated to the [non-decision maker's] original biased action." *Id.*

To prevail on a cat's paw theory, the plaintiff must demonstrate (1) "'a supervisor

performs an act motivated by [discriminatory] animus,'" (2) "'that is intended by the supervisor

to cause an adverse employment action,'" and (3) "'that act is a proximate cause of the ultimate

[adverse] action.'" *Burley v. National Passenger Rail Corp.*, 801 F.3d 290, 297 (D.C. Cir. 2015)

(quoting *Staub*, 562 U.S. at 422) (first alteration in the original) (affirming summary judgment to

the defendant where the plaintiff failed to produce any evidence that the non-decision maker was motivated by racial discrimination). Here, the plaintiff alleges that the Associate Dean's "malicious email" to the Dean of the Law School, describing the plaintiff's threat against the President of the United States, was the retaliatory act that was intended and, in fact, caused the plaintiff's suspension. Pl.'s Opp'n at 22. The defendants counter that this cat's paw theory of liability fails because the plaintiff has not plausibly alleged that the Associate Dean's actions were motivated by retaliatory animus, or that the email was the proximate cause of her suspension. Defs.' Reply at 4–5. The Court agrees with the defendants.

The plaintiff imputes unlawful retaliatory intent on the part of the Associate Dean based on the conclusory statement that "[the Associate Dean] . . . used the University as the 'conduit' to unlawfully retaliate against Plaintiff solely for asking her for ADA accommodation six times in nine days, for going over her head to report ADA violations to her Supervisor, [Dean of the Law School] (on January 30, 2012), and for reporting ADA violations to Plaintiff's U.S. Senator on February 6, 2012." Pl.'s Opp'n at 22. The logic of this "conduit" theory falls apart, however, for several reasons. First, most significantly, the reason for the Associate Dean's email on February 9, 2012 is revealed by its content, namely that the plaintiff made statements at a meeting with the Associate Dean that were interpreted to pose a threat of harm to the President of the United States. Pl.'s Letter to the Secretary of Education at 76 (describing the contents of the Associate Dean's email). This reason is corroborated by the plaintiff, who admits to having a conversation with the Associate Dean regarding "an incident involving a semi-auto ha[n]dgun in front of the [White House]." Pl.'s Opp'n,, Ex. 3 (Pl.'s Email to the Director of Public Safety, dated Feb. 13, 2012) at 21, ECF No. 54-1. Second, since the plaintiff had repeatedly requested ADA accommodations for at least four months prior to the Associate Dean's email on February 9, 2012, without any

suggestion of suspension.  *See* List of 28 ADA Requests at 3 ("1 time on October 6, 2011 . . . [a]t

least 5 times during Fall 2011 starting 10/10/11").  The conduct prompting the suspension was far

reasonably linked to the plaintiff's perceived threat to the President, as indicated in the Associate

Dean's email. Third, the four months that elapsed between the plaintiff's first ADA request to the

Associate Dean and the Associate Dean's email on February 9, 2012, diminishes any inference of

causation. *See Woodruf*, 482 F.3d at 529; *Walker*, 501 F. Supp. 2d at 174.  Finally, the plaintiff

does not allege that the Associate Dean was aware of the plaintiff's reports to the Dean of the Law

School or to the Senator, further diminishing any basis for the plaintiff's bald attribution of

retaliatory animus to this Associate Dean.

        The plaintiff also has not plausibly alleged that the Associate Dean's email is "false,

reckless and defamatory," so as to raise an inference of retaliatory intent.  Pl.'s Letter to the

Secretary of Education, dated Sept. 4, 2013 at 75.  To support this allegation about the Associate

Dean purportedly purposefully misconstruing their conversation, the plaintiff claims that the

Associate Dean "knew that [her] statements about 'Obama' and 'assassination['] and/or 'Obama'

and 'shooting' were professional statements, made as law enforcements reports to law

enforcement agencies," *id.* at 74, citing as examples of her reporting activity: (1) the plaintiff's

letter to her U.S. Senator "about the availability of ammunition" at a retail establishment in

Alexandria, *id.* at 72; (2) the plaintiff's report to the FBI regarding "DOJ Asset Forfeiture Sales

of 'assassination guns' on national and regional DOJ websites," *id.* at 74; (3) the plaintiff's

report to the United States Secret Service about a man carrying a gun near the White House, *id.*;

and (4) the plaintiff's email to her criminal law professor forwarding screen-shots of webpages

selling "once-fired shell[s of] . . . 7mm NATO round[s]," *id.* at 73.  The plaintiff alleges that the

Associate Dean "had actual factual knowledge" about these reports, in which the plaintiff

confirms her own familiarity with types and sources of guns and ammunition and concerns related to "assassination[s]." *Id.* at 74.[9]  These admissions, far from demonstrating the intentional falsity of the Associate Dean's email, provide legitimate bases for the concern expressed in the Associate Dean's email, and undermine any inference of retaliatory intent.  *See Walker v. Johnson*, 798 F.3d 1085, 1093–94 (D.C. Cir. 2015) (affirming summary judgment that no inference of retaliation can be drawn, where the adverse action occurred three months after the protected activity, and no evidence "support[s] a finding that the employer's proffered reasons were untrue, and thus, *a fortiori*, could not support an inference that her employer was hiding a prohibited motive").  In sum, the plaintiff has not plausibly alleged any unlawful retaliatory intent on the part of the Associate Dean.  *See Twombly*, 550 U.S. at 570.

Moreover, contrary to the plaintiff's argument, the Associate Dean's email was not the proximate cause for the plaintiff's suspension.  The D.C. Circuit's decision in *Hampton v. Vilsack*, 685 F. 3d 1096 (D.C. Cir. 2012), is illustrative.  There, the "deciding official . . . conducted an independent review of the evidence . . . provided [the plaintiff] an opportunity to respond in writing and orally to the proposed termination and he even ordered an additional investigation after [the plaintiff] raised several 'reasonable questions' about the charges made against him." *Id.* at 1101–02.  The Court concluded that, regardless of any retaliatory animus on the part of other officials, this process by an independent decision-maker defeated the plaintiff's discrimination claim. *Id.*

---

[9]     The plaintiff's allegation that the Associate Dean "staged" fake U.S. Secret Service Agents, who were possibly just "some friends of [another law professor at UDC] or [the Associate Dean]," is even more farfetched. Pl.'s Letter to the Secretary of Education, dated Sept. 4 at 69, 71.  The evidence proffered by the plaintiff for her allegation that the two Secret Service Agents were impersonators is that they "did not seem to know [] Judge Pryor." The fundamental silliness of this allegation only bolsters the defendants' argument that the plaintiff has not plausibly alleged retaliatory intent.

Likewise here, even if the plaintiff's unsupported allegations of retaliatory animus by the Associate Dean were accepted as true, the plaintiff's own allegations make plain that UDC undertook an independent investigation of the plaintiff's behavior, provided the plaintiff three hearings and two written appeals, and uncovered evidence of additional wrongdoing, separate from the plaintiff's behavior in the Associate Dean's office.  For example, during the second disciplinary appeal hearing on February 27, 2012, another first-year law student testified that he had heard the plaintiff say the President's name and "assassination" in the same sentence.  Pl.'s Letter to the Secretary of Education, dated Sept. 4, 2013 at 72.  On March 1, 2012, the plaintiff attended a third hearing concerning offensive behavior towards other students, such as her using "lewd, threatening, and racially insensitive remarks towards another UDC Law School Student," making "false remarks . . . about another UDC Law School student" and "spreading rumors . . . that this same student . . . is the victim of spousal abuse," and becoming "verbally abusive and accus[ing] another UDC Law School student of stealing [her] Civ Pro notes."  Notice of Disciplinary Hearing, dated Feb. 8, 2012 at 114; Denial of Pl.'s Appeal, dated Mar. 15, 2015 at 147.  She was found guilty of these acts, which constituted violations of the UDC Code of Student Conduct, and this became an alternative basis for her suspension.  Denial of Pl.'s Appeal, dated Mar. 15, 2015 at 147.  The plaintiff does not allege that the Associate Dean was the source of these complaints about her behavior.  Instead, the Notice specifies that these accusations were based on "incidents reports" filed with the Office of Public Safety.  Notice of Disciplinary Hearing, dated Feb. 8, 2012 at 114.  In short, the plaintiff's own allegations render her "cat's paw" theory implausible because "this is not a case in which the deciding official was 'dependent upon a biased [colleague's] opinion' or was 'unable independently to assess' the

basis for [suspension]." *Hampton*, 685 F.3d at 1101 (quoting *Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1311 (D.C. Cir. 1998)) (alterations in the original omitted).

After examining the plaintiff's allegations and, as required by the D.C. Circuit, the exhibits she submitted with her complaint and her opposition to the defendants' motion to dismiss, *Brown*, 789 F.3d at 152 (holding that the "district court should have considered the facts alleged in *all* of [the plaintiff's] pleadings," including facts alleged in "filings responsive to a motion to dismiss" (emphasis in original)), the Court finds that the plaintiff has failed to "nudge [her] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  She may have participated in protected activity, but the protected activity could not plausibly have *caused* her suspension.  She was suspended for entirely separate reasons: making threats upon the President's life and engaging in inappropriate and abusive behavior toward her fellow classmates.  *See* Notice of Disciplinary Hearing, dated Feb. 8, 2012 at 114; Notice of Interim Suspension, dated Feb. 9, 2012, at 133.  These reasons have nothing to do with her protected activity.  Independent, third-party decision makers, who did not know the plaintiff nor her participation in any protected activity, found her guilty on all of the charges, for which she was suspended, after considering corroborating evidence from student testimony and incident reports, not merely the Associate Dean's email.  Pl.'s Letter to the Secretary of Education, dated Sept. 4, 2013 at 72; FAC ¶¶ 69, 83; Denial of Pl.'s Appeal, dated Mar. 15, 2015 at 147.

Indeed, it appears the plaintiff herself did not always view her suspension as retaliation for her requests for disability accommodations.  In the plaintiff's first appeal, she did not link her suspension to her requests for accommodations anywhere in her five-page, single-spaced letter.  *See generally* Pl.'s First Appeal, dated Feb. 16, 2012 at 142–46.  She did, however, assert that she believed her suspension was due to her ongoing dispute with the American Federation of

State, County and Municipal Employees ("AFSCME"), which the plaintiff alleges operates at

UDC.[10]  *Id.* at 143–44.  Likewise, the plaintiff similarly did not raise retaliation as an issue in her

second appeal.  *See generally* Pl.'s Second Appeal, dated Mar. 6, 2012 at 149.  The first time the

plaintiff appears to link her suspension with her requests for accommodations is in the plaintiff's

twenty-nine page letter to the Secretary of Education, on September 4, 2013, a year and a half

after her suspension.  In that letter, she claimed that the Associate Dean "wanted [the plaintiff]

out of UDC at any price" in order to conceal the fact that the Associate Dean "had never set up

an ABA Complaint Process as the ABA required," and she was targeted for being "a

complainer."  Pl.'s Letter to the Secretary of Education, dated Sept. 4 at 75.  The plaintiff's

theory of retaliation shifted in her opposition to the defendants' motion to dismiss, claiming now

before this Court that "[t]he Associate Dean's malicious email targeted Plaintiff for retaliation

because of Plaintiff's disability, because of Plaintiff's record of disability, and because Plaintiff

was regarded at the Law School as a person with a disability."  Pl.'s Opp'n at 22.  The plaintiff's

shifting explanations for her suspension, and the reason she was "targeted," only undermines the

plaintiff's assertion now that UDC suspended her in retaliation for her requests for reasonable

accommodations.

　　　Accordingly, the defendants' motion to dismiss Count 1 is granted.[11]

---

[10]　　　The plaintiff claims that she has an ongoing dispute with AFSCME stemming from an incident in 2006, when AFSCME refused to defend her husband when he was terminated from the University of Nevada at Reno for taking petty money from the university library, and because she "could still sue AFSCME today for violating [her] civil rights in Nevada . . . that is what I believe is behind this action by UDC—in my opinion, that is why AFSCME wants me off the UDC Campus and out of law school."  Pl.'s First Appeal, dated Feb. 16, 2012 at 143–44.

[11]　　　The plaintiff's opposition also raises a "Lack of ADA Accommodation" claim as part of Count 1, *see* Pl.'s Opp'n at 37 ("Disability Discrimination under Section 504 of 29 U.S.C. 794 . . . claims are in Count 1"), but this appears to be a restatement of the plaintiff's Count 10, which is addressed *infra* Part III.F.

B.        **Count 2: Retaliation Claim under the First Amendment**

In Count 2, the plaintiff claims that three UDC professors, along with the Associate Dean of Students and Dean of the UDC law school, the Assistant to the UDC Vice President for Student Affairs, and the Director of Public Safety at UDC, violated her First Amendment rights, under 42 U.S.C. § 1983, by taking "retaliatory action[s]" against her, FAC ¶ 153, for her persistent reports of "academic fraud involving plagiarism by Law Faculty and Law Students at her public Law School." Pl.'s Opp'n at 26. To establish a retaliation claim under the First Amendment, the plaintiff must demonstrate "(1) that [she] engaged in protected conduct[;] (2) that the government 'took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again;' and [3] that there exists 'a causal link between the exercise of a constitutional right and the adverse action taken against him.'" *Doe v. D.C.*, 796 F.3d 96, 106 (D.C. Cir. 2015) (quoting *Aref v. Holder*, 774 F. Supp. 2d 147, 169 (D.D.C. 2011)). Review of the plaintiff's allegations as to each of these defendants shows that she has failed to state a First Amendment retaliation claim arising from her numerous plagiarism reports against any of them.

First, the plaintiff alleges that her Contracts Professor retaliated against her by refusing to serve as her Law Faculty witness at her first disciplinary hearing because the plaintiff told the deceased Academic Dean, "in confidence," that this professor had "plagiariz[ed] an assignment that he gave to his 1L Contracts I Class on the very first day of her Contracts I Course." FAC ¶¶ 53, 54, 153. The plaintiff, however, does not allege that this Contracts Professor was even aware of this plagiarism report, which she herself states was made "in confidence." *Id.* ¶ 53.

Second, the plaintiff alleges that, on February 9, 2012, the Assistant to the Vice President for Student Affairs gave her a Notice of Interim Suspension and "called Plaintiff a 'terrorist.'"

25

*Id.* ¶¶ 69, 153.  The plaintiff makes no allegation, however, that the Assistant knew about

plaintiff's repeated plagiarism reports. On the contrary, the plaintiff alleges that she had never

met the Assistant before.  *Id.* ¶ 69.

Third, the plaintiff alleges that an Assistant Professor of Social Work at UDC, who

presided over the first disciplinary hearing on February 14, 2012, "spent two-and-one-half hours

repeating the derogatory disability terms and disability slurs from Defendant University's official

letters of February 8, 2012 and February 9, 2012 that had targeted Plaintiff's physical disability."

*Id.* ¶¶ 83, 153.  Additionally, the plaintiff complains that the Assistant Professor did not show her

"any of the evidence against her," and did not "allow [her] to introduce any evidence of her

own," or "call any witness."  *Id.*  Nowhere does the plaintiff allege, however, this Assistant

Professor knew about her plagiarism reports or that his treatment of the plaintiff during her

disciplinary hearing was a result in any way of her plagiarism reports.  In fact, the plaintiff

alleges that the Assistant Professor does not teach at the law school, *id.* ¶ 18, and that she "had

never met [the Assistant Professor] before," *id.* ¶ 83.

Fourth, the plaintiff alleges, on February 14, 2012, the day of her first disciplinary

hearing, the Director of Public Safety at UDC retaliated against her by preventing her from

bringing her Handicapped Book Cart to the disciplinary hearing in order to demonstrate "how it

might have irrationally bothered some Law Students."[12]  *Id.* ¶¶ 81, 153.  This Director of Public

Safety allegedly received several of the plaintiff's plagiarism reports.  *See* Pl.'s Opp'n, Ex. 17

---

[12]     The plaintiff alleges that the defendant Director of Public Safety rejected the plaintiff's application for an
internship with him "on or about January 25, 2012, a week after Plaintiff emailed the [Associate Dean of Students]
about [her Torts Professor's] plagiarism a second time."  FAC ¶ 128.  The rejection of her internship application
does not appear, based on the dates cited by the plaintiff, to be among the "retaliatory action[s]" underlying the
plaintiff's First Amendment Retaliation Claim, *id.* ¶ 153 ("Individual [sic] named . . . Defendant [Director of Public
Safety and Campus Police Chief] . . ., at all times acting under color of State law, took adverse and retaliatory action
against Plaintiff on February 6, 2012, February 8, 2012, February 9, 2012, February 14, 2012, February 27, 201[2]
[sic], and March 2, 2012 . . . ."), and therefore warrants no further discussion.

(Pl.'s Email to Director of Public Safety, dated Dec. 5, 2011) at 81 (asking whether the plaintiff's torts professor can be prosecuted for theft of public funds for plagiarizing his model course outline), ECF No. 54-1; *id.* Ex. 18 (Pl.'s Email to Director of Public Safety, dated Jan. 31, 2012) at 88–89 (regarding the same act of plagiarism), ECF 54-1; *id.* Ex. 20 (Pl.'s Email to Director of Public Safety, dated Feb. 8, 2012) at 109 (notifying the defendant of "a widespread cheating problem at UDC"), ECF No. 54-1; *id.* Ex. 22 (Pl.'s Email to Director of Public Safety, dated Feb. 8, 2012) at 118–19 (detailing Dean of the Law School's refusal to tell another law school that one of its professors plagiarized a book, even after the plaintiff brought it to the Dean's attention), ECF No. 54-1.  None of the plaintiff's allegations of plagiarism involved any wrongdoing by the Director.  Moreover, given that plagiarism is an academic rather than a public safety issue, any role that the Director may have had in policing plagiarism is difficult to discern. In any event, the plaintiff fails to allege any causal link between her repeated plagiarism reports to the Director of Public Safety and his refusal to allow her to bring her handicapped book cart to the hearing.  Instead, the plaintiff implies that the Director's refusal stemmed from discrimination against individuals with disabilities, rather than as retaliation for any plagiarism reports.  *See* FAC ¶ 82 (alleging that when plaintiff "wanted to bring [to the first disciplinary hearing] the Handicapped Book Cart to show it was normal accommodation for disability," the Director refused, calling it "a 'threat' to the University," and refused to allow the plaintiff to produce a letter from her neurosurgeon stating that the book cart is not a threat).

Fifth, the plaintiff alleges that, on February 6, 2012, an adjunct professor, after class, warned the plaintiff that if she "did not stop reporting plagiarism, in particular, [her Torts Professor's] 27-page plagiarism of his official Torts I Outline, which he had placed on the Law School's official website, then Plaintiff was going to get the 'surprise of her life.'"  *Id.* ¶ 27.  The

defendants argue that the plaintiff failed to allege that the adjunct professor's warning was a retaliatory action sufficient to deter a person of ordinary firmness from speaking again, especially because the plaintiff's speech was not actually chilled, and she continued to make plagiarism reports even after February 6, 2012.  Defs.' Mem. at 14.  The defendants are correct. A vague statement from an adjunct professor, even if construed as a "warning," as the plaintiff characterizes it, that has no repercussions, cannot, as a matter of law, deter a person of ordinary firmness from exercising her freedom of speech.  *See The Gallup Organization v. Scully*, No. Civ.A. 03-849, 2005 WL 3213963, at *4 (D.D.C. Oct. 5, 2005) (finding the defendant's response not "sufficiently severe as to constitute actionable retaliation," where the defendant only stated that he "'would like to investigate'" the plaintiff and that the plaintiff "'should be MUCH more careful' with his accusations," because the defendant's action did not actually prevent the plaintiff from exercising his freedom of speech and did not result in "any other adverse consequences" (emphasis in the original)).  In fact, the request did not deter the plaintiff from continuing to report perceived plagiarism at UDC Law School, and she subsequently submitted plagiarism reports to various UDC officials and federal government officials.  *See* Pl.'s Letter to Sen. Reid, dated Feb. 6, 2012 at 98; Pl.'s Email to Director of Public Safety, dated Feb. 8, 2012 at 109; Pl.'s Email to Director of Public Safety, dated Feb. 8, 2012 at 118–119; Pl.'s Opp'n, Ex. 29 (Pl.'s Email to Dean of the Law School, dated Feb. 22, 2012) at 169, ECF No. 54-1; *id.* (Pl.'s Email to Vice President UDC, dated Feb. 27, 2012) at 170, ECF No. 54-1; *id.*, Ex. 31 (Pl.'s Email to Dep't of Ed., dated Mar. 22, 2012) at 183, ECF No. 54-1.

Lastly, the plaintiff alleges that on February 8, 2012, the Dean and Associate Dean of Students at the Law School retaliated against her for making plagiarism reports by initiating

proceedings that eventually resulted in her suspension from UDC Law School.[13]  FAC ¶ 36.  The

Dean and Associate Dean of Students were allegedly aware of the plaintiff's numerous

plagiarism reports.  *Id.* ¶ 24 ("On February 8, 2012, Defendant [Dean of the Law School],

Defendant [Associate Dean of Students at the Law School] and deceased Academic Dean []

refused to accept anymore of Plaintiff's true and valid reports of plagiarism."); Pl.'s Opp'n at 27.

Nonetheless, the defendants posit that the plaintiff does not adequately plead a causal link

between her plagiarism reports and her suspension.  Defs.' Mem. at 16.  The Court agrees for at

least two reasons.

First, the temporal proximity between the plaintiff's plagiarism reports and her

suspension does not support an inference of causation in this case because the plaintiff alleges

that she started making plagiarism reports within the first week of matriculating at UDC Law

School.  *See* FAC ¶ 105 (the plaintiff attempted to make a plagiarism complaint on August 18,

2011, three days after matriculating).  The plaintiff engaged in the same type of protected

activity in mid-August 2011, and yet she was not suspended until six months later in February

2012.  The plaintiff may have continued to make plagiarism reports until just shortly before her

suspension, but any inference of causation from the timing is diluted by the fact that the plaintiff

had been making the same plagiarism reports for six months, with no retaliatory action from the

defendants.

Second, the plaintiff fails to link her plagiarism reports with her suspension because the

plaintiff's own allegations and attached exhibits demonstrate she was suspended because of her

own behavior.  As explained *supra* in Part III.A.2, the plaintiff was suspended after three

---

[13]       The plaintiff also refers generally to events that occurred on February 14 and 27, and March 2, 2012,
without specifying what occurred on those dates, FAC ¶ 153, although these dates appear to be when the
disciplinary hearings occurred and the date of her subsequent appeal, *see id.* ¶¶ 57, 80.

hearings and two written appeals, presided over by individuals whom the plaintiff herself concedes did not know the plaintiff or about her participation in any protected activity.

Finally, the plaintiff's effort to accuse the Dean and the Associate Dean of "us[ing] the University as the 'conduit' of her malicious allegation to eject Plaintiff from the Campus," relying again on a cat's paw theory of liability, Pl.'s Opp'n at 27, is unavailing.  The plaintiff's contention fails because she has not plausibly alleged that either the Associate Dean or the Dean of the Law School harbored any retaliatory intent against the plaintiff, or that their actions were the proximate cause of her suspension.  The plaintiff also has not plausibly alleged that the Associate Dean purposefully misconstrued her statements made in the Associate Dean's office on February 9, 2012, or that the Dean of the Law School purposefully stood by, with the intent to suspend her.  *See supra* Part III.A.2.  Rather than being improperly targeted and unfairly treated, the plaintiff admits that she received opportunities "to respond in writing and orally" to the charges about her misconduct, with an independent review by individuals who did not know her, and those charges were supported by evidence independent of the Dean and Associate Dean. *See, e.g.*, Pl.'s Letter to the Secretary of Education, dated Sept. 4, 2013 at 72 (a law student testified that he heard the plaintiff say "Obama" and "assassination" in the same sentence); Notice of Disciplinary Hearing, dated Feb. 8, 2012 at 114 (the second basis for the plaintiff's suspension relied on incident reports filed with the Office of Public Safety, documenting the plaintiff's abusive behavior towards fellow law school students).

Accordingly, the plaintiff fails, in Count 2, to state a claim for retaliation against her for exercise of her First Amendment rights.

### C.      Count 3: Due Process Under the Fifth Amendment

The plaintiff alleges in Count 3 that five individual defendants, "who at all times were acting under color of State Law, violated Plaintiff's protected right to Due Process of Law under the Fifth Amendment of the United States Constitution."  FAC ¶ 157; *see Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954) (applying the Fifth Amendment to the District of Columbia).  The Supreme Court has held that the Due Process Clause applies to students in public post-secondary educational settings and requires students facing suspension due to disciplinary problems to be "given oral or written notice of the charges against [them] and, if [they] den[y] them, an explanation of the evidence the authorities have and an opportunity to present [their] side of the story."  *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 85 (1978) (quoting *Goss v. Lopez*, 419 U.S. 565, 581 (1975)).  The Supreme Court has cautioned, however, that the Due Process Clause does not require a formal hearing and that an "'informal give-and-take' between the student and the administrative body dismissing him" would be sufficient to "give the student 'the opportunity to characterize his conduct and put in what he deems the proper context.'"  *Id.* (quoting *Goss*, 419 U.S. at 584).

In the instant case, the plaintiff alleges that she "was never given any evidence or any factually-based allegations to dispute" because "the letter sent to Plaintiff . . . summarized no wrongdoing by Plaintiff," that "there was no fact-finding process of any kind because there were no factually-based allegations," and that the plaintiff was "denied the right to call any witness or introduce any evidence to the contrary."  FAC ¶ 57.  These allegations are fully belied by the plaintiff's own exhibits, which reflect the ample and fair process UDC provided to her.

Contrary to the plaintiff's allegation that she was not given sufficient notice of the charges against her because the notices contained only "two-word 'charge/fact statements,'" Pl.'s

Opp'n at 28–29, the two notices submitted by the plaintiff as exhibits plainly describe in detail both the inappropriate behavior that she was accused of exhibiting and the specific sections of the UDC Code of Student Conduct that she was charged with violating.  The first notice informed the plaintiff that two incident reports had been filed with the Office of Public Safety alleging the plaintiff "us[ed] lewd, threatening and racially insensitive remarks towards another UDC Law School Student," "spread[] rumors" that a classmate "was addicted to drugs" and was "the victim of spousal abuse," and verbally abus[ed] another student for allegedly stealing some class notes.  Notice of Disciplinary Hearing, dated Feb. 8, 2012 at 114.  The second notice advised the plaintiff that she was placed on "interim suspension" due to "misconduct . . . in the Office of the Associate Dean" on February 9, 2012, that violated the UDC Code of Student Conduct rules, *inter alia*, against "menacing," and "terroristic threats."  Notice of Interim Suspension, dated Feb. 9, 2012 at 133.

The plaintiff's reliance on *Dixon v. Alabama State Bd. of Ed.*, 294 F.2d 150 (5th Cir. 1961), is misplaced since this case only bolsters the defendants' position that she received more than adequate notice.  The plaintiffs in *Dixon* were expelled before any hearing, and the only notice they received attributed their expulsion to their involvement in a "problem at Alabama State."  *Id.* at 152 n.2.  By contrast to the notice at issue in *Dixon*, the plaintiff not only received far more detailed notices about her charged misconduct, but also received three hearings and opportunities for appeal.

Moreover, the plaintiff's complaint that no fact-finding occurred at the hearings on the charges against her cannot be squared with her submitted exhibits. The plaintiff herself described the evidence presented during the three hearings, including student testimony that the plaintiff made a threat on the President's life and the Associate Dean's email regarding the same.  *See,*

*e.g.,* Pl.'s Letter to the Secretary of Education, dated Sept. 4, 2013 at 69 ("On Feb. 27 and March 2, 2012, [Assistant to the Vice President and a dean] introduced an email of [the Associate Dean]."); *id.* at 72 ("[A] failing 1L student came to the Feb. 27, 2012 "Student [Disciplinary] Appeal," who said he *thought* that he *might* have heard me *once* say the words 'Obama' and 'assassination,' *unconnected* by any verb[.]").  The plaintiff also concedes that she was given an opportunity to "present [her] side of the story," *Horowitz*, 43 U.S. at 85, both orally during the hearing and later in writing, *see e.g.*, FAC ¶ 80 ("Plaintiff denied all of the terms and contents ascribing wrongdoing to her in the University's official notices of deprivation on February 8, 2012 and February 9, 2012 . . . ."); Pl.'s First Appeal, dated Feb. 16, 2012 at 142–45 ("[I]t was I who made a genuine report to FBI.gov on 1/16/2012 at 5:30 pm—which [Associate Dean] and I discussed . . . —concerning a Metro Bus Driver seeing a man in a business suit with a concealed semiautomatic handgun get on his bus at H street by the White House . . . How could such an FBI.gov report ever be twisted into such a statement as a 'terroristic threat' allegedly by me . . . ."); Pl.'s Second Appeal, dated Mar. 6, 2012 at 149–50 ("At <u>no time</u> on 2-9-2012—Did I ever threaten Pres. Obama or the WH or any political figure in DC in [the Associate Dean of Students' office] or in the office of Assist. Dean . . . . ALL REMARKS about UDC LAW to Asst Dean [] —were made—in the context of going to the ABA—and the cheating—if not disclosed to the ABA—could jeopardize the school's accreditation—and that might result in it being closed—after a legal process." (emphases in the original)).

Additionally, the plaintiff broadly alleges she was "denied the right to call any witness or introduce any evidence to the contrary."  FAC ¶ 57.  Closer examination of her supporting allegations, however, reveal that she was not allowed to introduce evidence that appeared to be irrelevant or likely not to exist, and she does not allege that she was denied the opportunity to

present relevant evidence or testimony.  For example, she complains that she was not allowed to "call the 'L' Street office of the U.S. Secret Service to verify whether U.S. Secret Service Agents had come—and not just some friends of [a professor at UDC Law school or the Associate Dean], with fake identifications."  Pl.'s Letter to the Secretary of Education, dated Sept. 4, 2013 at 68–69.  She was also not allowed to explain her criminal law professor's "discussions on [the] *Hinckley* and *Gordy* cases," two federal criminal cases, "in [her] suspension hearings," nor was she allowed to "admit into evidence a document from November 2011 from Federal Court in D.C.—the detention memorandum for Oscar Ortega Hernandez."  *Id.* at 71–72.  The plaintiff also complains that she was not allowed to discuss four incidents in which she felt discriminated by her fellow classmates based on her disability, during the first disciplinary hearing on February 14, 2012, FAC ¶ 80, which was intended to investigate whether the plaintiff made any "terroristic threats" against the President, Notice of Interim Suspension, dated Feb. 9, 2012 at 133.  Given that the plaintiff's own examples of purported evidence that she was denied the opportunity to present are, in fact, irrelevant, UDC did not violate the plaintiff's due process rights by declining her request to delve into these areas.

Finally, the plaintiff complains that she was denied due process because she "had no power to compel [witnesses] to come" to her defense, FAC ¶ 80, and that she was not provided with a "Law Faculty Witness" because no professor was willing to attend, *id.* ¶ 50–52.  "A school is an academic institution, not a courtroom or administrative hearing room."  *Horowitz*, 435 U.S. at 88.  Due process does not require that the plaintiff have the power to compel witnesses or to have a faculty adviser present during the hearing.  *See Furey v. Temple University*, 884 F. Supp. 2d 223, 254 (E.D. Pa. 2012) (finding that "[i]n the normal course of disciplinary proceedings," the school's effort to contact each witnesses to request their presence

34

is sufficient); *Turof v. Kibbee*, 527 F. Supp. 880, 886 (E.D.N.Y. 1981) (finding no constitutional

deprivation where a student was "denied the means to compel attendance of witnesses" during a

suspension hearing). Thus, even assuming the truth of the plaintiff's allegations on this point,

she fails to state a legally cognizable claim.

Accordingly, since the plaintiff's own allegations and submitted materials demonstrate

that she was provided ample due process, she has failed to state a claim in Count 3.[14]

### D.    Counts 4–6: Claims Arising Under UDC Law School's Honor Code

The plaintiff next brings three claims based on the UDC Honor Code. Specifically, the

plaintiff claims that (1) UDC "breached its written DCSL-UDC Honor Code Contract with

Plaintiff by refusing to take a credible report of Law Faculty plagiarism for investigation as

required by the DCSL-UDC Honor Code Contract," FAC ¶ 160 (Count 4); (2) all named

defendants breached an implied covenant of good faith and fair dealing by "intentionally and

maliciously interfer[ing] with and imped[ing] Plaintiff's fulfillment of her DCSL-UDC Honor

Code Contract by contravening the terms of the DCSL-UDC Honor," *id.* ¶ 167 (Count 5); and

(3) UDC intentionally and fraudulently induced the plaintiff "to move her domicile . . . to enroll

---

[14]     The plaintiff also claims that UDC failed to follow the procedures "contained [in] the Law School's rules
that were stipulated to the Court in 2008 . . . for a deprivation involving a Law Student," FAC ¶ 39, which rules
allegedly require a "four-part process include[ing] a hearing attended by Law Faculty and . . . (1) charges with
written evidence before the hearing; (2) a fact-finding process addressing factually-based evidence including a time,
place, manner and date; (3) time to respond and offer facts and witnesses to the contrary; (4) a substantial three-page
decision giving the conclusions reached and the reasons for those conclusions based on the fact-finding process," *id.*
¶ 41. To the extent the plaintiff alleges a breach of contract claim based on this "four-part process," her claim fails.
In support of this assertion, the plaintiff submitted, as an exhibit, *Di Lella v. Univ. of the Dist. of Columbia David A.
Clarke School of Law*, 570 F. Supp. 2d 1 (D.D.C. 2008), a case purporting to illustrate the four-part procedure UDC
"stipulated to" in 2008. Review of the case reveals that the "four-part process" the plaintiff describes is neither a
stipulation nor dictated by UDC Law School rules, but simply the process that was allegedly received by the
plaintiff in *Di Lella*. *See Di Lella*, 570 F. Supp. 2d at 10 ("Di Lella's complaint states that she received notices of all
charges and evidence against her . . . . Di Lella's complaint indicates that she was given the opportunity to present
her side of the story in both written and oral form . . . . According to Di Lella, the Academic Standards Committee
informed Di Lella of its decision in a three-page letter."). Here, the plaintiff not only received similar process to the
plaintiff in *Di Lella*, but, as explained above, received all the process that the *Di Lella* court concluded was required
under the Due Process Clause. *Id.* at 9 ("A student facing suspension from school for disciplinary reasons is entitled
to 'oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the
authorities have and an opportunity to present his side of the story.'" (quoting *Horowitz*, 435 U.S. at 85)).

in Defendant University's Law School," *id.* ¶ 172 (Count 6), by "promis[ing to] polic[e]

plagiarism [according to] the Honor Code Contract," Pl.'s Opp'n at 36.  These three claims are

predicated on the plaintiff's incorrect view that the UDC Honor Code established a contract

between the plaintiff and UDC.

"'To *prevail* on a claim of breach of contract, a party must establish (1) a valid contract

between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty;

and (4) damages caused by breach.'" *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015)

(quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009) (emphasis in the

original)).  A valid, enforceable contract requires that the parties "(1) express an intent to be

bound, (2) agree to all material terms, and (3) assume mutual obligations."  *Dyer v. Bilaal*, 983

A.2d 349, 356 (D.C. 2009) (citing *Eastbanc Inc. v. Georgetown Park Assocs.*, 940 A.2d 996,

1002 (D.C. 2008)).  If a valid contract is in place, but "a party 'evades the spirit of the contract,

willfully renders imperfect performance, or interferes with performance by the other party, he or

she may be liable for breach of the implied covenant of good faith and fair dealing.'" *Sundberg*

*v. TTR Realty, LLC*, 109 A.3d 1123, 1133 (D.C. 2015) (quoting *Paul v. Howard Univ.*, 754 A.2d

297, 310 (D.C. 2000)).  Set against these legal principles, the plaintiff has failed to allege

sufficient facts to establish that the UDC Honor Code is an enforceable contract.

The UDC Honor Code lacks both an intent to be bound and mutuality of obligation.  The

UDC Honor Code is merely an "acknowledgement and pledge" that a student "will read and

become familiar with . . . the UDC-DCSL Student Handbook," and "pledge that [he or she] will

abide by the UDC-DCSL Honor System," as spelled out in the Student Handbook.  Pl.'s Opp'n,

Ex. 33 (UDC Honor Code) at 191, ECF No. 54-1.  The plaintiff's bald assertion that "[t]he

material terms of the Honor Code Contract require mutual noticing, a duty freely taken by each

36

party," Pl.'s Opp'n at 34, is directly contradicted by the text of the UDC Honor Code, which

disclaims any obligation whatsoever upon UDC.  The UDC Student Handbook, which outlines

the UDC Honor System, explicitly states that it "does not constitute a contract between the

student and the David A. Clarke School of Law or the University of the District of Columbia."

Defs.' Mem. at 19 (quoting Defs.' Mot. Ex. E ("UDC-DCSL Student Handbook") at 15, ECF

No. 52-1).   Instead, the Honor Code refers only to what the student must do: read the Student

Handbook, including the Academic Norms and Standards portion that spells out the honor

system, and promise to abide by the honor system.  In short, the UDC Honor Code is not an

enforceable contract.

The plaintiff's "intentional misrepresentation and fraudulent inducement" claim in Count

6 fails for the same reason.  The plaintiff alleges she relied on "Defendants' promise of policing

plagiarism in the Honor Code Contract" to make her decision to enroll at UDC Law School.

Pl.'s Opp'n at 36; FAC ¶¶ 170, 172.  Contrary to her claim, however, UDC makes no promise

whatsoever of policing plagiarism in the UDC Honor Code.  Instead, the Honor Code obliges

only students to pledge to be "honest[] in crediting sources of ideas, information, and written

work" and not to "be silent with regard to the violations of those norms by others if such

violations come to my attention."  UDC Honor Code at 191.  Therefore, the alleged

misrepresentations relied upon by the plaintiff do not exist.

Accordingly, the plaintiff's Counts 4, 5 and 6 fail to state a claim and must be dismissed.

### E.        Counts 7–9: Claims Arising Under ABA Standard 512

The plaintiff brings three claims based on the alleged failure of UDC Law School to

comply with the requirements set forth in the American Bar Association ("ABA") Standard

512.[15] According to the plaintiff, this ABA standard "required Law Schools to: (1) take the Complaint of the Law Student; (2) resolve the Complaint in a timely manner of two to three weeks; (3) keep a written record of the Complaint and its resolution that any law Student or any ABA Officers could view."  FAC ¶ 100.  The plaintiff claims: (1) defendant UDC "breached its Contract with Plaintiff by refusing to provide an ABA Law School with an ABA 512 Standard [sic] Complaint Process," *id.* ¶ 177 (Count 7); (2) defendant UDC breached its implied covenant of good faith and fair dealing by "engaging in misconduct and contravening the terms of the Contract" to provide her with an ABA Standard 512 complaint process, *id.* ¶ 185 (Count 8); and (3) the plaintiff relied, to her detriment on UDC's promise to provide "an ABA Law School with an ABA 512 Complaint Process," when she decided to enroll in UDC Law School, *id.* ¶¶ 188, 190 (Count 9).

The crux of these three claims is the plaintiff's effort to seek redress for a perceived failure by UDC Law School to comply with an ABA Standard.  Other courts confronted with similar claims have consistently found that ABA standards do not create a private right of action. *See Waller v. Southern Illinois Univ.*, 125 F.3d 541, 542 (7th Cir. 1997) ("Even if a public institution, in order to be accredited by the ABA, promises to adhere to the standards for accreditation that the ABA has laid down, it would not follow that the institution was

---

[15]     The plaintiff made repeated threats to report her professors and the Deans at UDC Law School to the local bar association.  *See* Pl.'s Opp'n, Ex. 18 (Pl.'s Email to EEO Representative, dated Feb. 2, 2012) at 94, ECF No. 54-1 (stating that she will "decide if the Law School or the ABA . . . or the DC Bar . . . is the more appropriate forum for [her] complaint" regarding her torts professor); Pl.'s Opp'n, Ex. 20 (Pl.'s Email to Director of Public Safety, dated Feb. 8, 2012) at 109, ECF No. 54-1 ("I will be going to the DC Bar to seek [the Dean of the Law School's] removal as Dean."); Pl.'s Opp'n, Ex. 20 (Pl.'s Email to Associate Dean, dated Jan. 16, 2012) at 112, ECF No. 54-1 ("I will most likely make an ABA complaint and seek to have [the torts professor's] bar license suspended.").  Indeed, the plaintiff submitted an actual complaint to the District of Columbia Board on Professional Responsibility against the Associate Dean on February 26, 2014, after she filed the instant lawsuit, alleging that the Associate Dean "[v]iolated Honor Code Contract," when she "refused to take any more complaints about Law Faculty and Law Student Plagiarism at [UDC] Law School."  FAC, Ex. B (Pl.'s Bar Complaint Against Associate Dean, dated Feb. 26, 2014) at 64–65, ECF No. 12.

undertaking a contractual duty to its students . . . . But of course the institution could if it wanted

(and it was permitted by state law) enter into a contract with the students to abide by the ABA's

standards[.]"); *Hewett v. City of Grand Rapids*, No. 1:12-cv-998, 2012 WL 5409790, at *8 (W.D.

Mich. Oct. 15, 2012) ("The ABA Standards describe the requirements that a law school must

meet to obtain and retain ABA approval.  Neither the ABA nor the Higher Education Act . . .

creates a private right of action enforceable in federal court." (citing *Thomas M. Cooley Law*

*School v. Am. Bar Ass'n*, 459 F.3d, 708, 711 (6th Cir. 2006) & *Weller v. S. Illinois Univ.*, 125

F.3d 541 (7th Cir. 1997)).  The reasoning of these courts is persuasive.

Moreover, the plaintiff has not alleged that UDC Law School entered into any contract

with her promising to abide by ABA Standards.  Instead, she merely alleges that she somehow

acquired a "contractual right to an ABA-quality Law School with an ABA 512 Complaint

Process," FAC ¶ 104, because she has paid "ABA-level tuition," *id.* ¶ 103; *see also* Pl.'s Opp'n

at 36 ("Plaintiff had an implied contract with the University to provide an ABA-quality Law

School.").  UDC Law School owes the plaintiff no contractual duty to abide by ABA standards

merely because of its status as an ABA-accredited law school.

The plaintiff has also failed to allege sufficient facts to support her claim of fraudulent

misrepresentation.  The plaintiff alleges that "Defendant University promised Plaintiff an ABA

Law School with an ABA 512 Complaint Process as ordered by the ABA on August 8, 2011,"

and that she relied on this alleged misrepresentation to enroll at UDC Law School.  FAC ¶ 188.

The plaintiff could not have possibly have relied upon any representations about ABA Standard

512 in making her decision to attend UDC Law School, however, because according to her own

allegations, ABA Standard 512 was voted upon in August 2011, *id.* ¶ 97, when the plaintiff had

already made her decision to attend UDC Law School by July 2011, *see* Pl.'s Opp'n, Ex. 33

(UDC Law School Registration Instructions Letter, dated July 18, 2011) at 189, ECF No. 54-1.

Furthermore, the plaintiff admitted that she did not know about ABA Standard 512 until

February 2012, following her suspension.  FAC ¶ 95–96.

Accordingly, Counts 7, 8, 9 fail to state a claim and must be dismissed.

**F.     Count 10: Unreasonable Restrictions on Participant in School Integration Under the ADA and the Rehabilitation Act**

The plaintiff brings, in Count 10 of the her first amended complaint, a claim for

"unreasonable restrictions on participa[tion] in school integration," under 42 U.S.C. §§ 12182

(b)(1)(C) & (b)(1)(D)(ii) and 29 U.S.C. 701, *et seq.*  FAC Count 10.  The ADA provides that

"[n]o qualified individual with a disability shall, by reason of such disability, be excluded from

participation in or be denied the benefits of the services, programs or activities of a public

entity," and this applies to a public law school.  42 U.S.C. § 12132.  Similarly, the Rehabilitation

Act requires "qualified handicapped individuals [be provided] the meaningful access to which

they are entitled," recognizing that "reasonable accommodations in the [federal] grantee's

program or benefit may have to be made."  *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

Here, the plaintiff alleges she repeatedly requested the following accommodations: (1) "moving

the book lockers," (2) "turning a small, vacant and unused room . . . into a study carrel area for

ADA students by means of a card-reading pass key lock," and (3) "better seating assignments to

ease ABA students' entry and exit in law classrooms if they had mobility devices."  FAC ¶ 139.

UDC, however, allegedly failed to provide any of these "reasonable modifications" for her

"lifting disability."  Pl.'s Opp'n at 24.

The plaintiff fails to allege that she lacked meaningful access to UDC law school in the

absence of her requested accommodations.  To the contrary, despite UDC's denial of her

requests, the plaintiff boasts of excelling in school prior to her suspension, FAC ¶ 48 (describing

the plaintiff as "an excellent law student, earning A- and B- grades"), with no trouble accessing classrooms or libraries, *id.* ¶ 68 ("At 3:30 p.m. on February 9, 2012, Plaintiff walked with her Handicapped Cart to the Law Library . . . ."); ¶ 75 ("Plaintiff never once came late to class, but always at least 15 to 30 minutes early . . . .").

Furthermore, none of the plaintiff's requests relate to her access to law school facilities or benefits. The plaintiff was simply dissatisfied with the location of her book locker, which she received through a lottery. Pl.'s Opp'n at 5; FAC ¶ 139. The plaintiff also wanted a "study carrel area" for disabled students to store their books, despite access to lockers and study carrels presumably in the law library, where the plaintiff has professed no difficulty accessing. Pl.'s Opp'n at 9; FAC ¶ 139. Finally, the plaintiff requested "better seating assignments to ease ABA students' entry and exit in law classrooms if they had mobility devices," *id.*, even though she does not allege that she herself had any difficulty entering or exiting her assigned seat. The plaintiff alleges only that she used a "Handicapped Book Cart" to reach her seat in "the middle of many classes," and that she had to pass some students in the rows along the way, *id.* ¶ 75, a nuisance also faced by able-bodied students. Tellingly, the plaintiff revealed, in an email to the Dean of the Law School, that the plaintiff wanted better seating assignments because she "want[ed] to sit up closer," not for any mobility reasons. Pl.'s Opp'n Ex. 14 ("Email to Dean of the Law School Requesting Seating, dated Jan. 30, 2012") at 53, ECF 54-1. The plaintiff simply has not plausibly alleged that she was restricted in any way from participating or benefitting from her law school program.

Accordingly, the plaintiff has failed to state a claim in Count 10.

### G.    Count 11: Defamation

Finally, the plaintiff brings a defamation claim against UDC for releasing her transcript, including her suspension, to the Law School Data Assembly Service ("LSDAS").   Under D.C. law, to bring a defamation claim, the plaintiff must allege "'(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.'" *Armstrong v. Thompson*, 80 A.3d 177, 183 (D.C. 2013) (quoting *Blodgett v. Univ. Club*, 930 A.2d 210, 222 (D.C. 2007)).   Here, the plaintiff has not alleged that the defendant made a false statement.   The plaintiff herself acknowledges, as she must, that she has been suspended.   FAC ¶ 93.   The validity of her suspension is the subject of the instant lawsuit, but the fact that she was suspended from UDC Law School is indisputable.   Accordingly, the plaintiff cannot satisfy an essential element for her defamation claim, which must be dismissed.[16]

## IV.    Conclusion

For the foregoing reasons, the plaintiff has failed to state any claims upon which relief can be granted. Rather, the plaintiff's extensive factual allegations, together with the ample documentation she submitted, and drawing all reasonable inferences that may be drawn in her favor, has made clear that her "success on the merits is impossible."   *Peters v. District of*

---

[16]       The plaintiff attempts to raise a Title IX retaliation claim for the very first time in her opposition papers. Even a *pro se* plaintiff may not circumvent the procedural rule, in Federal Rule of Civil Procedure 15(a), for amendment of claims, to bring an entirely new cause of action for the first time in response to the defendant's motion to dismiss. *See Christopher v. Harbury*, 536 U.S. 403, 418 n.17 (2002) ("Whatever latitude is allowed by federal notice pleading, no one says [the plaintiff] should be allowed to construe 'adequate legal redress' to mean causes of action that were not even mentioned in her complaint."); *Budik v. Ashley*, 36 F. Supp. 3d 132, 144 (D.D.C. 2014) ("It is a well-established principle of law in this Circuit that a plaintiff may not amend her complaint by making new allegations in her opposition brief" (citing *Larson v. Northrop Corp.*, 21 F.3d 1164, 1173–74 (D.C. Cir. 1994))).

*Columbia*, 873 F. Supp. 2d 158, 167 (D.D.C. 2012).  Accordingly, the defendants' motion to dismiss, ECF No. 52, is GRANTED.

An Order consistent with this Memorandum Opinion will be issued contemporaneously.

DATE: February 1, 2016

_____
BERYL A. HOWELL
United States District Judge